**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
BETWEEN THE LINES PRODUCTIONS, LLC,

Civil Action No. 13-cv-8899[1]

Plaintiff,

-vs-

**DEMAND FOR**
**JURY TRIAL**

LIONS GATE ENTERTAINMENT CORP.,
SUMMIT ENTERTAINMENT, LLC

**ECF CASE**

Defendants.
------------------------------------------------------------------------X

**COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES**

**COMES NOW** the Plaintiff, BETWEEN THE LINES PRODUCTIONS, LLC, a

limited liability company organized under the laws of the State of California, by and through its

counsel, James H. Freeman, Esq. of JH FREEMAN LAW, 3 Columbus Circle, FL 15, New York,

New York 10019-8716, to state its claims as against Defendants LIONS GATE

ENTERTAINMENT CORP., a foreign corporate entity organized under the laws of Vancouver,

British Columbia (Canada) and publicly traded on the New York Stock Exchange [NYSE:

LGF], and SUMMIT ENTERTAINMENT, LLC, a limited liability company organized under

the laws of the State of Delaware (collectively referred to herein as the "Defendants").

---

[1] Upon filing this Complaint, Plaintiff's counsel certified that the parties and matters to be
adjudicated are related to Case No. 13-civ. 3584 (JSR) [closed] - Hon. Judge Jed S. Rakoff.

1

# JURISDICTION AND VENUE

## A.    SUBJECT MATTER JURISDICTION

1.    This action arises under the laws of the United States and all counts set forth herein may be entertained under the original jurisdiction of the Honorable Court pursuant to 28 U.S.C. § 1331 [federal question].

2.    The Court has original jurisdiction over <u>Count I</u> pursuant the DECLARATORY JUDGMENT ACT, 28 U.S.C. §§ 2201, 2202; 28 U.S.C. 1338(a); the COPYRIGHT ACT OF 1976, 15 U.S.C. §§ 101, et seq.; and the First Amendment to the U.S. Constitution (Amend. I).

3.    The Court has original jurisdiction over <u>Count II</u> pursuant to the DECLARATORY JUDGMENT ACT, 28 U.S.C. §§ 2201, 2202; 28 U.S.C. §§ 1338(a); and under the LANHAM (TRADEMARK) ACT OF 1946, 15 U.S.C. §§ 1051, 1065, 1119, 1125.

4.    Plaintiff respectfully requests that the Court exercise supplemental jurisdiction over Count III for *prima facie* tort which arises under New York common law.

## B.    PERSONAL JURISDICTION

5.    Defendant LIONS GATE ENTERTAINMENT CORPORATION ("LIONSGATE") is a publicly traded North American company listed on the New York Stock Exchange [NYSE: LGF] with corporate executive offices located within this Judicial District at 75 Rockefeller Plaza,  New York, NY 10019, 16th Floor.

6.    Defendant SUMMIT ENTERTAINMENT, LLC ("SUMMIT") is a wholly-owned subsidiary of LIONSGATE which transacts business within this Judicial District. The interstate trade and commerce involved were carried on, in part, within this District and the

2

unlawful acts described herein were performed or made effective within this Judicial District.

## C.    VENUE

7.    Venue is proper under 28 U.S.C. §§ 1391(b) and (c) in this case because Defendants LIONSGATE and SUMMIT routinely transact business in this Judicial District.

# PARTIES

## A.    PLAINTIFF

8.    Plaintiff BETWEEN THE LINES PRODUCTIONS LLC ("Plaintiff") is a limited liability company organized under the laws of the State of California.  The company has two members.

9.    Plaintiff is an independently-owned and operated entertainment company engaged in the business of developing and producing motion pictures for domestic and international distribution.

10.    Plaintiff is the copyright owner of a feature-length motion picture entitled *Twiharder,* Copyright Office Reg. No. PAu 3-635-415 [Ex. B (BTL_000056)]

11.    Following is a table consisting of the copyright registrations owned by Plaintiff.

| # | Title | Registration Date | Copyright Number | Content | Citation |
|---|-------|-------------------|------------------|---------|----------|
| 1 | *Twiharder* | 2010-06-21 | TXu 001700221 | Screenplay | Ex. B (BTL_000048-49) |
| 2 | *Twiharder* | 2012-04-09 | TXu 1-817-945 | Screenplay | Ex. B (BTL_000052) |
| 3 | *Twiharder* | 2012-4-11 | PAu 3-635-415 | Motion Picture | Ex. B (BTL_000056-57) |

B.  **DEFENDANTS**

12.  Defendant LIONSGATE ENTERTAINMENT CORPORATION ("LIONSGATE") is a foreign multimedia conglomerate with a U.S. presence in motion picture production and distribution, television programming and syndication, home entertainment, family entertainment, digital distribution, new channel platforms and international distribution and sales.

13.  LIONSGATE is a publicly traded company on the New York Stock Exchange

14.  On, January 13, 2012, LIONSGATE acquired and merged with co-Defendant SUMMIT ENTERTAINMENT, LLC., a limited liability company organized under the laws of the State of Delaware.

15.  Following is a table consisting of the copyright registrations which Defendants allege have been infringed by Plaintiff's copyrighted motion picture *Twiharder.*

|   | Work Title | Registration Date | Copyright Number | Nature of Work | Citation |
|---|---|---|---|---|---|
| *1* | *Twilight* | 2008-12-12 | PA 1-616-599 | Motion Picture | Ex. B (BTL_000060) |
| *2* | *The Twilight Saga: New Moon* | 2009-11-24 | PA 1-653-512 | Motion Picture | Ex. B (BTL_000064) |
| *3* | *The Twilight Saga: Eclipse* | 2010-07-2 | PA 1-689-175 | Motion Picture | Ex. B (BTL_000066) |

### *THE TWILIGHT SAGA*
### *MOVIE FRANCHISE*

**A.      BOOK**

17.      "*Twilight* is a series of four **vampire-themed fantasy romance novels** by American author Stephenie Meyer. [Ex. M (BTL_000669-670)]

18.      The wikipedia page for the *Twilight (series)* lists the genre of the *Twilight* books as **"romance, fantasy, young-adult fiction."** [Ex. M (BTL_000669)]

19.      "*The Twilight Saga* is a series of five **romance fantasy films**." [Ex. X (BTL_001345)]

**B.      MOVIES**

**(1)      TWILIGHT (2008)**

20.      On November 21, 2008, Defendant SUMMIT released the first installment of *The Twilight Saga* movies entitled "*Twilight*," a teen fantasy romance about vampires who attend U.S. high school based on the best-selling book of the same name by Stephenie Meyer. [Ex. E (BTL_000264)]

**(2)      THE TWILIGHT SAGA: NEW MOON (2009)**

21.      On November 20, 2009, Defendants released the second installment entitled *The Twilight Saga: New Moon*, also based on the popular novel by Stephenie Meyer, breaking box office records in its first weekend, grossing $142,839,137 in three days and posting the fourth all-time best weekend box office figure.  [Ex. E (BTL_000264)]

**(3)      THE TWILIGHT SAGA: ECLIPSE (2010)**

22.      On June 30, 2010, Defendants released the third installment of the *Twilight* series entitled *The Twilight Saga: Eclipse.* [Ex. E (BTL_000264)]

**(4)    THE TWILIGHT SAGA: BREAKING DAWN PART 1 (2011)**

23.    On November 18, 2011, Defendants released the <u>fourth</u> installment of the *Twilight* series entitled *The Twilight Saga: Breaking Dawn Part 1,* which earned a total of $281.3 million domestically and $712.2 million worldwide.  [Ex. H (BTL_000369-370)]

**(5)    THE TWILIGHT SAGA: BREAKING DAWN PART 2 (2012)**

24.    On November 16, 2012, Defendants released the <u>fifth</u> and purportedly final installment of the *Twilight* series entitled *The Twilight Saga: Breaking Dawn Part Two,* which earned a total of $292.3 million domestically and $829.7 million worldwide. [Ex. H (BTL_000369-370)]

**C.    "TWIHARD" FANATICS**

**(1)    DIEHARD FANS OF *THE TWILIGHT SAGA***

25.    With the box-office success of the first *The Twilight Saga* movie in November 2008, an intensely dedicated and loyal fan base was highlighted by media.

26.    The most enthusiastic fans of *The Twilight Saga* movie series became known through the some media outlets as "Twihards,"

27.    "Twihard" is an invented word used to describe "diehard fans of 'Twilight'" [Ex. O (BTL_000757)].

28.    According to the Urban Dictionary the definition of "Twihard" is: "Stupid obsessive people (mostly teenage girls) who are in love with fictional characters and wouldn't know a good book if it punched them in the face." [Ex. O (BTL_000774)][2]

29.    Twihards are said to be "overwhelmingly female" [Ex. O (BTL_000762)] and to "include young adults and mothers of teens captivated by the supernatural romance."  [Ex. O (BTL_000750)].

---

[2] <u>See</u> http://www.urbandictionary.com /define.php?term=Twihard

30.     Twihards have been described by the press as "Vampire groupies" [Ex. O (BTL_000737)] and as "ardent fans" who turn out "en masse for midnight screenings of *Twilight*"

31.     Twihards "will spend the winter nitpicking over details in their new fave movie. The test of any cult hit is whether it can pull in viewers beyond hard-core fans." [Ex. O (BTL_000754)].

**(2)     STEPHENIE MEYER'S PUBLIC CONTEMPT FOR THE WORD "TWIHARD"**

32.     The term "Twihard" is ordinarily viewed as a derogatory word.

33.     Twihards have "a passion for Stephenie Meyer's supernatural book."  [Ex. O (BTL_000740-741)].

34.     Stephenie Meyer, author of *The Twilight Saga* books, has publicly disapproved of the official moniker of her fan base: **"I don't really like 'Twi-Hard.' It sounds awful."**  [Ex. O (BTL_000774)]

**D.     CONTROVERSIAL VIEWPOINTS**

**(1)     POLARIZING OPINIONS**

35.     At the height of its market popularity, *The Twilight Saga* movie franchise was a pop-culture media driven "event" that strongly polarized public opinion.

36.     Due to the polarizing viewpoints concerning *The Twilight Saga,* as both a film series and a popular culture phenomenon, the controversial subject matter explored by the films, *The Twilight Saga* has been a constant target for parodists since its debut it movie theaters.

**(2)     TARGETING YOUNG CHILDREN w/ MATURE ADULT THEMES**

37.     *The Twilight Saga* books and movies are heavily marketed by Defendants to young teenagers and pre-teen children.

38.     Despite the youthful nature of the Defendants' target market, *The Twilight Saga* books and movies deal with a variety of serious and mature, adult themes including domestic violence, teen pregnancy, drug addiction, date rape, teen infatuation, race-based social hierarchy, revenge, murder, torture and death.

39.     Defendants have described the aforementioned material depicted in *The Twilight Saga* films as "essential, intrinsic and well-known [for its] wholesomeness." [Ex. A (BTL_000034)]

**(3)   DOMESTIC VIOLENCE**

40.     *The Twilight Saga* has been widely criticized by female activists as "promoting, normalizing and idealizing an emotionally and physically abusive relationship" that is highly demeaning to women.

41.     The Parents Television Council have warned parents that the relationships depicted in *The Twilight Saga* films reportedly meet "all fifteen criteria set by the National Domestic Violence Hotline for being an abusive relationship." [Ex. M (BTL_000680)]

**(4)   RACIAL STEREOTYPES**

42.     Civil rights activists and scholars have criticized The *Twilight Saga* for perpetuating one-dimensional stereotypes about Native Americans and indigenous culture through the depiction of the character Jacob Black as a "noble savage," "bloodthirsty warrior" and "sexual predator."

43.     There is heavy emphasis throughout Defendants' films on socio-political hierarchy and economic power based on the color of skin rather than the content of his or her character or accomplishments. [Ex. R (BTL_001052-1056)]

**(5)   SEXUAL INFATUATION**

44.   The main plot of *The Twilight Saga* centers around the lustful and eventual sexual relationship between a seventeen-year-old girl, Bella Swan, and a male character, Edward Cullen, who is nearly 100 years her senior.

45.   Despite *The Twilight Saga*'s purported underlying message that promotes sexual abstinence before marriage, the irony is that the main thrust of the motion picture's visual appeal is decidedly sexual in nature, such that the main romantic leads spend an inordinate amount of time in extremely close physical proximity looking as if they are about to engage in sexual relations; only to then show restraint in the final moment when lust is ready to overtake them.

**(6)   GRATUITOUS VIOLENCE**

46.   The final epic battle in the *Twilight Saga: Breaking Dawn Part 2* depicts over a dozen teenage actors being brutally decapitated and having their headless bodies set ablaze.

## DEFENDANTS' SELF-AUTHORIZED SPOOFS
## OF *THE TWILIGHT SAGA* MOVIES

### A.   VAMPIRE SUCKS (2010)

### (1)   AUTHORIZATION & PRODUCTION

47.    *Vampires Sucks* is the title of a feature-length artistic parody of the first two installments of *The Twilight Saga* movie franchise.

48.    Upon information and belief, Defendant SUMMIT conveyed a license to production company Regency Enterprises granting authorization to use Defendants' *Twilight Saga*-related copyrights and trademarks in connection with the production of *Vampire Sucks*.

49.    Upon information and belief, Defendant SUMMIT conveyed a license to 20th Century Fox granting Regency Enterprises authorization to use Defendants' copyrights and trademarks in connection with the distribution *Vampire Sucks*.

50.    Upon information and belief, Defendants have and continues to receive valuable consideration (e.g., royalties, licensing fees, dividends) as a result of the international distribution of *Vampire Sucks*.

51.    Upon information and belief, Defendants have earned and/or received and valuable consideration (e.g., royalties, licensing fees, dividends, bonuses, etc.) as a result of revenues generated from the worldwide distribution, licensing and sale of the feature-length motion picture *Vampire Sucks*.

### (2)   WIDE THEATRICAL RELEASE

52.    On August 18, 2010, about two (2) months after the release of the third *The Twilight Saga* installment, 20th Century FOX theatrically released *Vampires Sucks* in the United States. The theatrical release of the film *Vampires Sucks was* rated PG-13.

(3)    MARKETING OF *VAMPIRE SUCKS* AS "PARODY" AND "SPOOF" OF *THE TWILIGHT SAGA*

53.    On BoxOfficeMojo.com, the film *Vampires Sucks* is categorized in the genre of "Comedy-Spoof," "Horror Comedy" and/or "Vampire"

54.    Upon *Vampire Sucks'* theatrical release in the U.S., major media outlets repeatedly noted that *Vampire Sucks* was a feature-length motion picture "parody" or "spoof" of *The Twilight Saga* movie franchise.

55.    BOSTON HERALD reported that *Vampire Sucks* is "essentially a **straightforward mash-up of the first two 'Twilight' films."** [Ex. I (BTL_000418]

56.    CHICAGO TRIBUNE [described *Vampire Sucks* as **"[t]he parody of the first two *Twilight* movies** [and as] the usual mixed bag of hits and misses, but with more hits than expected. For those who can't get enough of photogenic teen vampires and werewolves, consider this another helping, albeit basted in mockery." Ex. I (BTL_000421]

57.    LOS ANGELES TIMES reported that *Vampire Sucks was* "**a lightly regarded spoof** of the movies on novelist Stephenie Meyer's blockbuster *Twilight* series." [Ex. I (BTL_000423)]

58.    On August 18, 2010, the WASHINGTON POST reviewed *Vampire Sucks* stating that it involved the same writer-directors: "that have participated in an ongoing parade of **movie-genre parodies,** including *Scary Movie, Date Movie* and *Meet the Spartans* and [who] have set their comedic crosshairs on the most obvious of targets: the hugely successful film franchise based on the equally successful novels by Stephenie Meyer.  [Ex. I (BTL_000398-99)].

(4)    AN "EXACT REPLICA" OF "ONE FILM SERIES"

59.    As a feature-length parody, *Vampire Sucks* targets *The Twilight Saga* franchise as the object of its ridicule.

60.     *Vampire Sucks* exhibits a virtual *scene-by-scene* re-enactment of the first two *The Twilight Saga* films, utilizing separate actors to lampoon the original works.

61.     As reported by the St. Fresno Bee at the time of the film's theatrical release, *Vampire Sucks* represents:

> **"a dead-on send-up of the *Twilight* films** . . . **The parody works because the pair [Friedberg-Seltzer] have created an almost exact replica of the [Twilight Saga] films from setting to actors** . . . [Ex. I (BTL_000406)]

62.     On August 18, 2010, the Washington Post reviewed *Vampire Sucks* stating that the film was predominately based on the first two installments of The Twilight Saga movie franchise.

> The plot, for lack of a better word, is based on **a pastiche of moments from the first two Twilight films: *Twilight* and *The Twilight Saga: New Moon*."** [Ex. I (BTL_000398-99)]

63.     According to the St. Petersburg Times' review of *Vampire Sucks,* the film enjoyed the advantage of targeting "one pop culture target" rather than "multiple movies":

> **The only surprise is that Meyer didn't receive a co-writing credit for setting up the punch lines** … It helps that Friedberg and Seltzer stick with **one pop culture target** this time, unlike earlier spoofs so thinly spread among multiple movies…" [Ex. I (BTL_000403)]

64.     Rafer Guzman of Newsday described *Vampire Sucks* as "a spoof of the *Twilight* franchise," and queried "How do you spoof a self-parody?"  Guzman reported as follows:

> **Granted, the *Twilight* films are difficult to love. For starters, they feel like soulless marketing ploys** (though millions of preteen girls might beg to differ) . . . **[with *Vampires Suck*] we're limited to one film series.**" [Ex. I (BTL_000412)]

65.     The Houston Chronicle:

> ***Vampire Sucks* manages not a single memorable joke at the expense of the easiest target in the world: Stephenie Meyer fans.** [Ex. I (BTL_000412)]

B.     *BREAKING WIND* (2012)

(1)     INDEPENDENT PRODUCTION

66.     *Breaking Wind* is a feature-length comedic spoof of *The Twilight Saga: Eclipse,* which is the third installment of *The Twilight Saga* series. [Ex. J (BTL_000448-449; 458)]

67.     Like the motion picture *Vampire Sucks, Breaking Wind* predominantly targets *The Twilight Saga* series alone as the object of parody (as opposed to referencing multiple films).

68.     Breaking Wind largely "tracks" the scenes in *The Twilight Saga: Eclipse* and portrays caricatures of the various roles depicted in the franchise's third installment.

(2)     MARKETING *BREAKING WIND* AS "SPOOF" OF *THE TWILIGHT SAGA*

69.     Like *Vampire Sucks, Breaking Wind* was marketed and distributed to the public as a feature-length film parody and "spoof" of *The Twilight Saga* movie franchise.

70.     Movieweb.com describes *Breaking Wind* as "a comedic spoof based on the worldwide phenomenon, *The Twilight Saga."* [Ex. J (BTL_000474).

71.     Users at Amazon.com have described *Breaking Wind* as "**a dirty spoof of those sparkly glampire movies**," and "a nice F-U to the makers of Twilight and the over-obsessed psycho fans of it all." [Ex. J (BTL_000455]

72.     Defendant LIONSGATE provided the following synopsis of its film *Breaking Wind,* which appears on Amazon.com and the Apple iTunes store.

> From the director who brought you *The 41 Year Old Virgin Who Knocked Up Sarah Marshall And Felt Super Bad About It* comes the new **wildly funny spoof** of the latest films from the TWILIGHT SAGA: NEW MOON and ECLIPSE. **Raunchy hilarity** ensures when Bella's life becomes threatened by the vengeful Victoria and her gang of blood sucking newborns and Edward and Jacob must put aside their differences in order to save her life. [Ex. J (BTL_000447)]

**(3)    THEATRICAL DISTRIBUTION**

73.    On January 13, 2012, about two months after the theatrical release of the fourth installment in *The Twilight Saga* movie series, Defendants released their own feature-length, R-Rated comedic spoof of *The Twilight Saga* movie franchise entitled *Breaking Wind*.  [Ex. J. (BTL_000440)]

74.    *Breaking Wind* was <u>not</u> theatrically released in the domestic market.

75.    Between January 12, 2012 and March 22, 2012, *Breaking Wind* was theatrically released in foreign markets, including Brazil, Italy, Philippines and Singapore, reportedly earning $1,408,604 at the foreign box office.  [Ex. J (BTL_000481-484)]

**(4)    HOME VIDEO MARKET**

76.    On March 27, 2012, *Breaking Wind* was released direct to the home video market in the United States by LIONSGATE's Home Entertainment division, via a subsidiary of LIONSGATE called GRINDSTONE ENTERTAINMENT.  [Ex. J. (BTL_000440; 478)]

77.    The uncut version of the motion picture *Breaking Wind* is available for digital download at the Apple  iTunes Store  for either "Buy" ($14.99) or "Rent" ($3.99).

78.    The movie *Breaking Wind* is available in packaged DVD media format at Walmart.com, which features a widescreen version and an unrated director's cut.  [Ex. J (BTL_000490)]

**(5)    UNCENSORED / X-RATED / NC-17 VERSION (UNITED STATES)**

79.    The international theatrical release of *Breaking Wind* was purportedly Rated R.

80.     The only version of the motion picture to be released to U.S. audiences is labeled as "Director's Cut / Uncensored," implying that the movie is not suitable for even an R-Rated audience.

81.     A cursory viewing of Defendants' U.S. version of *Breaking Wind* reveals that the movie embodies X-Rated or NC-17-rated material.

## *TWIHARDER:*
## PLAINTIFF'S COMEDIC SPOOF

### A.     PRODUCTION

### (1)     A GENUINE PARODY [JANUARY 2010]

82.     In the wake of the record-breaking box office success of the second installment of the series, *The Twilight Saga: New Moon* in November 2009, John Gearries was amused to discover that his girlfriend's young daughter had became one of the legion of obsessed *The Twilight Saga* fans.  .

83.     In or about January 2010, Gearries and his acting colleague Christopher Sean decided to produce a zany, *feature length* motion picture spoof of *The Twilight Saga* movies, which at that time included only two movies: *Twilight* and *The Twilight Saga: New Moon.*

84.     Plaintiff's decision to write and produce a feature film parody of *The Twilight Saga* was made almost eight (8) months <u>before</u> the theatrical release of *Vampire Sucks* in August 2010; and was made a two full years before Defendant's theatrical release of *Breaking Wind* in January 2012.

### (2)     INDEPENDENT FILM PRODUCTION OF "TWIHARDER" [FEBRUARY-MAY 2010]

85.     On February 1, 2010, Christopher Sean, acting on behalf of Plaintiff, e-mailed eleven (11) original audio-visual works, tentatively entitled *TWILIGHT SPOOF: Between the Lines* with the SCREEN ACTORS GUILD ("SAG").  [Ex. Q (BTL_000982)]

86.     On February 2, 2010, SAG requested additional information about the TWILIGHT SPOOF project before transmitting a copy of the SCREEN ACTORS GUILD New

Media Agreement. [Ex. Q (BTL_000983)]

87.     From April 16, 2010 through May 16, 2010, Plaintiff filmed its original, full length *TwiHarder* motion picture on location at various sites throughout the Los Angeles, California area.  Actual filming of *Twiharder* was scheduled on thirteen (13) distinct dates over the course of one month where the cast and crew worked anywhere from 8-15 hours per shooting date. [Ex. Q (BTL_000987)]

**B.     KEY "TWIHARDER ASSETS"**

88.     The term "TWIHARDER ASSETS" shall be used in the Complaint to refer to the divisible assets that Plaintiff has used and continues to use in commerce for the purposes of (a) marketing the entertainment and production services of Plaintiff's business; and (b) build awareness for its copyrighted motion picture *Twiharder.*

89.     The term "TWIHARDER ASSETS" shall be used to <u>collectively</u> refer to:

(i)     *Twiharder* as the descriptive title of a single creative work (the "TWIHARDER Single Title Work or TWIHARDER Movie Title"); and

(ii)    the domain name <u>www.Twiharder.com</u> (the <TWIHARDER> Domain Name); <u>and</u>

(iii)   the stylized font (or logo) used in connection with the motion picture (the "*TWIHARDER"* Title Logo); and



BTL_000363

(iv)    Movie Poster / DVD Cover ("One Sheet"); as depicted below.



**C.     INITIAL USE IN COMMERCE OF *TWIHARDER* MOVIE TITLE**

**(1)     MOVIE TITLE *TWIHARDER* AS A PARODICAL DEVICE**

90.    The parodical nature of the movie title *Twiharder* serves to defeat any claim by Defendants that Plaintiff's use of the single work title is confusingly similar to any of the titles released in connection with Defendants' *The Twilight Saga* franchise.

**(2)     PUBLIC REGISTRATION OF *TWIHARDER* MOVIE TITLE [APRIL 11-12, 2010]**

91.    On April 11, 2010, Plaintiff notified SAG that the title of its production would be "*Twiharder*." [Ex. Q (BTL_000985)]

17

92.     On April 12, 2010, Plaintiff registered the domain name www.Twiharder.com via GoDaddy.  [Ex. D (BTL_000297)]

**D.     INITIAL PUBLICATION OF PLAINTIFF'S AUDIOVISUAL WORKS**

**(1)     PLAINTIFFS' "YOU ARE READY" TRAILER  [JULY 4, 2010]**

93.     On or before July 4, 2010, Plaintiff registered an on-line profile at the video-sharing site www.Vimeo.com using the name of its legal corporate identity "Between the Lines Productions, LLC" (the "BTL Vimeo Site").  [Ex. BB_BTL_001780-87]

94.     The BTL Vimeo Site is published on-line at www.vimeo.com/betweenlines. [Ex. BB_BTL_001780-87]

95.     On July 4, 2010, Plaintiff posted its first audio-visual clip to the BTL Vimeo Site, entitled "You are Ready," which contained a trailer of audio-visual content that would eventually be incorporated into the final edited version of the feature-length film *Twiharder.* [Ex. BB_BTL_001781-83]

**(2)     PLAINTIFF'S "I'M SO SEXY" MUSIC VIDEO [JULY 11, 2010]**

96.     On July 11, 2010, Plaintiff posted its second audio-visual clip to the BTL Vimeo Site, entitled "I'm So Sexy," which contained an original music video featuring audio-visual content that was not incorporated into the final edited version of the feature-length film *Twiharder.*  [Ex. BB_BTL_001784]

**(3)     PLAINTIFF'S "GREATEST LOVE STORY" TRAILER [AUG. 4, 2010]**

97.     On August 4, 2010, Plaintiff posted its third audio-visual clip to the BTL Vimeo Site, entitled "The Greatest Love Story," which contained a trailer of audio-visual content that would eventually be incorporated into the final edited version of the feature-length film *Twiharder*  [Ex. BB_BTL_001785-86]

**E.     INITIAL USE IN COMMERCE OF PLAINTIFF's LOGO & TRADE DRESS**

98.     On July 4, 2010, Plaintiff posted the "Twiharder" Logo / Icon Mark," which is the identical logo used in the final edited version of the feature-length motion picture.  [Ex. BB_BTL_001783]

99.     On August 4, 2010, as part of "The Greatest Love Story," Plaintiff posted the "One Sheet" (i.e., movie poster), which is the identical One Sheet used to market the final edited version of Plaintiff's feature-length motion picture *Twiharder.*  [Ex. BB_BTL_001785]

**F.     *<TWIHARDER>* WEBSITE**

**(1)     INITIAL DOMAIN REGISTRATION**

100.     On April 12, 2010, Plaintiff registered the domain name www.twiharder.com via GoDaddy.  [Ex. D (BTL_000297)]

101.     Plaintiff continues to maintains a website at www.twiharder.com to serve as promotion for Plaintiff's film.  [Ex. F (BTL_000348-349)]

**(2)     WEBSITE PRESENCE**

102.     As described by Plaintiff on their movie page at www.twiharder.com:  Plaintiff's promotional materials and trade dress are entirely consistent with *Twiharder's* transparent intent to market a comedic spoof *The Twilight Saga.*  [Ex. F [(BTL 000320-363)]

> **If you are an intense fan of the *Twilight Saga*, then you have nothing in common with the creators of "TWIHARDER"!**

# DEFENDANTS' OBJECTIVELY
# BASELESS C&D CAMPAIGN

## A.    "TWIHARDER" vs. "TWIHARD"

103.   On November 22, 2011, Plaintiff's former trademark attorney e-mailed Defendants' IP Enforcement Counsel.  [EX. EE (BTL_001813)]

> My name is Amy Wright, and I represent Between the Lines Productions, LLC, the owner of US trademark Application Serial No. 85357228 for the mark TWIHARDER in connection with **"entertainment in the nature of a series of short films and feature films."**
>
> I note that you are the attorney of record on the TWIHARD trademark application No. 85128736 in connection with a variety of apparel items. **Your client's TWIHARD application was recently cited against my client's application to register TWIHARDER in the United States Trademark Office**.
>
> Significantly, **please note that my client has been using its TWIHARDER trademark since at least as early as April, 2010, about 5 months prior to the date your client's ITU application was filed**. As such, our client may be in a position to petition to cancel your client's future TWIHARD registration based on its seniority. We would however simply like to obtain a consent to register our US trademark Application Serial No. 85357228 for the mark TWIHARDER.

104.   On December 14, 2011, Defendants' IP Enforcement Counsel returned Plaintiff's e-mail.  [Ex. EE (BTL_001812)]

> We have reviewed your correspondence of November 22, 2011 and discussed the same with our client, Summit Entertainment, LLC ("Summit"), the producer of the Twilight series of movies…
>
> As set forth in the [USPTO] office action refusing registration of your client's TWIHARDER application, the TWIHARDER mark is likely to be confused with Summit's prior application to register TWIHARD. You essentially admit as much in your November 22 email, and a review of your client's application to register TWIHARDER and <www.twiharder.com> website confirms the same, namely, that the TWIHARDER mark is derived from the TWIHARD mark and the Twilight Motion Pictures.
>
> Consequently, **Summit demands your client's immediate abandonment of its TWIHARDER application and agreement not to seek registration of the same or a similar mark in the future**. If, in fact, your client does not abandon its TWIHARDER application and the application is eventually published for opposition, Summit will oppose your client's application on

the grounds that it is likely to cause confusion with and dilution of its TWILIGHT and TWIHARD marks, and draws a false suggestion of a connection or association with the Twilight Motion Pictures. Likewise, Summit will file counterclaims as applicable in the event your client seeks cancellation of Summit's eventual TWIHARD registration.

Finally, **Summit reserves all of it rights and remedies related to your client's unauthorized use of the TWIHARDER mark in commerce and registration of the <www.twiharder.com> domain name.**

105.   On the very same day that Defendants' IP Enforcement Counsel returned Plaintiff's e-mail, December 14, 2011, Defendants petitioned the USPTO to divide its TWIHARD application into two separate and divisible marks.  [Ex. EE (BTL_001816-1820)]

## B.   DEFENDANTS' INTERFERENCE WITH WORLDWIDE DISTRIBUTION

## (1)   ALL-OUT ATTACK [JUNE 2012]

106.   On June 11, 2012, VARIETY magazine published an article entitled "*Twiharder eyes distribution*" which reported that Plaintiff was seeking distribution of Twiharder, which is described as a "spoof on the Twilight franchise," and a "full-fledged indie feature" budgeted at $300,000 that was being positioned in the market to "capitalize on the release of Twilight Saga" Breaking Dawn Part 2" on November 16, 2012.  [Ex. D (BTL_000226-232)]

107.   On June 13, 2012, Defendants requested a second extension with the USPTO to file a Statement of Intended use for its TWIHARD '325 mark, which had yet to be used in actual commerce.  [Ex. EE (BTL_1849)]

108.   Upon information and belief, Defendants came to learn in mid-June 2012 that Plaintiff had secured a lucrative, worldwide distribution licensing deal with Warner Brothers Digital Distribution, via its relationship with Gravitas Ventures.

109.   On June 27, 2012, Defendants transmitted a sham "cease-and-desist" letter to Plaintiff alleging that Plaintiff's feature film *Twiharder* and the TWIHARDER ASSETS constituted "trademark infringement, copyright infringement, false designation of origin, and

dilution of [Defendant] Summit's intellectual property derived from the *Twilight* motion pictures." (the "6/27/12 C&D Notice") [Ex. A (BTL_000004-7)]

110.    In the 6/27/12 C&D Notice, Defendants anticipated the Plaintiff's "Fair Use" defense and dismissed it in conclusory fashion:

> Notably, Between the Lines Productions' attempt to characterize the Movie as a parody does not immunize Between the Lines Productions from liability. The Movie has created and will continue to create consumer confusion and dilution under the trademark laws and is substantially similar under the Copyright Act. **The Movie likewise will not qualify as fair use under the trademark or copyright laws.** Between the Lines Productions has appropriated substantial elements from the Twilight Motion Pictures for a commercial purpose. **There is nothing "fair" about the use. Rather, the Movie is a wholesale exploitation of Summit's valuable intellectual property rights in the Twilight Motion Pictures**. [Ex. A (BTL_000006-7)] (emphasis added)

111.    Defendants demanded nothing less than the complete destruction of Plaintiff's business and the forfeiture of all of its valuable assets.  Not a single one of Defendants' claims or demands as stated in the 6/27/12 C&D Notice were subject to compromise or good faith negotiation.  [Ex. A (BTL_000006-7)]

112.    Defendants' C&D Campaign continued from December 2011 through May 2013 – a full 18 months – before Plaintiff was ultimately able to find litigation counsel.

**(2)    PROHIBITED DERIVATIVE LICENSING ACTIVITY**

113.    Defendants have continuously maintained *that Twiharder* is NOT a parody.

114.    On April 18, 2013, however, Defendants conceded in writing that *Twiharder* was, in fact, a parody of THE TWILIGHT SAGA movies.  Defendants argued that Plaintiff could nonetheless be held liable for copyright infringement because Plaintiff intended to distribute its motion picture into the identical "derivative" market already occupied by its own feature-length parody *Breaking Wind.*

**"Between the Lines Productions is trying, without authorization,**

to enter a market already occupied by an authorized derivative
work [*Breaking Wind*] of the *Twilight* films.   [See Ex. (A
(BTL_000043)]

**(3)   VEXATIOUS CLAIMS OF "WHOLESALE COPYING"**

115.   On June 27, 2012, Defendants concluded that, based on their review of the three-

minute movie trailer displayed on Plaintiff's Website:

> "[Twiharder] is a **wholesale exploitation** of Summit's valuable
> intellectual property rights in the *Twilight* Motion Pictures." [Ex. A
> (BTL_00005)]

> "Between the Lines Productions has also **copied the key elements of
> the scripts** of the copyrighted Twilight Motion Pictures **and the**
> Twilight **Motion Pictures themselves.**" [Ex. A (BTL_00005)]

116.   Even though, by Defendants' own admission, Defendants had only viewed a

trailer, Defendants somehow concluded on June 27, 2012 that:

> the entire [Twiharder] Movie is just a condensed version of the
> *Twilight* **Motion Pictures**." [Ex. A (BTL_00005)]

117.   On July 24, 2012, Defendants reiterated their untenable position that Plaintiff's

work was attempting to copy Defendants' "entire work."

> "Between the Lines Productions was not just "inspired" by the
> Twilight Motion Pictures, as you assert. **Between the Lines**
> **Productions copied the entire storyline, characters, look and feel**
> **of the Twilight Motion Pictures, notably, New Moon**. As such,
> Between the Lines Productions' actions cannot be shielded by an
> excuse of parody". [Ex. A_BTL_00020]

> "the Movie appears to be merely a bad imitation of the Twilight
> Motion Pictures." [Ex. A_BTL_00020]

**(4)   FAILURE TO ASCRIBE ANY WEIGHT TO POTENTIAL MARKET DISPLACEMENT**

118.   U.S. Courts presume that parodies do NOT compete in the same market as the

original works they are parodying.  Campbell v. Acuff-Rose Music, 510 U.S. 569, 591 (1994):

> Indeed, as to parody pure and simple, it is more likely that the new

23

work will not affect the market for the original in a way cognizable under this factor, that is, by acting as a substitute for it.  This is so because **the parody and the original usually serve different market functions.**

119.    Despite the fact that Defendants repeatedly cite the U.S. Supreme Court's holding in <u>Acuff-Rose</u> throughout its C&D campaign against Plaintiff, Defendants arbitrarily reject Plaintiff's application of <u>Acuff-Rose</u> to the facts at bar with respect to market displacement:

> You [Plaintiff] state that there is no market harm because the [Twiharder] Movie is not a substitute for the Twilight Motion Pictures because it serves a different market purpose. Your conclusory statement bears no weight.

120.    Defendants avoid analyzing the crucial factor of market displacement in their "Fair Use" discussion and instead accuse Plaintiff of "free-riding"

> what the evidence does show is that the Movie is trying to launch this fall, approximately the same time frame as the launch of Summit's *Breaking Dawn - Part 2*, the final installment in the Twilight Motion Pictures, **indubitably to ride on the coattails of Summit's advertising and promotion of its film** . . .Thus, you cannot seriously contend that the Movie will not have any effect on the market for the Twilight Motion Pictures. [Ex. A_BTL_00020]

121.    The amount of money earned by Plaintiff through marketing of its own copyrighted work has no bearing on the "Fair Use" factor of market displacement, which is concerned with the potential loss of income to Defendants through exploitation of the ownership interest - as opposed to the gains realized by Plaintiff that do not cause detriment to Defendants' interests.

122.    In the C&D campaign, Defendants asserted three (3) separate copyrighted works (*Twilight, The Twilight Saga: New Moon; The Twilight Saga: Eclipse*) against Plaintiff's motion picture *Twiharder* without explaining how Plaintiff's low budget comedic spoof would function in the market to impair Defendants' rights to exploit its "A Market" copyright portfolio.

123.   Defendants NEVER once alleged that the introduction of *Twiharder* into the distribution chain would cause *any* market displacement of *The Twilight Saga: Breaking Dawn – Part 2*.  Defendants' entire C&D campaign against Plaintiff was a façade orchestrated to protect revenue streams accruing to Defendants from their *non-exclusive* license holdings in self- authorized parodies, *Breaking Wind* and *Vampire Sucks*.

**(5)    DEMAND FOR FORFEITURE OF PLAINTIFF'S ASSETS WITHOUT ANY COMPROMISE**

124.   At all relevant times, Defendants' sole intent was to categorically shut down Plaintiff's *entire business* and permanently exclude the motion picture *Twiharder* from entering the WMPI market in any manner.

125.   On June 27, 2012, Defendants threatened to sue Plaintiff.

> **Summit takes the protection of its intellectual property very seriously and is prepared to litigate to enforce its rights.**

126.   Defendants warned Plaintiff that Court action would be taken unless Plaintiff capitulated to:

> (1) immediately cease and desist from presenting, marketing, and otherwise promoting the Movie, including on Facebook, Vimeo, YouTube.com, etc. or seeking distribution of the Movie;
>
> (2) turn over all works of authorship associated with the Movie, including all original and duplicate recordings or portions thereto;
>
> (3) turn over all marketing and promotional materials bearing the TWIHARDER trademark to Summit;
>
> (4) transfer ownership of the domain name <twiharder.com> to Summit;
>
> (5) provide us with an accounting of all donations made to Between the Lines Productions and disgorge such donations;
>
> (6) stop all manufacturing, marketing, selling and distribution of the Infringing Goods and all variations confusingly similar thereto;

(7) agree not to manufacture, market, sell or distribute the Infringing Goods or provide any Infringing Services in the future, or otherwise use the TWIHARDER trademark or any other marks, logos, designs, or the like confusingly similar thereto;

(8) recall the Infringing Goods from other retail stores, warehouses, and the like, and deliver all remaining inventory to us;

(9) notify all such retailers that the Infringing Goods have been recalled and are not to be stocked and/or sold, and notify all members of the Twiharder fan club that the fan club has been terminated;

(10) disgorge Between the Lines Productions' profits earned from the sale of the Infringing Goods; and

(11) provide us with an accounting of the sales made to date.

127.    On July 24, 2012, Defendants unconditionally rejected every argument made by Plaintiffs' "Fair Use" counsel and found Plaintiff's concessions to be "unacceptable." [Ex. A_(BTL-000019)]

> The arguments raised in your letter are unpersuasive for the reasons set forth below, and Between the Lines Productions' settlement offer to merely (i) add a disclaimer to its website at www.twiharder.com and DVDs and (ii) modify the written content on the website is unacceptable.

128.    On July 24, 2012, Defendants failed to make any offer of compromise. Instead, Defendants reiterated their demand for complete destruction of Plaintiff's assets. [Ex. A_(BTL-000019)]

129.    On October 3, 2012, Plaintiff, who was under pressure to release film, agreed to change the movie title *Twiharder,* surrender its domain name graphically alter its movie logo [Ex. A (BTL_000025]. But it didn't matter. Defendants refused to compromise:

> We reiterate the requests made in our June 27, 2012 letter to Between the Lines Productions and notify you that **Summit will have no choice but to bring suit if Between the Lines Productions does not agree to each request.**

130.    On October 30, 2012, Defendants responded to Plaintiff's "additional concessions" as follows:  [Ex. A_(BTL-000028)]

> **Summit is unable to enter into any settlement that would release claims against Between the Lines Productions without even knowing the scope of the claims that it is releasing**. Therefore, we again request all information and documents identified in our June 27, 2012 and July 24, 2012 letters, most notably, a true and correct copy of the Twiharder motion picture film for Summit's review

131.    On January 15, 2013, Defendants proclaimed that they "cannot agree to settlement of this dispute"; by that point, Defendants had never once itself issued a single offer of compromise – not one.

132.    Defendants consistently delayed their responses to Plaintiff's concessions and then issued one-sided written proclamations that conclusively rejected Plaintiff's proposed terms without any offer to compromise or engage in good faith negotiation.   [Ex. A_(BTL-000033)]

> Our viewing only serves to confirm that the *Twiharder* film commits wholesale trademark and copyright infringement of the trademark TWIHARDER and other intellectual property owned by Summit. **Summit cannot agree to settlement of this dispute short of Between the Lines Productions' agreement to stop all display and efforts to distribute the Twiharder film,** including any use on any websites or solicitations for sale or distribution.

**(6)    LEVERAGING MS. MEYER'S RELIGION AS FALSE JUSTIFICATION TO CENSOR SPEECH**

133.    On July 24, 2012, Defendants asserted a trademark dilution claim against Plaintiff based on nothing more than an innocuous movie trailer lodged on Vimeo.com (a sanitized on-line environment) depicting fully-clothed actors.  [Ex. A (BTL_00023]

> **The [Twiharder] Movie looks low budget and depicts scenes that appear sexually suggestive and tawdry, constituting dilution through harmful tarnishment of Summit's valuable intellectual property rights.**

134.    On December 20, 2012, Plaintiff received the following e-mail from his former

"Fair Use" counsel regarding the screening of the *Twiharder* film.  [Ex. DD (BTL_001806)]

> We just completed the screening. Two representatives from Summit and two from Sheppard Mullin attended today's screening, along with Michael Donaldson. **They were primarily concerned with the trademark issues and the sexual content in the films. Because they are extremely protective over the franchise (and they said the author is a strict Morman who has instilled her values in the film) they view the sexual content in the film to be tarnishment of the brand**. Even though we can remedy the trademark concerns, they said they would go after this film on tarnishment grounds. Jill said we can expect a response of the screening at the beginning of the year (they are closed through the beginning of the year). I wouldn't expect any action from Summit until the film is distributed.
>
> If they have specific objections to sexual scenes in the film (the vibrator scene at the end of the end credits caused quite a stir), edits to those scenes may drop their concerns to allow us to reach a settlement.

135.    Because Defendants' own movie spoof *Breaking Wind* is excessively vulgar, the religious convictions of Ms. Meyer could not possibly factor into Defendants' business decision to license *Breaking Wind* for U.S. distribution.

136.    Notwithstanding Defendants' knowledge of the grotesque, sexual depravity on display in *Breaking Wind*, Defendants continue to pursue frivolous "tarnishment" claims against Plaintiff.

137.    For example, in January 2013, after viewing Plaintiff's motion picture *Twiharder* in its entirety, Defendants claimed "tarnishment" based on Plaintiff's innocuous motion picture content.

> "the intentionally sexual, vulgar, and tawdry nature of **the TWIHARDER film tarnishes the essential, intrinsic, and well-known wholesomeness of the Twilight Motion Pictures."** [Ex. A (BTL_000034)] (emphasis added)

# COUNT I

DECLARATORY JUDGMENT

## ◆   NON-INFRINGEMENT   ◆

### COPYRIGHTED MOTION PICTURES
[COPYRIGHT ACT of 1976, 17 U.S.C § 101, 106, 107]

————

138.    Plaintiff repeats and realleges every allegation set forth above as if set forth fully herein.

139.    Defendants' false allegations of copyright infringement against Plaintiff, as contained in Exhibit A,  have created a "case of actual controversy" within this Court's original jurisdiction pursuant to 28 U.S.C. § 2201.

140.    Plaintiff seeks a declaratory judgment from the Honorable Court holding that Plaintiff's feature-length motion picture entitled *Twiharder*, bearing registration Copyright No. PAu 3-635-415, constitutes Fair Use under Section 107 of the COPYRIGHT ACT of 1976, 17 U.S.C § 107 vis-a-vis the five copyrighted *The Twilight Saga* motion pictures identified in this Complaint.

141.    In the alternative, Plaintiff seeks a declaratory judgment from the Honorable Court holding that Plaintiff's feature-length motion picture *Twiharder* is constitutionally immunized from suit by the First Amendment on grounds of artistic parody.

142.    In the alternative, Plaintiff seeks a declaratory judgment from the Honorable Court holding that Plaintiff's feature-length motion picture *Twiharder* is privileged by the common law doctrine of Fair Use.

143.    Plaintiff respectfully seeks its full costs and an award of reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

## COUNT II

DECLARATORY JUDGMENT

#### ◆   NON-INFRINGEMENT / NON-DILUTION   ◆

**TRADEMARKS & SERVICEMARKS**
[LANHAM ACT, 15 U.S.C. § 1051 et seq.]

———

144.    Plaintiff repeats and realleges every allegation set forth above as if set forth fully herein.

145.    In their 6/27/12 C&D Notice, Defendants demanded under threat of civil litigation that Plaintiff "cease and desist" all use or intent to use the TWIHARD ASSETS in commerce.

146.    To date, despite Plaintiff's repeated requests via counsel to withdraw its untenable and false allegations, Defendants have failed to retract their claims of LANHAM ACT violations as initially charged against Plaintiff on June 27, 2012.  [Ex A. (BTL_000019-23) (July 24, 2012); Ex A. (BTL_000028-29) (October 30, 2012); Ex A. (BTL_000033-35) (January 15, 2013); Ex A. (BTL_000042-43) (April 18, 2013)].

147.    Plaintiff seeks a declaratory judgment from the Honorable Court holding that NONE of the TWIHARDER ASSETS identified in this Complaint constitute infringement, dilution or false designation of origin violations pursuant to the LANHAM ACT.

148.     Plaintiff respectfully seeks its full costs and an award of reasonable attorneys' fees on account of Defendants' bad faith and predatory conduct.

## COUNT III

<u>PRIMA FACIE TORT</u>

### ✦ DAMAGES ✦

149.   Plaintiff repeats and re-alleges every allegation set forth above as if fully set forth herein.

150.   At all relevant times, Defendants had a duty to Plaintiff not to assert objectively baseless infringement or dilution claims sounding under U.S. federal statutes.

151.   Defendants' tortious interference with the licensing and worldwide distribution of the *Twiharder* motion picture via Warner Brothers Digital Distribution in the Fall of 2012 constituted a malicious act that was exclusively directed to cause injury and damage to Plaintiff.

152.   Defendants' desire to permanently injure Plaintiff and to bring about complete destruction of Plaintiff's business and valuable intellectual property assets was in bad faith, even if Defendants' transmission of the C&D letters constituted lawful petitioning activity.

153.   Had Defendants' motivation been economic in nature, then a license could have been negotiated over the last two years.  But there was never any negotiation.  Defendants refused to compromise.  Defendants' sole object, therefore, was or devolved into malevolent suppression of Plaintiffs' expressive work.  Such is the evil manifested by undertaking to parody oneself.

154.   Defendants' interference with the licensing and worldwide distribution of *Twiharder* via Warner Brothers Digital Distribution in the Fall of 2012 was a substantial factor bringing about Plaintiffs' economic injury.

155.   As a direct and proximate result of Defendants' malevolent acts, Plaintiff is entitled to compensatory damages and/or lost profits in an amount to be determined at trial.

# PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff BETWEEN THE LINES PRODUCTIONS, LLC prays for

Judgment Against Defendants LIONSGATE ENTERTAINMENT CORP. and SUMMIT

ENTERTAINMENT, LLC as follows:

## COUNT I

### DECLARATORY JUDGMENT

**NON-INFRINGEMENT OF DEFENDANTS' COPYRIGHT INTERESTS
PURSUANT TO COPYRIGHT ACT OF 1976, 17 U.S.C. §§ 101, 106-107**

1. Upon good cause shown, Plaintiff seeks a declaratory judgment from the Honorable
   Court pursuant to 28 U.S.C. §§ 2201, 2202 and in the further interests of justice
   declaring the copyrighted motion picture TWIHARDER to be: (a) "Fair Use" pursuant
   to Section 107 of the Copyright Act of 1976, 15 U.S.C. § 107; or (b) constitutionally
   immunized from suit by the First Amendment on grounds of artistic parody; or (c)
   privileged by the common law doctrine of Fair Use vis-à-vis the five motion picture
   titles in Defendants' THE TWILIGHT SAGA copyright repertoire.

2. Plaintiff respectfully seeks its full costs and an award of reasonable attorneys' fees
   pursuant to 17 U.S.C. § 505.

## COUNT II

### DECLARATORY JUDGMENT

**NON-INFRINGEMENT / NON-DILUTION
OF DEFENDANTS' TRADEMARKS & SERVICEMARKS
PURSUANT TO LANHAM ACT, 15 U.S.C. §§ 1051 ET SEQ.**

3. Upon good cause shown, Plaintiff seeks a declaratory judgment from the Honorable
   Court pursuant to 28 U.S.C. §§ 2201, 2202 and in the further interests of justice
   declaring that NONE of the "TWIHARDER ASSETS" identified in this Complaint

constitute infringement, dilution or false designation of origin violations pursuant to the LANHAM ACT, 15 U.S.C. § 1051; et seq, §1119, §1125; vis-à-vis THE TWILIGHT SAGA-related trademarks & servicemarks asserted by Defendants against Plaintiff.

4. Plaintiff respectfully seeks its full costs and an award of reasonable attorneys' fees on account of Defendants' bad faith and predatory conduct.

## COUNT III

### *PRIMA FACIE* TORT

5. Pursuant to New York common law, Plaintiff seeks to recover compensatory damages against Defendants for the loss of its business opportunity to distribute the motion picture TWIHARDER via Warner Brothers Digital Distribution in the Fall of 2012.

6. Plaintiff respectfully seeks its full costs and an award of reasonable attorneys' fees on account of Defendants' bad faith, frivolous legal arguments, fraud upon the Court and predatory conduct.


Dated: December 16, 2013
New York, New York

RESPECTFULLY SUBMITTED

**/jameshfreeman/**

_____
James H. Freeman, Esq.

JH FREEMAN LAW
3 Columbus Circle, 15th Floor
New York, NY 10019
Telephone: (212) 931-8535
james@jhfreemanlaw.com
*Counsel for Plaintiff*