1  JAMES H. FREEMAN,ESQ. [(NY) JF 8605]
   *Pro Hac Vice Pending*
2  JH FREEMAN LAW
   3 Columbus Circle, 15th Floor
3  New York, NY 10019
   Tel: (212) 931-8535 / Fax: (212) 496-5870
4  james@jhfreemanlaw.com

5  STEVE LOWE, ESQ. (Cal. Bar #122208)
   LOWE & ASSOCIATES, P.C.
6  11400 Olympic Blvd., Suite 640
   Los Angeles, CA 90064
7  Tel: (310) 477-5811 / Fax: (310) 477-7672
   steven@lowelaw.com

8  *Attorneys for Counter-Defendants*
   *Between the Lines Productions, LLC*
9

10              **UNITED STATES DISTRICT COURT**
11              **CENTRAL DISTRICT OF CALIFORNIA**
                    **WESTERN DIVISION**
12

13  (LIONS GATE ENTERTAINMENT CORP., a
    British Columbia company; and)
14                                              Case No. 2:14-cv-00104-R- (PJWx)
    SUMMIT ENTERTAINMENT, LLC,
15  (allegedly) a Delaware limited              **MEMORANDUM OF LAW IN SUPPORT**
    liability company                          **OF COUNTER-DEFENDANT BETWEEN**
16                                              **THE LINES PRODUCTIONS' MOTION TO**
                                                **DISMISS SUMMIT ENTERTAINMENT'S**
                    Counterclaimants,           **COUNTERCLAIMS PURSUANT TO FED.**
17                                              **R. CIV. P. (12)(b)(1); 12(b)(3); 12(b)(4);**
            vs.                                 **12(b)(5); and 12(b)(7); Fed. R. Civ. P. 17(a)**
18                                              **and Fed. R. Civ. P. 19(a)**
    BETWEEN THE LINES
19  PRODUCTIONS, LLC, a
    California limited liability
20  company,                                    Hearing Date: May 19, 2014
                                                Hearing Date: 10:00 a.m.
21                  Counter-Defendant
                                                **Judge: Hon. Manuel L. Real**
22

23

24  Counter-Defendant BETWEEN THE LINES PRODUCTIONS, LLC ("BTL"), by and
25  through counsel, respectfully submits this Memorandum of Law in Support of
26  BTL's Motion to Dismiss Counts I, II, III and V of the Counterclaims [Document
27  No. 16, pp. 22 *et seq*]. pursuant to Rules (12)(b)(1); 12(b)(3); 12(b)(4); 12(b)(5);
28  12(b)(7); 17(a); and 19(a) of the Federal Rules of Civil Procedure (Fed. R. Civ. P.)

i

# TABLE OF CONTENTS

Rule 12(b)(1): Lack of Subject Matter Jurisdiction

POINT I

**LIONS GATE (SUMMIT) LACKS STATUTORY STANDING TO FILE AN INFRINGEMENT SUIT UNDER THE COPYRIGHT ACT OF 1976, 17 U.S.C. §§ 101, et seq.** ........................................................................ 1

A.  LIONS GATE (SUMMIT) DOES NOT HAVE STATUTORY STANDING TO SUE FOR COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. § 501(b).................................. 1

(1)  A "Copyright Owner" *Must Actually Own* an "Exclusive Right under a Copyright" to File Suit for Infringement .................................................... 2

(2)  Lions Gate (Summit) Does NOT *Own* the "Exclusive Right" To Create, Develop Nor Exploit the "Derivative Market For Critical Works, Including Parody"............................................................................................. 5

B.  LIONS GATE (SUMMIT) CONCEDED THAT THERE IS NO "INJURY-IN-FACT" STANDING TO SUE FOR FEDERAL COPYRIGHT INFRINGEMENT .......................... 8

POINT II

**CONGRESS LACKS AUTHORITY UNDER ARTICLE I, SEC. 8 TO PRESCRIBE A STATUTORY REMEDY FOR "TARNISHMENT" PURSUANT TO THE LANHAM ACT, 15 U.S.C. § 1125(c)** ........................... 11

A.  NONE OF THE (PLAUSIBLE) ENUMERATED POWERS WITHIN ARTICLE I, SEC. 8 OF THE U.S. CONSTITUTION VESTS CONGRESS WITH THE AUTHORITY TO PROTECT THE *REPUTATION* OF FAMOUS TRADEMARKS .............................. 12

B.  THE TDRA FACILITATES VIEWPOINT DISCRIMINATION OF COPYRIGHTED WORKS EMBODYING *ARTISTIC* CONTENT & *POLITICAL* MESSAGES ................. 15

POINT III

**THE TRANSFEREE COURT LACKS SUBJECT MATTER JURISDICTION OVER THIS CIVIL ACTION BECAUSE LIONSGATE DID NOT HAVE STANDING TO TRANSFER VENUE UNDER 28 U.S.C. § 1404(a)** ................................................................. 17

ii

1

| Rule 12(b)(3): Improper Venue |
|---|

2

POINT IV

3

S.D.N.Y. IS THE PROPER VENUE ........................................................23

4

5

| Rule 12(b)(4)-(5): Improper Venue |
|---|

6

7

POINT V

8

NEITHER THE FORM OF PROCESS NOR THE
SERVICE OF PROCESS WAS STATUTORILY PROPER............................21

9

10

   A.  THE COUNTERCLAIMS SHOULD BE DISMISSED PURSUANT TO
       FED. R. CIV. P. 12(b)(4) FOR INSUFFICIENT PROCESS ....................................21

11

12

   B.  THE COUNTERCLAIMS SHOULD BE DISMISSED PURSUANT TO
       FED. R. CIV. P. 12(B)(5) FOR INSUFFICIENT SERVICE OF PROCESS.................22

13

14

| Rule 12(b)(7) / Rule 17(a) / Rule 19(a) |
|---|

15

16

POINT VI

17

SUMMIT IS NOT THE "REAL PARTY IN INTEREST" AND
 LIONS GATE ENTERTAINMENT CORP MUST BE JOINED

18

AS A NECESSARY PARTY ..................................................................23

19

20

   A.  SUMMIT ENTERTAINMENT IS NOT THE NAME OF THE REAL PARTY IN INTEREST
       AS REQUIRED BY FED R. CIV. 17(a)................................................23

21

22

   B.  COUNTERCLAIMS MUST BE DISMISSED FOR *FAILURE TO JOIN* LIONS GATE,
       A "NECESSARY PARTY" UNDER FED. R. CIV. P. 12(b)(7) AND 19(a) ..............26

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2
*Cases*                                                                 **Pages**

3
American Geophysical Union v. Texaco, Inc.,
4
  802 F. Supp. 1, 21 n.18 (S.D.N.Y. 1992)_____ 6

5
Ashcroft vs. Free Speech Coalition,
  535 U.S. 234, 244 (2002)_____ 6
6

7
Boeing Airplane Co. v. Perry,
  322 F.2d 589, 591 (10th Cir. 1963), <u>cert denied</u>, 375 U.S. 984 (1964) _____ 23
8

9
Broadcast Music, Inc. v. CBS, Inc.,
  421 F.Supp. 592 (S.D.N.Y. 1983) _____ 5

10

11
Brownmark, LLC vs. Comedy Partners,
  682 F.3d 687 (7th Cir. 2012) _____ 6

12
Caminetti v. United States,
13
  242 U.S. 470, 485 (1917)_____ 4

14
Campbell vs. Acuff-Rose Music,
15
  510 U.S. 569, 592-593 (1994) _____ 5

16
Cooper v. Aaron, 358 U.S. 1, 18 (1958) _____ 5

17
DeBartolo Corp. v. Florida Gulf Coast Trades Council,
18
  485 U.S. 568, 575 (1988)_____ 11

19
Eden Toys, Inc. v. Florelee Undergarment Co.,
20
  697 F.2d 27 (2d Cir. 1982)_____ 23

21
Fisher v. Dees,
  794 F. 2d 432, 438 (9th Cir. 1986) _____ 6
22

23
Hooper v. California,
  155 U.S. 648, 657 (1895)_____ 11
24

25
Leibovitz v. Paramount Pictures Corp.,
  948 F. Supp. 1214, 1226 (S.D.N.Y. 1996)_____ 6

26
Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC,
27
  507 F.3d 252, 264 n.2 (4th Cir. 2007) _____ 11

28

1

### TABLE OF AUTHORITIES
(continued….)

2

3

Pages

4
Marbury vs. Madison,
  5 U.S. (1 Cranch) at 177 _____ 5

5

6
Moseley vs. V Secret Catalogue,
  537 U.S. 418 (2003) _____ 11

7

8
Righthaven LLC v. Hoehn.
  , __ F.3d ____ (9th Cir. May 9, 2013) _____ 23

9

10
Ringgold v. Black Entm't Television, Inc.,
  126 F.3d 70, 81 (2d Cir. 1997) _____ 6

11

12
Rose v. Simms,
  1995 WL 702307, at *6 (S.D.N.Y. Nov. 29, 1995) _____ 27

13

14
Smith v. Kessner,
  183 F.R.D. 373, 375 (S.D.N.Y. 1998) _____ 27

15

16
Steel Co. v. Citizens for a Better Environment,
  523 U.S. 83, 101 (1998) _____ 1

17
Sullivan v. Stroop,
  496 U.S. 478, 484-85 (1990) _____ 7

18

19
Sybersound Records, Inc. v. UAV Corp.,
  517 F.3d 1137 (9th Cir. 2008) _____ 5

20

21
Thornhill Publishing Co.  Inc., General Telephone & Electronics Corp.,
  594 F.2d 730, 733 (9th Cir. 1979) _____ 1

22

23
Topolos v. Caldewey,
  698 F.2d 991, 994 (9th Cir. 1983) _____ 4

24

25
TradeMark Cases,
  100 U.S. 82 (1879) _____ 13

26
United HealthCare Corp. v. American Trade Insurance Co., Ltd.,
  88 F.3d 563, 568-69 (6th Cir. 1996) _____ 23

27

28

# TABLE OF AUTHORITIES
(continued….)

Pages

Warren v. Fox Family Worldwide, Inc.,
   171 F. Supp. 2d 1057 (C.D. Cal. 2001) _____ 1

Whelan v. Abell,
   953 F.2d 663, 672 (D.C. Cir. 1992), cert. denied, 506 U.S. 906 (1992) _____ 23

White v. Lee,
   227 F.3d 1214 (9th Cir. 2000) _____ 1

***Statutes***

15 U.S.C. § 1125(c) _____ 12, 16

17 U.S.C. § 101 _____ 4, 8

17 U.S.C. § 106(2) _____ 4, 5

17 U.S.C. § 106(3) _____ 4

17 U.S.C. § 107 _____ 9

17 U.S.C. § 107(4) _____ 8

17 U.S.C. § 201(d)(2) _____ 2, 3

17 U.S.C. § 501(a) _____ 3, 4, 7

17 U.S.C. § 501(b) _____ ii, 3, 5

Act of July 8, 1870, ch. 230, 16 Stat.
(the "1870 Act") _____ 13

Act of Mar. 3, 1881, ch. 138, 21 Stat. 502 (repealed 1946)
   ("the 1881 Act") _____ 13

***Other Authorities***

Ethan Horwitz & Benjamin Levi, *Fifty Years of the Lanham Act: A Retrospective of Section 43(a),* FORDHAM INTELLECTUAL PROPERTY, MEDIA AND ENTERTAINMENT LAW JOURNAL, Vol. 7, Issue 1 (1996). _____ 13

**TABLE OF AUTHORITIES**
(continued….)

**Page(s)**

Jefferson, Thomas (1802-01-01). "Jefferson's Letter to the Danbury Baptists".
 U.S. Library of Congress. *Retrieved* 2006-11-31 _____ 17

Mike Masnick, *Why the Theory of 'Tarnishment' Doesn't Make Sense for
 Trademark Law, www.*TechDirt.com  techdirt.com/articles/20120926/…/
 why‑theory‑tarnishment‑doesnt‑make‑sense‑trademark‑law.shtml, accessed
 9/14/13 _____ 15

*The Rehnquist Court's Canons of Statutory Construction*,
 108 Harv. L. Rev. 26, p. 3 (November 1994) _____ 7


***Rules***

Fed. R. Civ. P. 4 _____ 20

Fed. R. Civ. P. 5 _____ 20

Fed R. Civ. p. 12(b)(1) _____ 1-17

Fed R. Civ. p. 12(b)(3) _____ 18

Fed. R. Civ. P. 12(b)(4) _____ 19

Fed. R. Civ. P. 12(b)(5) _____ 19, 20

Fed. R. Civ. P. 12(b)(7) _____ 25, 26

Fed. R. Civ. P. 19(a)(2)(i) _____ 26

Fed. R. Civ. P. 19(a)(2)(ii) _____ 25

Fed. R. Civ. P. 17(a) _____ 21, 22

# TABLE OF AUTHORITIES
(continued….)

**Treatises**                                                              **Page(s)**

Paul Goldstein, I COPYRIGHT: PRINCIPLES, LAW AND PRACTICE
   § 4.4.1.1, at 409 (1989) _____ 5


***Constitutional Provisions***

U.S. CONST. art. I, § 8, cl. 3 _____ 13, 14

U.S. CONST. art. I, § 8, cl. 8 _____ 13, 15

**END**

## FED R. CIV. P. 12(b)(1)

◆   ◆   ◆

## LACK OF SUBJECT MATTER JURISDICTION

### STANDARD OF LAW

A party may bring a motion to dismiss the complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure if the court lacks "jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1). An attack on jurisdiction may be either facial or factual. White v. Lee, 227 F.3d 1214 (9th Cir. 2000). In a facial attack, the court must accept the allegations in the complaint as true and the evidence is viewed in the light most favorable to the non-moving party. Warren v. Fox Family Worldwide, Inc., 171 F. Supp. 2d 1057 (C.D. Cal. 2001). In a factual attack, the court may rely on extrinsic evidence and there is no presumption of truth given to the factual allegations in the complaint. Thornhill Publishing Co. Inc., General Telephone & Electronics Corp., 594 F.2d 730, 733 (9th Cir. 1979). Only after the Court is satisfied as to its subject matter jurisdiction may it reach the substance of a plaintiff's claims. See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 101 (1998).

### POINT I

### LIONS GATE (SUMMIT) LACKS STATUTORY STANDING TO FILE AN INFRINGEMENT SUIT UNDER THE COPYRIGHT ACT OF 1976, 17 U.S.C. §§ 101, et seq.

———————————————

BTL's Motion to Dismiss Counterclaim **Count V**
Pursuant to Fed. R. Civ. P 12(b)(1) *With Prejudice*

———————————————

A.   **LIONS GATE (SUMMIT) DOES NOT HAVE STATUTORY STANDING TO SUE FOR COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. § 501(b)**

➔   The issue presented on Point I.A. is whether the copyright owner of a

*non-exclusive* right to prepare, distribute or license artistic parody has standing to sue for infringement under 17 U.S.C. § 501(b), particularly where the infringement plaintiff has *already conceded* that the copyright defendant's allegedly infringing work is critical work parody.

Pursuant to the Copyright Act of 1976, only copyright holders who possess an "*exclusive right*" under § 106 have statutory standing under § 501(b) to file suit for infringement against "anyone who violates" that "particular [exclusive] right" under § 501(a). See 17 U.S.C. §§ 106; 501(b); 501(a). Significantly, the copyright holder may ONLY seek protection "to the extent of that [exclusive] right." 17 U.S.C. § 201(d)(2).

Here, LIONS GATE (Summit) simply does *not* own the "exclusive right" to prepare, distribute or license works of artistic parody and therefore lacks standing to invoke the protection or remedies of the federal copyright statute. 17 U.S.C. §§ 106; 201(d)(2); 501(b); 501(a). LIONS GATE (Summit) lacks statutory standing to sue BTL for copyright infringement because it has already conceded in writing that BTL's motion picture *Twiharder* is a parody.[1]

## (1)   A "COPYRIGHT OWNER" MUST ACTUALLY OWN AN "*EXCLUSIVE RIGHT UNDER A COPYRIGHT*" TO FILE SUIT FOR INFRINGEMENT

In Count V of the Counterclaims, LIONS GATE (Summit) alleges that the Court has jurisdiction over its copyright claim under 17 U.S. § 501 [Docket No. 16, Counterclaims, p. 22, ¶ 1]. LIONS GATE (Summit) also claims that BTL's "acts constitute infringement of Summit's copyrights … in violation of 17 U.S.C. § 501, *et seq."* [Id. at ¶ 70]. Standing to file suit, therefore, necessarily depends on

---

[1] LIONS GATE (Summit) Admits: "Between the Lines Productions is trying, without authorization, to enter a market already occupied by an authorized derivative work of the Twilight films. This constitutes a significant harm to Summit."[Docket No. 1, Compl. Ex. A_BTL_00043, April 18, 2003].

whether LIONS GATE (Summit) is the "copyright owner" of "an exclusive right under a copyright,"  17 U.S.C. § 501(b), which is statutorily CAPPED by the "*extent of that [exclusive] right*." 17 U.S.C. § 201(d)(2).

- **Section 501(b)** of the Copyright Act provides in relevant part:

    The legal or beneficial **owner of an *exclusive right* under a copyright is entitled** … to institute an action for any infringement *of that particular right* committed while he or she is the owner of it. 17 U.S.C. § 501(b) [emphasis added]

- **Section 501(a)** of the Copyright Act provides in relevant part:

    Anyone who violates any of the ***exclusive rights* of the copyright owner** as provided by sections 106 through 122 or of the author as provided in section 106A(a), … ***is an infringer of the copyright*** or right of the author, as the case may be. . . . 17 U.S.C. § 501(a) [emphasis added]

- **Section 201(d)(2)** of the Copyright Act provides in relevant part:

    [the] ***owner of any particular exclusive right*** is entitled, ***to the extent of that right***, to all of the protection and remedies accorded to the copyright owner by this title. 17 U.S.C. § 201(d)(2) [emphasis added].

    LIONS GATE (Summit) alleges in Count V that it owns the "exclusive rights in and to the *Twilight*" materials and that "Summit has not granted to [BTL] any such right or license" to "use them and/or to edit, alter, and/or otherwise modify them [Id. at ¶¶ 68-69]   Based on the foregoing allegations, it is clear that LIONS GATE (Summit)'s copyright infringement suit rests on its alleged "exclusive right to prepare derivative works" pursuant to 17 U.S.C. § 106(2) [and, by extension, to license such derivative works under 17 U.S.C. § 106(3)]

- **Section 106(2)** of the Copyright Act provides in relevant part:

    ***[T]he owner of copyright*** under this title **has the *exclusive right[]*** to … ***prepare derivative works*** based upon the copyrighted work; 17 U.S.C. § 106(2) [emphasis added]

3

- ◆ **Section 101** of the Copyright Act defines "a derivative work" as:

> *a work based upon one or more preexisting works* … or any other form *in which a work may be* recast, **transformed**, or adapted. *A work consisting* of editorial revisions, annotations, *elaboration*s, or other modifications, which, as a whole, represent an ***original work of authorship***, is a "derivative work" 17 U.S.C. §101, [emphasis added]

Under the plain language[2] of the Copyright Act of 1976, and for purposes relevant here, a copyright holder has statutory standing to file an infringement suit under § 501(b) *only if* the copyright owner possesses an "exclusive right" under §§ 106(2)-(3) to "prepare [or license] derivative works" 17 U.S.C. §§ 501(a); 501(b); 106(2)-(3).

As a threshold matter to an infringement claim based on the copyright owner's "exclusive right" to prepare [or license]  "derivative works" under 17 U.S.C. § 106(2),  LIONS GATE (Summit) is required to make a showing that it *owns* an "exclusive right" to prepare the *particular class* of "derivative work" at issue. Accord Topolos v. Caldewey, 698 F.2d 991, 994 (9th Cir. 1983) ("Ownership of the copyright is … always a threshold question.").  If the copyright holder does <u>not</u> own the "exclusive right" to prepare [or license] a *particular class* of derivative work, then it must follow that the copyright holder's right is merely ***non-exclusive***.

It is well-established that a non-exclusive licensee has no statutory standing to file suit for copyright infringement under 17 U.S.C. § 501(b).  <u>See, e.g.</u> <u>Sybersound Records, Inc. v. UAV Corp.</u>, 517 F.3d 1137 (9th Cir. 2008); <u>Broadcast Music, Inc. v.</u>

---

[2] "It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain . . . the sole function of the courts is to enforce it according to its terms." <u>Caminetti v. United States</u>, 242 U.S. 470, 485 (1917). And if a statute's language is plain and clear, the "the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion." <u>Id</u>.

4

CBS, Inc., 421 F.Supp. 592 (S.D.N.Y. 1983); see also Paul Goldstein, I COPYRIGHT: PRINCIPLES, LAW AND PRACTICE § 4.4.1.1, at 409 (1989).

*A fortiori,* if a copyright owner merely possesses a non-exclusive right to prepare [or license] a particular class of derivative work that is beyond the statutory ambit, then, as a matter of law, the copyright holder *lacks standing* to invoke the Court's original jurisdiction under 17 U.S.C. § 501(b).

**(2)    LIONS GATE (SUMMIT) DOES NOT OWN THE "EXCLUSIVE RIGHT" TO CREATE, DEVELOP NOR EXPLOIT THE "DERIVATIVE MARKET FOR CRITICAL WORKS, INCLUDING PARODY"**

To resolve the threshold question of statutory standing under § 501(b) is to determine whether the *particular class* of derivative work at issue falls within the scope of the Congressional enactment.  See, e.g., Marbury vs. Madison, 5 U.S. (1 Cranch) at 177 ("It is emphatically the province and duty of the judicial department to say what the law is."); Cooper v. Aaron, 358 U.S. 1, 18 (1958) (asserting the supremacy of the Judiciary and of the Supreme Court in matters of constitutional interpretation).

In Campbell vs. Acuff-Rose Music ("Acuff-Rose"), the U.S. Supreme Court defined two separate classes of derivative work: (i) those which are protectible under copyright law; and (ii) those for which no protectible market exists.  Campbell vs. Acuff-Rose Music, 510 U.S. 569, 592-593 (1994). "The market for potential derivative uses includes *only* those that creators of original works would in general develop or license others to develop."  Id. at 592 (emphasis added). Finding that artistic parody which criticizes the pre-existing work occupies a distinct market than the original, the Supreme Court adopted the "rule that there is no protectible derivative market for criticism," Id.  The High Court further declared:

> **…the law recognizes no derivative market for critical works, *including* parody …**

5

<u>Acuff-Rose</u>, 510 U.S. at 592   (emphasis added)[3]   Accord <u>Leibovitz v. Paramount Pictures Corp.</u>, 948 F. Supp. 1214, 1226 (S.D.N.Y. 1996) ("there is no protectable derivative market for criticism"); <u>Brownmark, LLC vs. Comedy Partners</u>, 682 F.3d 687 (7th Cir. 2012) ("Any effect on the derivative market for criticism is not protectable"); <u>see also</u> <u>Fisher v. Dees</u>, 794 F. 2d 432, 438 (9th Cir. 1986) (the role of the courts is to distinguish between "[b]iting criticism [that merely] suppresses demand [and] copyright infringement [which] usurps it").[4]

Given that the derivative market for parody is not protectible under the statute, the "exclusive right" to "prepare" [or license] "derivative works" under §§106(2)-(3) is confined to only those derivative works which fall within the parameters set by the U.S. Supreme Court in accordance with "the First Amendment's vast and privileged sphere."[5]

In other words, to ensure the proper balance between free speech markets and copyright protection, <u>Acuff-Rose</u> recognized that copyright owners *do not own* the "exclusive right" to prepare, distribute or license *every class* of derivative work that may fit within the expansive definition of "derivative work" provided by Congress. And in doing so, <u>Acuff-Rose</u> imposed a limitation on the "*extent*"[6] of a copyright

---

[4] <u>See also</u> <u>American Geophysical Union v. Texaco, Inc.</u>, 802 F. Supp. 1, 21 n.18 (S.D.N.Y. 1992), <u>aff'd</u>, 60 F.3d 913, 929 n.17 (2d Cir. 1994), <u>cert. dismissed</u>, 516 U.S. 1005 (1995) (the fact that a copyright holder has previously secured licenses does not make a given market "traditional, reasonable, or likely to be developed."); <u>Ringgold v. Black Entm't Television, Inc.</u>, 126 F.3d 70, 81 (2d Cir. 1997) (avoiding the problem of circularity in market harm analysis by considering only "traditional, reasonable, or likely to be developed" markets).

[5] <u>See</u> <u>Ashcroft vs. Free Speech Coalition</u>, 535 U.S. 234, 244 (2002) ("The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere.")

[6] <u>See</u> 17 U.S. 201(d)(2).

owner's "exclusive right[] to prepare [or license] derivative works" under §§106(2)-(3).

As per black letter canons of construction, the Supreme Court's limitation on the "extent" of an "exclusive right" granted under section § 106(2) necessarily applies *equally* to § 501(a) and § 501(b).[7]  If the copyright owner does not possess the "exclusive right" under §§ 106(2)-(3) to license a critical work parody of its own pre-existing material, then as a matter of law, a copyright holder does not have standing under § 501(b) to file an infringement suit against the author of genuine parody.

Moreover, because the copyright owner merely possesses a *non-exclusive* right to prepare or license a critical work of parody, then the author of the secondary work is *not* an infringer pursuant to 17 U.S.C. § 501(a).

Here, <u>if</u> BTL's motion picture *Twiharder* constitutes a parody that targets *The Twilight Saga* as the object of ridicule, <u>then</u> LIONS GATE (Summit) merely possesses a *non-exclusive* statutory right vis-a-vis BTL and therefore lacks standing to file suit under the Copyright Act of 1976, 17 U.S.C. § 101, et. seq..

The only issue to be decided on BTL's motion to dismiss Count V pursuant to Fed. R. Civ. 12(b)(1), therefore, is whether *BTL's* motion picture *Twiharder* constitutes a work of parody that criticizes *The Twilight Saga.*   But this issue has already been decided: LIONS GATE (Summit) conceded during its C&D "petitioning activity" that BTL's allegedly infringing work is, without a doubt, a genuine parody of *The Twilight Saga*.  [Docket No. 1, Compl. Ex. A_BTL_00043].  LIONS GATE'S written admission, standing alone, warrants dismissal of Count V under Fed. R. Civ.

---

[7] Basic canons of construction dictate that the same or similar terms in a statute should be interpreted the same way.   <u>See</u> *The Rehnquist Court's Canons of Statutory Construction*, 108 Harv. L. Rev. 26, p. 3 (November 1994); citing <u>Sullivan v. Stroop</u>, 496 U.S. 478, 484-85 (1990).

P. 12(b)(1).

Accordingly, because it is undisputed that LIONS GATE (Summit) does not actually own an "exclusive right" to create, license or distribute works of parody under U.S. copyright law, the Counterclaimant(s)' claim for infringement under the Copyright Act (Count V) fails as a matter of law under § 501(b) for lack of subject matter jurisdiction.

**B.    LIONS GATE (SUMMIT) CONCEDED THAT THERE IS NO "INJURY-IN-FACT" STANDING TO SUE FOR FEDERAL COPYRIGHT INFRINGEMENT**

➔    The issue presented in Point I.B is whether the copyright owner possesses Article III "injury-in-fact" standing to sue for infringement where the infringement plaintiff has *already conceded* that the copyright defendant's allegedly infringing work occupies a non-protectible derivative market which, as per Campbell vs. Acuff-Rose, 510 U.S. 569 (1994), produces NO cognizable harm to the copyright owner.

Under Section 107 of the Copyright Act, market harm is analyzed under the codified version of fair use, 17 U.S.C. § 107(4).  In Acuff-Rose, the U.S. Supreme Court "held that parody, like other comment or criticism, *may* claim fair use under § 107." 510 U.S. at 579 (citations omitted).  However, the High Court did not state that *every* parody of a pre-existing work "must" claim fair use under § 107 to defend a claim for copyright infringement. In Acuff-Rose, the underlying parties conceded that the parody at issue constituted an infringement, thereby requiring the defendant to raise the doctrine of fair use as an affirmative defense.[8]

Here, in contrast, BTL vehemently denies that its motion picture constitutes an infringement because BTL's materials were all *independently created* using

---

[8] Id. at 574-575 ("It is uncontested here that 2 Live Crew's song would be an infringement of Acuff-Rose's rights in 'Oh, Pretty Woman,' under the Copyright Act of 1976, 17 U. S. C. § 106 but for a finding of fair use through parody.")

8

BTL's own means and methods of production without any digital replication or sampling from *any* pre-existing works alleged in the Counterclaims.

BTL avers that the codified doctrine of fair use under 17 U.S.C. § 107 *may* be raised in some lawsuits where the parties dispute whether: (a) the allegedly infringing work is a critical work of parody that comments on the original;[9] or (b) the work parody supersedes the targeted work or otherwise usurps the market for the original. These elements are not in dispute here.[10]

While the issue of fair use is not being litigated on this motion to dismiss pursuant to Fed. R. Civ. 12(b)(1), the U.S. Supreme Court's holding in Acuff-Rose is once again dispositive; albeit by way of a different legal theory: lack of Article III "injury-in-fact" standing.

Acuff-Rose held that ***"a lethal parody … does not produce a harm cognizable under the Copyright Act."*** Acuff-Rose, 510 U.S. at 591-92. The U.S. Supreme Court referred to a parody's effect on the market as "unremediable disparagement." Id. at 592. It must follow that if the allegedly infringing work IS a critical work of parody, there can be NO harm to the market for the original work. And if no 'injury-in-fact' can be sustained by the copyright holder, then there can be no Article III standing. The judicial intervention required is precise.

Here, LIONS GATE (Summit) admitted during its "petitioning activity" that *Twiharder* would occupy the same derivative market as LIONS GATE'S own

---

[9] Thus, for example, in Acuff-Rose, the Supreme Court held that the "the threshold question when fair use is raised in defense of parody is whether a parodic character may be reasonably perceived." Id. at 582.

[10] Nonetheless, BTL reserves the right to raise the affirmative defense of fair use, 17 U.S.C. § 107, via a prospective motion to dismiss for failure to state a claim or via summary judgment. However, BTL respectfully submits that LIONS GATE (Summit)'s copyright infringement claim (Count V) may be disposed of with far greater expediency and judicial economy pursuant to Fed. R. Civ. 12(b)(1).

authorized parody, *Breaking Wind*.   On April 18, 2013, LIONS GATE (Summit) admits that:

> "Between the Lines Productions is trying, without authorization, to enter a market already occupied by an authorized derivative work of the Twilight films. This constitutes a significant harm to Summit."

[Docket No. 1, Compl. Ex. A_BTL_00043].

The "authorized derivative work" referred to in the above statement is *Breaking Wind*.  That is not in dispute.  In their Answer to BTL's initial complaint in cv-08899, LIONS GATE (Summit):

  ♦ "admit that *Breaking Wind* is an authorized parody of [*The Twilight Saga:*] *Eclipse*." [Docket No. 16, ECF p. 10, ¶ 66].

  ♦ "admit that *Breaking Wind* was marketed with Defendants' permission as a parody of *The Twilight Saga*" [Id. at ¶ 69]

  ♦ "admit that a subsidiary of LIONS GATE released *Breaking Wind*, which was marketed with LIONS GATE'S permission as a parody of "*The Twilight Saga*." [Id. at ¶ 73][11]

Thus, LIONS GATE has conceded that *Twiharder* could not produce a cognizable harm to the primary market for *The Twilight Saga* motion pictures. Acuff-Rose, 510 U.S. at 591-92.   But LIONS GATE (Summit) is suing BTL for infringement of *The Twilight Saga* motion pictures, not infringement of *Breaking Wind*. [Docket No. 16, Counterclaims, ¶¶ 64-73].   Accordingly, because LIONS GATE (Summit) has already conceded that its primary market copyrights suffer no "injury-in-fact" from BTL's distribution of *Twiharder* in a non-protectible derivative market, the copyright infringement claim must be dismissed pursuant to

---

[11] Although LIONS GATE (Summit) deny issuing any parody license to the producers / distributors of *Vampires Suck (2010)*, their denial is simply not credible. LIONS GATE is affirmatively concealing the licensing agreement to refute the element of "market share" under section 2 of the Sherman Act.

1 Fed. R. Civ. 12(b)(1) for lack of subject matter jurisdiction.

2

3 **POINT II**

4

**CONGRESS LACKS AUTHORITY UNDER ARTICLE I, SEC. 8
5 TO PRESCRIBE A STATUTORY REMEDY FOR "TARNISHMENT"
PURSUANT TO THE LANHAM ACT, 15 U.S.C. § 1125(c)**

6 ————————————

7 BTL's Motion to Dismiss Counterclaim **Count III**
Pursuant to **Fed. R. Civ. P 12(b)(1)** *With Prejudice*
8
————————————
9

10 "Congress, like this Court, is bound by and swears an oath to uphold the

11 Constitution." DeBartolo Corp. v. Florida Gulf Coast Trades Council, 485 U.S. 568,

12 575 (1988) (quoting Hooper v. California, 155 U.S. 648, 657 (1895)).

13 Count III of the Counterclaims alleges that BTL should be held liable for

14 "tarnishment" under the Trademark Dilution Revision Act of 2006, 15 U.S.C. §

15 1125(c)(1) of the Lanham Act ("TDRA").[12]  [Docket No. 16, Counterclaims, ¶¶ 47-

16 56]  The general purpose of the TDRA is to prevent the secondary market use of

17 famous trademarks to sell pornography and sex toys. See V Secret Catalogue v.

18 Victor's Little Secret (finding that the TDRA "creates a kind of rebuttable

19 presumption, or at least a very strong inference, that a new mark used to sell sex

20 related products is likely to tarnish a famous mark if there is a clear semantic

21 ————————————

22 [12] The TDRA was enacted after the U.S. Supreme Court held that its predecessor,
the Federal Trademark Dilution Act of 1995 (the "FTDA"), required proof of *actual*
23 *dilution* rather than a likelihood of dilution. Congress enacted the TDRA in 2006 to
overrule Moseley vs. V Secret Catalogue, 537 U.S. 418 (2003) and make clear that
24 mark holders need only prove a likelihood of dilution.  See TDRA, Pub. L. No. 109-
312, § 2, 120 Stat. 1730, 1730–32 (2006) (codified at 15 U.S.C. § 1125(c) (2006));
25 Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 507 F.3d 252, 264 n.2
(4th Cir. 2007).  In passing the TDRA, Congress also explicitly incorporated
26 dilution by "tarnishment" in the statutory text. 15 U.S.C. § 1125(c)(1).

27

28

11

1  association between the two.").

2  Here, the TDRA's "dilution by tarnishment" claim under 15 U.S.C. §

3  1125(c), as set forth in Count III, cannot survive the barest constitutional scrutiny

4  under the U.S. Supreme Court's landmark holding in TradeMark Cases, 100 U.S. 82

5  (1879). Accordingly, before considering the statutory elements of this claim under a

6  Rule 12 motion for failure to state a claim, the constitutionality of the cause of

7  action itself requires a thorough judicial vetting.

8  A.  **NONE OF THE (PLAUSIBLE) ENUMERATED POWERS WITHIN ARTICLE I, SEC.**

9  **8 OF THE U.S. CONSTITUTION VESTS CONGRESS WITH THE AUTHORITY TO**

10  **PROTECT THE *REPUTATION* OF FAMOUS TRADEMARKS**

11  ➔  The issue presented in Point II.A is whether the federal cause of action

12  for "dilution by tarnishment," 15 U.S.C. § 1125(c) is non-actionable as a matter of

13  law because it is "void for want of constitutional authority." Trade-Mark Cases, 100

14  U.S. 82, 98 (1879).

15  Congress derives its authority to enact the Lanham (Trademark) Act of 1946

16  by way of the Commerce Clause, which provides that Congress shall have the power

17  "[t]o regulate Commerce with foreign Nations, and among the several States, and

18  with the Indian Tribes." U.S. CONST. art. I, § 8, cl. 3. Congress enacted the first

19  trademark act *to be grounded on the Commerce Clause* in the year 1881. See Act of

20  Mar. 3, 1881, ch. 138, 21 Stat. 502 (repealed 1946) ("the 1881 Act"). However, the

21  1881 Act was *not* the first Congressional attempt to codify a federal trademark

22  statute. That distinction belongs to the Act of July 8, 1870, ch. 230, 16 Stat. (the

23  "1870 Act").[13]

24  Nine years after the 1870 Act went into effect, the U.S. Supreme Court *struck*

25

26  [13] See generally, Ethan Horwitz & Benjamin Levi, *Fifty Years of the Lanham Act: A Retrospective of Section 43(a),* FORDHAM INTELLECTUAL PROPERTY, MEDIA AND

27  ENTERTAINMENT LAW JOURNAl, Vol. 7, Issue 1 (1996).

28

*it down* as being "void for want of constitutional authority." See TradeMark Cases, 100 U.S. 82 (1879).   The High Court declared that the 1870 statute was unconstitutional because it rested on *the wrong congressional power*. Id. at 97-99.

The Supreme Court found that Congress had initially erred by basing the 1870 Act on the Copyright (& Patent) Clause, which provides that Congress shall have the power "[t]o promote the Progress of Science and the useful Arts, by securing for limited Times, to Authors and Inventors, the exclusive Right to their respective Writings and Discoveries." U.S. CONST. art. I, § 8, cl. 8. The U.S. Supreme Court drew a sharp distinction between trademarks, on one hand, and copyrights / patents on the other, holding that:

> *A trademark is neither an invention, a discovery, nor a writing* within the meaning of the eighth clause of the eighth section of the first article of the Constitution, which confers on Congress power to secure for limited times to authors and inventors the exclusive right to their respective writings and discoveries.
>
> *If an act of Congress can in any case be extended, as a regulation of commerce, to trademarks, it must be limited to their use in "commerce* with foreign nations, and among the several states, and with the Indian tribes."

Trademark Cases, 100 U.S. at 98-99 (emphasis added).   Accordingly, the High Court struck down the Nation's very first federal trademark statute as being "*void for want of constitutional authority.*" Id. at 99.

Not unlike the 1870 Act, the TDRA is patently void under the U.S. Supreme Court's holding in Trademark Cases, 100 U.S. at 97-99, to the extent the statute prescribes a remedy for "tarnishment" of famous trademarks, 15 U.S.C. §§ 1125(c). Indeed, as set forth below, none of the (plausible) enumerated powers within Article I, Section 8 of the U.S. Constitution vests Congress with the authority to protect *individual owners* of famous trademarks from mere reputational harm.[14]

---

[14] Section 43(a) of the Lanham Act is derived from the Commerce Clause; not from the state right of publicity or defamation law. It is self-evident that ALL statutory

13

**First,** the purported federal cause of action for "tarnishment" under § 1125(c) does *not* arise out of the Commerce Clause.  U.S. CONST. art. I, § 8, cl. 3.  The injury redressed by this statutory provision bears *no relation whatsoever* to commerce with foreign nations, nor to commerce among the several states, nor to any economic principle of any kind.  It's definitely not benefitting the Indian Tribes.[15]  For example, there is no requirement that a § 1125(c)(1) "tarnishment" plaintiff prove actual economic injury; nor market competition; nor actual confusion; nor even a likelihood of confusion.  Moreover, the "tarnishment" prong of the TDRA does not provide any incentive to trademark owners to make their marks more famous or more attractive to consumers.  (Capital gain is the only true incentive a trademark owner needs to build a brand).[16]  The TDRA is a statutory remedy for *self-perceived* damage to reputation, nothing more.

**Second,** as per Trademark Cases, 100 U.S. at 97-99, Congressional authority to enact a "tarnishment" claim under § 1125(c)(1) clearly does <u>not</u> derive from the Copyright & Patent Clause.  U.S. CONST. art. I, § 8, cl. 8.  Maintenance of self-perceived "wholesomeness" is inapposite to the "Progress of Science and the Useful Arts...."

**Third,** Congressional authority to enact a "tarnishment" claim under 15 U.S.C. § 1125(c) does not fall within the scope of the Necessary and Proper Clause.  U.S.

---

remedies prescribed by the Lanham Act must be limited to those which are intended to protect consumers from injury.  See Trademark Cases, 100 U.S. at 98-99

[15] *The Twilight Saga* movie franchise has been publicly condemned by American scholars and civil rights activists for perpetuating 19th century-era racial stereotypes about Native American culture & heritage.  [See Docket No. 1; Ex. R]

[16] See Mike Masnick, *Why the Theory of 'Tarnishment' Doesn't Make Sense for Trademark Law,* *www.TechDirt.com*  techdirt.com/articles/20120926/.../why-theory-tarnishment-doesnt-make-sense-trademark-law.shtml,  accessed 9/14/13

14

1
2
3
4
5
6
7
8
9
10
11
12

CONST. art. I, § 8, cl. 18.[17]  It is *not* Necessary nor Proper for the Government to protect owners of famous trademarks from the perceived threat of alleged "free-riders," whether they be pornographers or parodists. If consumers have come to identify with a certain brand, and enjoy consuming products associated with said brand, then no amount of uncouth parody or audio-visual debauchery is going to alter that perception.   If the owner of a famous mark somehow managed to achieve fame, it was ultimately because the company's products were of superior quality or maximum utility in relation to the competitor's products.  Tarnishment of the mark via third-party "obscenity" – however that may be perceived in the eye of the beholder – is not going to deter American consumers from brand loyalty, provided that the goods produced by the famous trademark owner remain of superior quality and  maximum utility.

13
14
15
16
17

In sum, the Trademark Dilution Revision Act of 2006 is a *rogue* statute that is constitutionally unhinged from any enumerated power under Article I.  In any event, this federal cause of action is wholly inconsistent with the purpose of the Lanham (Trademark) Act of 1946, which is *to protect consumers from deception* by trademark owners and their secondary users.

18
19

**B.    THE TDRA FACILITATES VIEWPOINT DISCRIMINATION OF COPYRIGHTED WORKS EMBODYING *ARTISTIC* CONTENT & *POLITICAL* MESSAGES**

20
21
22

➔    The issue presented in Point II.B is whether the federal cause of action for "dilution by tarnishment," 15 U.S.C. § 1125(c) should be struck down on grounds of public policy.

23
24

First, the Congressional enactment of a "tarnishment" claim under 15 U.S.C. §

25
26
27

---

[17] "The Congress shall have Power ... To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

28

1125(c) tends to violate "the wall of separation Between Church & State" by according the Government authority to parse out what is "wholesome" or "sexy" from what isn't.   Judicial intervention to regulate "wholesomeness" in private commercial transactions and Free Speech markets is clearly beyond U.S. constitutional boundaries.   The Framers instruct that the entire concept of preaching "wholesomeness" is best left to religious organizations in the privacy of their own domains. As per Thomas Jefferson:

> Believing with you that religion is a matter which lies solely between Man & his God, that he owes account to none other for his faith or his worship, ***that the legitimate powers of government reach actions only, & not opinions,*** I contemplate with sovereign reverence <u>that act of the whole American people</u> which declared **that their legislature should "make no law respecting an establishment of religion, or prohibiting the free exercise thereof"**, ***thus building a wall of separation between Church & State.***[18]

Here, the sheer folly of LIONSGATE (Summit)'s federal "dilution by tarnishment" claim is that *The Twilight Saga* motion pictures are anathema to core American ideals of sexual liberation, meritocracy and transcultural utopia.  And if that weren't enough, LIONSGATE (Summit) made an X-Rated parody which quite literally *defecated* all over their "wholesome" *Twilight* fantasy romance series.  As a result, *The Twilight Saga* trademark portfolio remains 140% Tarnish-Proof.

<u>Second</u>, in real world litigation practice, the TDRA is utilized as an oppressive tool of political speech censorship.  As this case amply demonstrates, the TDRA manifests in the 21st century information goods industry as nothing more than a Trademark Act *proxy* for a copyright infringement claim. Indeed, the TDRA cause of action can be and IS targeted at the author of virtually *any* expressive content in the

---

[18]   <u>See</u> Jefferson, Thomas (1802-01-01). "Jefferson's Letter to the Danbury Baptists". U.S. Library of Congress. *Retrieved* 2006-11-31.

marketplace of ideas that hasn't been "Rated G."[19]

LIONS GATE (Summit) lacks constitutional standing to invoke the remedy it seeks under the third cause of action. [Docket No. 16, Counterclaims ¶¶ 47-56] Count III should therefore be dismissed *with prejudice* pursuant to Fed. R. Civ. P. 12(1)(b) for lack of subject matter jurisdiction.

## POINT III

### THE TRANSFEREE COURT LACKS SUBJECT MATTER JURISDICTION OVER THIS CIVIL ACTION BECAUSE LIONSGATE DID NOT HAVE STANDING TO TRANSFER VENUE UNDER 28 U.S.C. § 1404(a)

———————————

To Dismiss All Counterclaims
Pursuant to Rule 12(b)(1) *Without Prejudice*

———————————

BTL respectfully submits that the Transferee Court lacks subject matter jurisdiction over this action because the Transferor Court (S.D.N.Y. - Rakoff, J.) acted outside the confines of its prescribed jurisdiction when it ordered this civil action, S.D.N.Y. 1:13-cv-08899 transferred to the Central District of California. [Docket No. 5]

Courts have held that where a district court exceeds its power to transfer a civil action pursuant to § 1404(a), further proceedings, judgments in the transferor court are a nullity. See Foster-Milburn Co. v. Knight, 181 F.2d 949, 951 (2d Cir. 1950) (if the district court had no power to transfer, then transfer will be a "nullity" and the transferee court "will have no jurisdiction .... and any judgment it may enter

---

[19] According to the MPAA, "[a] G-rated motion picture contains nothing in theme, language, nudity, sex, violence or other matters that, in the view of the Rating Board, would offend parents whose younger children view the motion picture … No nudity, sex scenes or drug use are present in the motion picture." http://www.mpaa.org/ratings/what-each-rating-means,

will be void.").

Here, LIONS GATE lacked Article III standing to invoke the Transferor Court's power to transfer under § 1404(a) because LIONS GATE failed to make a threshold showing that it would suffer any cognizable harm by proceeding in the original forum.  In Tomita Technologies, the Transferor Court (Rakoff, J.) recognized that a large company's history of successful intellectual property litigation in the Southern District of New York forecloses any credible argument that the original forum here was inconvenient. 818 F.Supp.2d at 774, fn. 1 ("Given Nintendo's history of successful intellectual property litigation in the Southern District of New York, *the Court cannot imagine that further litigation here will meaningfully inconvenience Nintendo or put it at any tactical disadvantage.")* (emphasis added).

LIONS GATE litigates in the Southern District of New York with greater frequency and success than Nintendo.[20] Clearly, if there was no inconvenience to LIONS GATE to successfully defend itself before the Transferor Court in an action related to LIONS GATE'S exploitation of copyrights in the motion picture industry, then it is beyond credible that LIONS GATE could have or will ever suffer *any degree* of inconvenience – whether real or imagined – by appearing in *this* action.[21]

Further, LIONS GATE enjoys "maximum contacts" with the original forum.

---

[20] LIONS GATE appeared before the Transferor Court as a named defendant in a 2011 copyright infringement action decided in LIONS GATE'S favor. Webb v. Stallone, Civ. Action No. 11-civ-7517 (S.D.N.Y.) (JSR); see also Lionsgate Entertainment Corp. v. Icahn, Civ. Action No. 10-cv-08169 (S.D.N.Y.) (J. Baer)

[21] Furthermore, a pre-merger SUMMIT ENTERTAINMENT LLC is NOT in any way inconvenienced by litigating in the Southern District of New York.   See Summit Entertainment, LLC v. Bath & Bodyworks Brand Management, Inc., 2011 WL 2649973 *2 (C.D. Cal. July 5, 2011) (transferring second-filed action to Southern District of New York after finding that Summit has "substantial connections to the New York forum" because Summit "conducts routine business in New York and has brought suits in New York in the past.")

18

LIONS GATE  trades its stock on the New York Stock Exchange [LGF]; maintains executive offices and employees at 75 Rockefeller Plaza, New York, NY 10019; heavily advertises, promotes and exhibits its trademarks and copyrights in New York; retains Am 100 litigation counsel in New York on this case[22] and others;[23] uses a New York accounting firm[24] to prepare its quarterly and annual submissions to the federal government; transacts business in the New York banking system;[25] takes advantage of New York tax incentives and programs;[26] and is subject to local taxes including the New York City Unincorporated Business Tax.[27]   LIONS GATE (Summit) had no standing to deprive BTL of its venue privilege.

In addition, BLT incorporates by reference, as if fully stated herein, the arguments concerning Article III standing set forth in BTL's Motion for Certification of the Transferor Court's Transfer Orders pursuant to 28 U.S.C. § 1292(c) [Docket No. 14, pp. 17-43].

---

[22] SHEPARD MULLIN (with 61 Attorneys in New York office).

[23] LIONSGATE retained WACHTELL, LIPTON, ROSEN & KATZ in its lawsuit against Carl Icahn; and retained PRYOR CASHMAN in Webb v. Stallone.

[24] PricewaterhouseCoopers LLC

[25] The Bank of New York Mellon Trust Company, N.A.; J.P. Morgan Trust Co.; Chase Manhattan Bank.

[26] As per Lionsgate's public 10-K filings.

[27] Id.

# FED R. CIV. P. 12(b)(3)

◆   ◆   ◆

## IMPROPER VENUE

### STANDARD OF LAW

"Venue is necessarily defined as the appropriate district court to file an action ." <u>NLRB v. Line</u>, 50 F.3d 311, 314 (5th Cir. 1995).

### POINT IV

### S.D.N.Y. IS THE PROPER VENUE

The Southern District of New York was and is the appropriate district court in which to file an action in this case because it was the only district in which BTL was capable of filing.  BTL's federal antitrust causes of action were discovered in New York, investigated in New York and filed in New York.

Therefore, the Transferor Court retains original jurisdiction over all claims and issues originally brought in the original forum, including all claims arising under the First Amendment to the U.S. Constitution (Amend. I); the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202; 28 U.S.C. 1338(a); the Copyright Act of 1976, 15 U.S.C. §§ 101, 106-107; 201; 501; 28 U.S.C. § 1367(a); Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2; and under Sections 4 and 16 of the Clayton Antitrust Act , 15 U.S.C. §§ 15, 26;  28 U.S.C. § 2403 [constitutional question]; and the Lanham (Trademark) Act, 15 U.S.C. §§ 1051, 1065, 1119, 1125; as well as under New York common law.

Given that this civil action could not have been *fairly or effectively* brought in the Transferee Forum, venue in the Central District of California is improper pursuant to Fed. R. Civ. P. 12(b)(3).  The Court should dismiss the Counterclaims in their entirety.  Alternatively, the district court should, in the further interests of justice, re-transfer the civil action to the original forum pursuant to 28 U.S.C. §1406(a).

20

# FED R. CIV. P. 12(b)(4); 12(b)(5)

❖   ❖   ❖

## INSUFFICIENT PROCESS / SERVICE OF PROCESS

### STANDARD OF LAW

• Rule 12(b)(4) provides that claims for relief may be dismissed for insufficient process.  Fed R. Civ. P. 12(b)(4)

• Rule 12(b)(5) provides that claims for relief may be dismissed for insufficient service of process.  Fed R. Civ. P. 12(b)(5)

## POINT V

**A.      THE COUNTERCLAIMS SHOULD BE DISMISSED PURSUANT TO FED. R. CIV. P. 12(b)(4) FOR INSUFFICIENT PROCESS**

BTL hereby incorporates by reference, as if fully set forth herein, Plaintiff's *Ex Parte* Application for an Order to Stay This Civil Action, Docket No. 17, filed February 12, 2014, at ECF page 4:13 through page 8:5.

BTL avers that the Counterclaims are defective on their face in violation of Fed. R. Civ. P. 12(b)(4).  They were filed before BTL served its summons and initial complaint and before BTL's counsel filed its notice of appearance. [Docket Nos. 22-23]  Summit admits in its Answer that the filing of Counterclaims did NOT comply with the Federal Rules of Civil Procedure. See Docket No. 16, Counterclaims, ¶ 30 ("As of the filing of this Answer and Counterclaims, Plaintiff has not served Defendants or their agents with a summons or a copy of the complaint in this case.")  To date, BTL has *not* served the Counterclaimants with a summons and complaint in this action.

Accordingly, it was procedurally improper for LIONSGATE (Summit) to frame its causes of action as "Counterclaims," to describe Summit as "Counterclaimants" and BTL as "Counter-Defendants."  BTL's usage of such terms in this motion to dismiss pursuant to Rule 12 is intended to avoid further confusion caused by the

21

1  untimely and improper process utilized to file the Counterclaims.  Accordingly, the
2  Court should dismiss Counterclaims [Docket No. 16] pursuant to Fed. R. Civ. P.
3  12(b)(4) on grounds that they are facially defective and procedurally improper.

4  **B.    THE COUNTERCLAIMS SHOULD BE DISMISSED PURSUANT TO**
5  **       FED. R. CIV. P. 12(B)(5) FOR INSUFFICIENT SERVICE OF PROCESS**

6       In addition to the facially defective nature of Summit's Counterclaims, the
7  papers were not properly served upon BTL, the so-called Counter-Defendants,
8  pursuant to Fed. R. Civ. 4 (or Fed. R. Civ. P. 5). This is because BTL's New York-
9  based lead counsel did NOT consent in writing or otherwise to be served with
10  initiating documents in the Transferee Forum, a venue in which he is not admitted to
11  practice law. BTL's counsel has no authority to accept service of the Counterclaims
12  on behalf of BTL. Moreover, the Counterclaimant(s) failed to serve BTL directly
13  through its registered agent or at its principal place of business, or as otherwise
14  required by Fed. R. Civ. P. 4 (or Fed. R. Civ. P. 5).[28]  Accordingly, the Court should
15  dismiss LIONS GATE (Summit)'s Counterclaimants pursuant to Fed. R. Civ. P.
16  12(b)(5) for insufficient service of process.

17

18                    FED R. CIV. P. 12(b)(7); 17(a); 19(a)
19                                ♦   ♦   ♦
20               **REAL PARTY IN INTEREST / FAILURE TO JOIN**

21                            **STANDARD OF LAW**

22       Every federal civil action must be prosecuted in the name of the real party in
23  interest. <u>See</u> Fed. R. Civ. P. 17(a).  Rule 17(a) requires that "the action must be
24

_____

25  [28] Indeed, service of LIONS GATE (Summit)'s Counterclaims [Docket No. 16] has
26  NOT, to date, been properly effectuated. The papers will need to be served again in
    due course so as to re-set the clock on the Federal Rules of Civil Procedure, which is
27  now in total disarray.

28

brought by the person entitled under the governing substantive law to enforce the asserted right." Whelan v. Abell, 953 F.2d 663, 672 (D.C. Cir. 1992), cert. denied, 506 U.S. 906 (1992). See also United HealthCare Corp. v. American Trade Insurance Co., Ltd., 88 F.3d 563, 568-69 (6th Cir. 1996) ("this rule requires that the party who brings an action *actually possess*, under the substantive law, the right sought to be enforced") (emphasis added); Boeing Airplane Co. v. Perry, 322 F.2d 589, 591 (10th Cir. 1963), cert denied, 375 U.S. 984 (1964) ("the 'real party in interest' is the one who, under applicable substantive law, has the legal right to bring the suit").

## POINT VI

### SUMMIT IS NOT THE "REAL PARTY IN INTEREST" AND LIONS GATE ENTERTAINMENT CORP. MUST BE JOINED AS A NECESSARY PARTY

———————————

BTL's Motion to Dismiss ALL Counterclaims **Counts I-V**
Pursuant to **Fed. R. Civ. P 12(b)(7); 17(a); 19(a)**

———————————

A.   SUMMIT ENTERTAINMENT IS NOT THE NAME OF THE REAL PARTY IN INTEREST AS REQUIRED BY FED R. CIV. 17(a)

➔   The issue on Point VI.A is whether Summit Entertainment LLC, the sole named Counterclaimant on the face of Docket No. 16 is the real party in interest pursuant to Fed. R. Civ. P. 17(a).

"[W]e conclude that merely calling someone a copyright owner does not make it so." Righthaven LLC v. Hoehn, __ F.3d ____ (9th Cir. May 9, 2013); see also Eden Toys, Inc. v. Florelee Undergarment Co., 697 F.2d 27 (2d Cir. 1982) ("We do not believe that the Copyright Act permits holders of rights under copyrights to choose third parties to bring suits on their behalf.").

BTL brings this motion to dismiss under Rule 17(a) based on the fact that

23

Summit Entertainment is not the true and real owner of the intellectual property assets set forth in its Counterclaims.  Nevertheless, all of the Counterclaims in this action have been filed by "Summit Entertainment, LLC" [Docket No. 16] - *as opposed to* LIONS GATE ENTERTAINMENT CORP.  The COUNTERCLAIMS should be dismissed in their entirety under Rule 17(a) on grounds that "Summit Entertainment, LLC" is NOT the real party in interest. Fed. R. Civ. P. 17(a)

As grounds for this assertion, BTL avers that based on the material facts available in the public record, "Summit Entertainment" no longer operates as a going business concern or - if it does maintain structural formalities - it solely operates as a "shell," alter ego or holding vessel under the direct ownership, supervision and control of LIONS GATE and its public stakeholders.

◆    On or about January 13, 2012, LIONS GATE announced that it had effectuated a merger with Summit Entertainment LLC. [Docket No. 1 Ex. E (BTL_000244)].[29] In a statement to the press concerning the merger, Summit's former co-chairmen Rob Friedman and Patrick Wachsberger stated: "We believe that **the combined media entity** will be even greater than the sum of its parts." [Docket No. 1, Ex. E (BTL_000299)] (emphasis added).  Lions Gate's CEO Jon Feltheimer "said LIONS GATE would look to consolidate and pare down the **combined studios'** upcoming slate of movies." [Ex. E (BTL_000299)] (emphasis added)

◆    On January 14, 2012, the LOS ANGELES TIMES reported that LIONS GATE had merged with Summit in a deal that "**will combine the largest independent movie studios**," and reported that the studios would **"join forces"** and merge into **"one powerful entity."** [Docket No. 1, Ex. E (BTL_000256-57)]

_____

[29] Prior to the merger, Counterclaimant Summit Entertainment LLC was a limited liability company organized under the laws of the State of Delaware. [Docket No. 1, Ex. E (BTL_000260)]

(emphasis added)

◆     The merger between LIONS GATE (Summit) was effectuated via a "rare" type of transaction known as a **"simultaneous sign-and-close merger agreement"** in which about 80 percent of the $412.5 million purchase price was funded by cash and about 20 percent by stock in escrow. [Docket No. 1, Ex. E (BTL_000292)] (emphasis added)]. By agreeing to merge with LIONS GATE, the owners of Summit acquired "a stake of more than 5% in **the combined company."** [Docket No. 1, Ex. E (BTL_000257)] (emphasis added). "We are going to take the time to slowly but *consistently meld* with their team **and form a bigger company when we're done**." [Docket No. 1., Ex. E (BTL_000257)].

◆     As a result of the *sign-and-close merger agreement*, "Summit Entertainment" now subsists – if at all – as a "*separate movie label under Lions Gate*". [Docket No. 1, Ex. E (BTL_000257)] (emphasis added). After the merger was effectuated, LIONS GATE (Summit) was fully integrated into a unified corporate structure. A common identity thereafter formed between the executive officers and key personnel of LIONS GATE (Summit). For example, Rob Friedman and Patrick Wachsberger, who were the Co-Chairmen of Summit dating back to April 2007, became the Co-Chairman of LIONS GATE'S Motion Picture Group. [Docket No. 1, Ex. E. (BTL_000314)]. Likewise, Attorney Friedman, who was the general counsel of Summit prior to the merger, became the deputy general counsel of LIONS GATE. [Docket No. 1, Ex. E. (BTL_000292)]

◆     On April 30, 2013, LIONS GATE'S CEO stated that "**our integration of Lionsgate and Summit is substantially complete**, and **we have proven executives** like Rob Friedman, Patrick Wachsberger and Erik Feig, **all originally from Summit**, leading our film business." [Docket No. 1., Ex. E (BTL_000307)] (emphasis added)

◆     Incredibly, LIONS GATE ENTERTAINMENT CORP. has attempted to

absolve itself from antitrust liability in this proceeding by allocating full responsibility to its purported subsidiary "Summit Entertainment," which is merely a trade label.   For example, on October 22, 2013, LIONS GATE moved the Court (Morrow, J.) to dismiss BTL's federal antitrust claim pursuant to Rule 12(b)(6) [Action #1: Docket No 52].  LIONS GATE also sought to be dismissed from the action altogether on grounds that:

> "**Summit owns the intellectual property rights associated with the *Twilight Motion Pictures* at issue in this case, and Summit alone sent the cease and desist letter which forms the principal basis of Plaintiff's antitrust claim** …. ***Lions Gate did not take any of the actions alleged therein.***"  [Action #1, Docket No. 52]

◆   LIONS GATE'S deceptive "shell games" should not be countenanced by the Court.  LIONS GATE has been commandeering this predatory IP Enforcement enterprise since their first official contact was established with BTL in December 2011.  At all times thereafter, LIONS GATE and its individual executives had a financial interest to exclude BTL's feature length film Twiharder from the derivative market for parody of *The Twilight Saga*.  This enabled LIONS GATE to capture monopoly profits from the exploitation of *Breaking Wind* (2012) and *Vampires Suck* (2010).[30]

◆   The record shows that LIONS GATE played a key decision-making role in events leading up to this lawsuit. LIONS GATE'S Deputy General Counsel, David C. Friedman, Esq. and LIONS GATE'S Vice-President of Legal Affairs, Robert Mason, Esq., were both copied on ALL pre-litigation cease and desist letters from Counterclaimants' IP Counsel to BTL [Docket No. 1., Ex. A (BTL_000007;

---

[30] When BTL called LIONS GATE'S bluff and filed suit in the original forum in May 2013, LIONS GATE leveraged the Summit label name as a means to escape BTL's properly situated choice of venue.  And after venue transfer, LIONS GATE again leveraged the Summit label as a means to extricate itself from antitrust liability.

BTL_000023; BTL_000029; BTL_000035; BTL_000043; Ex. E (BTL_000276)].

◆      There can be no dispute that LIONS GATE is the real party in interest under Fed. Civ. 17(a). Therefore, it <u>must</u> be *named* as a Counterclaimant for a proper and just adjudication.

## B.   COUNTERCLAIMS MUST BE DISMISSED FOR *FAILURE TO JOIN* LIONS GATE, A "NECESSARY PARTY" UNDER FED. R. CIV. P. 12(B)(7) AND 19(a)

Summit's Counterclaims [Document No. 16] should likewise be dismissed under Fed. R. Civ. P. 12(b)(7) because Summit has failed to join a necessary party under Fed. R. Civ. 19(a)(1). Failure to include LIONS GATE as a Counterclaimant will subject BTL to the substantial risk of incurring incomplete relief as well as risk exposing BTL to double or multiple obligations, a concern of Fed. R. Civ. P. 19(a)(2)(ii).  If "Summit" is permitted to prosecute this action on its own, there is no protection for BTL or its individual members that would prevent BTL from later being sued by LIONS GATE (or one of its other subsidiaries or trade labels) for all of the same objectively baseless claims set forth in Docket No. 16. <u>See, e.g.</u>, <u>Smith v. Kessner</u>, 183 F.R.D. 373, 375 (S.D.N.Y. 1998); <u>Rose v. Simms</u>, 1995 WL 702307, at *6 (S.D.N.Y. Nov. 29, 1995).

Further, adjudication of the claims by a movie label named "Summit" without naming LIONS GATE could impair or impede LIONS GATE'S ability to protect its interests in the copyright repertoire / trademark portfolio at issue in this action. Under Fed R. Civ. P. 19(a)(2)(i), compulsory joinder under the "impair or impede clause" is warranted to protect LIONS GATE'S ability to protect its valuable intellectual property interests related to *The Twilight Saga*.  This is particularly the case here where BTL intends to petition the Court, or the appropriate executive agency, to <u>cancel</u> LIONS GATE'S trademarks and copyrights associated with *The Twilight Saga* on account of its antitrust violations.  Thus, the Court's disposition as to the cancellation of these IP assets will have direct and immediate consequences to

1   LIONS GATE, which purports to own the IP assets in its 10-K filings.

2       Based on the foregoing, the Counterclaims should be dismissed for failure to

3   join a necessary party under Fed R. Civ. P. 12(b)(7) and Fed R. Civ. P. 19(a)(2)(i).

4

5                              **CONCLUSION**

6   **WHEREFORE**, Counter-Defendants BETWEEN THE LINES PRODUCTIONS, LLC prays for

7   on ORDER DISMISSING ALL Counterclaims pursuant to Rules (12)(b)(1); 12(b)(3); 12(b)(4);

8   12(b)(5); 12(b)(7); 17(a); and 19(a) of the Federal Rules of Civil Procedure.

9

10       Dated: March 10, 2014
         New York, New York
11

12

13                                          RESPECTFULLY SUBMITTED:

14                                          **/jameshfreeman/**_____
                                            James H. Freeman, Esq.
15
                                            JH FREEMAN LAW
16                                           *[Pro Hac Vice Pending]*
                                            3 Columbus Circle, 15th Floor
17                                          New York, NY 10019
                                            Tel: (212) 931-8535 / Fax: (212)
18                                          james@jhfreemanlaw.com

19                                          *Attorney for Counter-Defendants*
                                            *Between the Lines Productions, LLC*
20

21

22

23

24

25

26

27

28

1

### CERTIFICATE OF SERVICE

2

3

I hereby certify that on this **10th day** of March**, 2014**, a true and correct copy of the

4

foregoing was filed with the Court through the ECF-CM electronic filing system, which will

5

automatically serve electronic notice of the same on the following counsel of record:

6

7    Jill Pietrini, Esq.
     SHEPPARD MULLIN RICHTER & HAMPTON LLP

8    1901 Avenue of the Stars, Suite 1600
     Los Angeles, CA 90067

9    Tel: (310) 228-2249
     Fax: (310) 228-3960

10   jpietrini@sheppardmullin.com

11   Paul Bost, Esq.

12   SHEPPARD MULLIN RICHTER & HAMPTON LLP
     1901 Avenue of the Stars, Suite 1600

13   Los Angeles, CA 90067
     Tel: (310) 228-2249

14   Fax: (310) 228-3960
     pbost@sheppardmullin.com

15

16   *Attorneys for Defendants* LIONS GATE *Entertainment Corp.*

17   *and Summit Entertainment LLC*

18

19                                                      By:  *s/ James H. Freeman*

20

21

22

23

24

25

26

27

28