JAMES H. FREEMAN
*Admitted Pro Hac Vice*
JH FREEMAN LAW
3 Columbus Circle, 15th Floor
New York, NY 10019
Tel: (212) 931-8535
james@jhfreemanlaw.com

STEVE LOWE (Cal. Bar #122208)
LOWE & ASSOCIATES, P.C.
11400 Olympic Blvd., Suite 640
Los Angeles, CA 90064
Tel: (310) 477-5811 / Fax: (310) 477-7672
steven@lowelaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| BETWEEN THE LINES PRODUCTIONS, LLC, a California limited liability Company, <br><br> Plaintiff, <br><br> vs. <br><br> LIONS GATE ENTERTAINMENT CORP., a British Columbia corporation, and SUMMIT ENTERTAINMENT, LLC, a Delaware limited liability company <br><br> Defendants. <br> -------------------------------------- <br> SUMMIT ENTERTAINMENT, LLC, <br><br> Counterclaimant <br> vs. <br><br> BETWEEN THE LINES PRODUCTIONS, LLC <br><br> Counter-Defendants | Case No. 2:14-cv-00104-R (PJWx) <br><br> Hon. Judge Manuel L. Real <br><br> **PLAINTIFF BETWEEN THE LINES PRODUCTIONS LLC'S UNILATERAL [PROPOSED] FINAL PRE-TRIAL CONFERENCE ORDER** <br><br><br> Trial Date: November 25, 2014 |

Pursuant to L.R. 16, Plaintiff and Counter-Defendant Between the Lines Productions, LLC ("BTLP") hereby lodges a unilateral [proposed] final pre-trial conference order. The submission is unilateral and filed two days late for the reasons stated in the attached declaration of BTLP's lead counsel. On October 28, 2014, the parties agreed by e-mail to submit a joint [proposed] order in the proper form.

◆     ◆     ◆

Following pretrial proceedings, pursuant to F.R. Civ.P. and L.R. 16, IT IS ORDERED:

**1.    The Parties And The Pleadings**

The parties are Plaintiff and Counter-Defendant Between the Lines Productions, LLC ("Plaintiff" or "BTLP"); <u>and</u> Defendant and Counterclaimant Summit Entertainment, LLC ("Defendant" or "Summit").

Each of these parties has been served and has appeared. All other parties named in the pleadings and not identified in the preceding paragraph are now dismissed.

The pleadings which raise the issues are:

◆    <u>BTLP's Complaint</u>:  Docket No. ("R.) 1
◆    <u>Summit's Answer and Counterclaims</u>: R. 16
◆    <u>BTLP's Answer to Summit's Counterclaims</u>: R. 45

**2.    <u>Jurisdiction and Venue</u>:**

**BTLP'S STATEMENT**

Counts I and II of BTLP's complaint for non-infringement (and non-dilution) arises under the Copyright Act of 1976, as amended, 17 U.S.C. §

101, *et seq*.; and trademark and anti-dilution laws of the United States, 15 U.S.C. § 1114; 1125, *et seq*.; this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) and (b), and § 1367, 17 U.S.C. § 501.

With respect to venue, BTLP contends that this civil action (and the prior related action) were improperly transferred by Hon. Judge Jed. S. Rakoff (S.D.N.Y.) on grounds, *inter alia*, that an antitrust defendant-New York public company (and its multi-national law firm with bi-coastal offices) lacked Article III standing to seek the award of venue transfer under 28 U.S.C. § 1404(a), which has caused extreme hardship to BTLP.

**3.    Trial Estimate**

**BTLP's Statement**

BTLP projects that it will need five (5) days to present its case, including a presentation on compensatory and punitive damages.

**4.    The trial is to be a jury trial.**   At least one week prior to the trial date counsel shall deliver to the Court and opposing counsel:  (a) proposed jury instructions as required by Local Rule 13.2 and (b) any special instructions requested to be put to prospective jurors on voir dire.

**5.    The following facts are admitted and require no proof:.**

BTLP incorporates by reference Summit's statement of stipulated facts in its unilateral submission, R. 101-1, PageID#4152, <u>except</u>:

♦   BTLP did <u>not</u> stipulate to ¶ 29, PageID#:4159 or ¶ 5 on PageID#4171 ("…and became famous before BTL's first use of the TWIHARDER mark in commerce.")

♦   BTLP does <u>not</u> stipulate to *any* facts concerning the registration or

use of the two (2)  TWIHARD marks and objects to the TWIHARD marks being used under the collective definition "TWILIGHT Marks."

**6.    The following facts, though stipulated, shall be without prejudice to any evidentiary objection: NONE.**

**7.    Parties' Claims and Defenses**

BTLP'S STATEMENT

**(a)    BTLP plans to pursue the following claims and defenses:**

- Claim 1:  Declaratory Judgment of Non-Infringement (Copyright)
- Claim 2:  Declaratory Judgment of Non-Infringement (Lanham Act)
- Claim 3:  *Prima Facie* Tort (New York Law)

- Affirmative Defense 1: (sixth defense): First Amendment Privilege / Immunity
- Affirmative Defense 2: (twelfth defense): Non-Infringement ("Fair Use")[1]
- Affirmative Defense 3: (thirteenth defense): Copyright Misuse
- Affirmative Defense 4: (third defense): Statute of Limitations
- Affirmative Defense 5: (second defense): Laches

---

[1] Although fair use has been labeled as an "affirmative defense," a fair use in NOT an infringement of copyright. See 17 U.S.C. § 107 (providing that "[n]otwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work . . . is not an infringement of copyright."); Association of American Medical Colleges v. Cuomo, 928 F.2d 519, 523 (2d Cir. 1991) ("It has long been recognized that certain unauthorized but 'fair' uses of copyrighted material do not constitute copyright infringement."); Online Policy Group v. Diebold, Inc., 337 F. Supp. 2d 1195, 1200 (N.D. Cal. 2004) ("fair use is not infringement of a copyright") (citing Campbell v. Acuff-Rose, 510 U.S. 569 (1994); Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539 (1985).

**(b)** **The Elements Required to Establish BTLP's Claims and Affirmative Defenses are:**

**Claim 1 and 2 [Elements]**

BTLP's Claim 1 and Claim 2 for Declaratory Judgment of non-infringement / non-dilution under the Lanham Act and Copyright Act are contingent upon Summit's failure to meet its burden on its federal claims and/or BTLP's success in establishing its defenses.  Accordingly, to avoid duplication, Claim 1 and Claim 2 will not be analyzed separately from Summit's counterclaims and BTLP's defenses.

**Claim 3 [Elements] -** *Prima Facie* **Tort**

1.     BTLP must establish by the preponderance of the evidence that Summit acted with "disinterested malevolence," which is the intentional infliction of harm without excuse or justification;

2.     BTLP must establish by the preponderance of the evidence that Summit utilized an otherwise lawful means to inflict harm;

3.     BTLP must establish by the preponderance of the evidence that it suffered economic injury as a direct or proximate result of Summit's conduct.

In addition, section 870 of the RESTATEMENT (SECOND) OF TORTS provides that:

> "[O]ne who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances. This liability may be imposed although the actor's conduct does not come within a traditional category of tort liability." RESTATEMENT (SECOND) OF TORTS § 870, at 279 (1979).

**Affirmative Defense 1** (sixth defense): **First Amendment Immunity**

◆   As a Defense to Copyright Claims [R. 16, Count V]

1.   BTLP must establish by the preponderance of the evidence that its feature-length motion picture *Twiharder* (and the related pictoral/graphic works) are imaginative or artistic works.

2.   BTLP must establish by the preponderance of the evidence that the expressive content of its motion picture targets a famous work as the object of commentary or criticism concerning matters of public interest.

◆   As a Defense to Trademark  / Unfair Competition Claims [R. 16, Count I, II, IV}

1.   BTLP must establish that the TWILIGHT marks are famous.

2.   BTLP must establish by the preponderance of the evidence that BTLP's use of its TWIHARDER mark is "artistically relevant" to the subject matter of BTLP's movie (and related promotional materials).

3.   BTLP must establish by the preponderance of the evidence that BTLP's use of the TWIHARDER mark is not "expressly misleading" as to the source or content of BTLP's work, i.e., does not expressly refer to Summit Entertainment.

◆   As a Defense to Trademark Dilution Claims [R. 16, Count III]

1.   BTLP must show by the preponderance of the evidence that its motion picture is "not purely commercial," i.e., that it does more than propose a commercial transaction.

**Affirmative Defense 2** (twelfth defense): **Non-Infringement ("Fair Use")**

There are limitations to a copyright owner's exclusive rights. One of these limitations is called "fair use." One who is not the owner of the

copyright may use the copyrighted work in a reasonable way under the circumstances without the consent of the copyright owner if it would advance the public interest.  Such use of a copyrighted work is called a "fair use."  Under the law the owner of a copyright cannot prevent others from making a fair use of the owner's copyrighted work.  <u>See</u> NINTH CIRCUIT MANUAL OF MODEL CIVIL JURY INSTRUCTIONS, § 20.18, 2001 Edition (modified).  The four statutory factors to consider are:

1.      The purpose and character of BTLP's use;

2.      The nature of Summit's work;

3.      The amount and substantiality of the portion of Summit's work used; and

4.      The effect of BTLP's use on the market for, or value of, BTLP's work.

♦ **<u>Affirmative Defense 3:</u>** (thirteenth defense): **Copyright Misuse**

1.      BTLP must establish by the preponderance of the evidence that Summit used its copyright(s) to secure an exclusive right or limited monopoly not granted by the copyright office;

2.      BTLP must establish by the preponderance of the evidence that Summit's copyright leveraging activity is contrary to public policy.

♦ **<u>Affirmative Defense 4:</u>** (third defense): **Statute of Limitations**

3.      BTLP must establish by the preponderance of the evidence (under copyright or trademark law) that Summit knew or should have known about BTLP's allegedly infringing materials <u>at any time before January 26, 2011</u>.

♦ **<u>Affirmative Defense 5:</u>** (second defense): **Laches**

1.      BTLP must show by the preponderance of the evidence that the

plaintiff [Summit] delayed in initiating the lawsuit (filed January 27, 2014);

2.     BTLP must show by the preponderance of the evidence that Summit's delay in filing suit was unreasonable; and

3.     BTLP must show by the preponderance of the evidence that the delay resulted in prejudice.

**KEY EVIDENCE: BTLP'S *PRIMA FACIE* TORT AND AFFIRMATIVE DEFENSE OF COPYRIGHT MISUSE**

## I.     EVIDENCE OF "DISINTERESTED MALEVOLENCE"

## A.     SUMMIT INTENDED TO CAUSE HARM TO BTLP

From the very beginning, Summit's C&D campaign against BTLP was all about inflicting an economic injury upon BTLP  - regardless of Summit's  own economic interests.

**(1)     Summit Sought To Expropriate The Ownership Of BTLP's Property By Threat Of Force.**

☑     On June 27, 2012, Summit issued a C&D Letter: ("Summit therefore requests that Between the Lines Productions agree in writing to: (1) **immediately cease and desist from presenting**, marketing, and **otherwise promoting** the Movie, including on Facebook, Vimeo, YouTube.com, etc. **or seeking distribution of the Movie;** (2) **turn over all works** of authorship associated with the Movie, including all original and duplicate recordings or portions thereto; (3) **turn over** all marketing and promotional materials bearing the TWIHARDER trademark to Summit; (4) **transfer ownership** of the domain name <twiharder.com> to Summit; . .. ) . [Ex. A BTL_000006

☑     On June 24, 2012, Summit renewed the identical demands stated in the June 27, 2012 C&D letter. See, e.g., Ex._BTL_00019 ("We reiterate the requests made in our June 27, 2012 letter to Between the Lines Productions and notify you that Summit will have no choice

but to bring suit if Between the Lines Productions does not agree to each request."); [Ex. A_BTL_000023] ("Please provide Between the Lines Productions' written consent to Summit's requests set forth in our June 27, 2012 letter no later than Monday, July 30, 2012).

☑   On January 15, 2014, after viewing the *Twiharder* film in its entirely, Summit informed BTLP that "Summit cannot agree to settlement of this dispute short of Between the Lines Productions' agreement to stop all display and efforts to distribute the Twiharder film, including any use on any websites or solicitations for sale or distribution. [BTLP_000033]. Summit further stated instance. Accordingly, Summit must reiterate its demand that Between the Lines Productions cease and desist from any use or other exploitation of the Twiharder film and associated content.

**(2)** **Summit Intended to Cause Injury to BTLP By Excluding *Twiharder* from Market (for the Sake of Exclusion)**

**(a)**   Summit repeatedly stated that it sought to deprive BTLP of the opportunity to earn a profit through mass market distribution of BTLP's own copyrighted materials.

☑   See JX. 1-2 (BTL_000005) ("Between the Lines Productions has appropriated substantial elements from the *Twilight* Motion Pictures for a commercial purpose. There is nothing "fair" about the use. Rather, the Movie is a wholesale exploitation of Summit's valuable intellectual property rights in the Twilight Motion Pictures.")

☑   See JX. 1-5 (BTL_000022) ("Between the Lines Productions' Movie, its TWIHARDER merchandise, its registration and use of the domain name <twiharder.com>, its intended distribution of the Movie to coincide with the release of Breaking Dawn – Part 2, and its filing of a trademark application for TWIHARDER all indicate that Between the Lines Productions is seeking to commercially profit from Summit's *Twilight* Motion Pictures and *Twilight* Marks.").

☑   See JX. 1-5 (BTL_000023) ("Between the Lines Productions is attempting nothing less than the wholesale exploitation of Summit's

valuable intellectual property rights in the Twilight Motion Pictures and Twilight Marks for its own monetary gain.")

☑    "The [Twiharder] film is merely an exploitative attempt for "monetary gain" [JX. 1-9 (BTL_000034)]

**B.**    **SUMMIT'S C&D CAMPAIGN WAS <u>NOT</u> MOTIVATED BY ECONOMIC SELF-INTEREST NOR PROFITS AND WAS THEREFORE "DISINTERESTED"**

**(1)    Summit's Selective Prosecution of BTLP Demonstrates Summit's Lack of Economic Concern in Enforcing its _Twilight_ IP Rights**

**(a)**    Defendants were selective in targeting BTLP and its intellectual property works for destruction. <u>See</u> Gearries Aff. at ¶¶ 245-246.

☑    According to Summit's written admission, *Vampires Suck (2010)* was a "spoof" that targeted Summit's *The Twilight Saga* movies. <u>See</u> [JX. 1-9 (BTL_000034)] ("the *Vampires Suck* film may focus on the *Twilight* Motion Pictures, but also spoofs other vampire genre films, such as Buffy the Vampire Slayer, Vampire Diaries, and True Blood and makes reference to other entertainment subjects, such as The Jersey Shore, Dear John, Gossip Girl, Taylor Swift, Jonas Brothers, The Black Eyed Peas, etc.").

☑    Movie reviews of *Vampires Suck (2010)* published by reputable news organizations invariably described *Vampires Suck* (2010) as a "parody" or "spoof" of the *Twilight Saga* films.

☑    Summit claims that *Vampires Suck* (2010) was <u>not</u> licensed by Summit and therefore constitutes an unauthorized parody distributed without Summit's permission.

☑    *Vampires Suck* (2010) generated $125 million in worldwide box office sales. Exploitation of the film was open and notorious and Summit had obviously seen it. S

☑    Summit concedes that it never sent a C&D letter to the unauthorized producer (Regency Enterprises) nor distributor (20th

Century Fox) of *Vampires Suck (2010)*. <u>See</u> Gearries Aff. at ¶¶ 59-64.

☑ Summit, ever file a claim against Regency or 20th Century Fox seeking damages for their unauthorized exploitation of The Twilight Saga

**(2)** **Summit Was NOT Driven By Any Perceived Economic Injury to Summit's Copyright Repertoire in the *Twilight* Saga Movies**

**(a)** Summit's copyright infringement claim [Count V] is not motivated by any risk (actual or perceived) that the *Twiharder* Feature would serve as a market substitute for *The Twilight Saga* movies.

☑ <u>See</u> Gearries Aff., R. 75 at ¶¶ 226-235.

☑ On July 12, 2012, BTLP informed Summit that "there was no market harm in this case." <u>See</u> Ex. A, BTL_000014 ("TWIHARDER is clearly not a substitute for the original Twilight films (as clearly demonstrated above), given that it serves a different market purpose as a "zany, surreal parody of the Twilight saga." Courts do not consider parodies to compete in the same markets as the original works they are parodying, so this factor is generally not an issue." <u>Citing</u> <u>Acuff-Rose</u>, at 591.

☑ On July 24, 2012, Summit addressed *Twiharder's* potential effect on the market for *The Twilight Saga* blockbuster films. <u>See</u> Ex. A, BTL_000020-21. However, Summit failed to claim that the release of the *Twiharder* motion picture would reduce the profits earned by Summit through its exploitation of *The Twilight Saga* movies. Rather, Summit claimed that BTLP was attempting to " ride on the coattails of Summit's advertising and promotion" of "Summit's Breaking Dawn - Part 2, the final installment in the Twilight Motion Pictures." See 7/24/12 C&D Letter from Sheppard Mullin, [Ex. A (BTL_000021)] ("the Movie is trying to launch this fall, approximately the same time frame as the launch of Summit's Breaking Dawn - Part 2, the final installment in the Twilight Motion Pictures, indubitably to ride on the coattails of Summit's advertising and promotion of its

1

2   film").

3   ☑   Despite Summit's stated intent to enforce its rights to *Twilight: Breaking Dawn - Part 2*, the last installment in the series, the public record shows that Summit assigned its rights to Lions Gate Entertainment, Inc. and Chase Bank.

4

5

6   **(3)   There is No Evidence that Summit Had Any Economic Interest in *Breaking Wind (2010)*, a feature-length *Twilight* movie spoof.**

7

8   ☑   On April 18, 2013, BTLP states that "Summit's parent company, Lions Gate Entertainment, has released the film *Breaking Wind*. Such film is obviously authorized by Summit, and therefore, noninfringing unlike Between the Lines' *Twiharder* film." Between the Lines Productions is trying, without authorization, to enter a market already occupied by an authorized derivative work of the *Twilight* films. This constitutes a significant harm to Summit. [BTLP_000043].

9

10

11

12

13   ☑   Summit concedes in its Answer that *Breaking Wind* is an authorized parody of *The Twilight Saga*. [R. 16 at ¶ 66, PageID#392].

14

15   ☑   Despite two sets of document demands, Summit has failed to produce any documentary evidence that *Breaking Wind* (2012) was actually licensed.  Both Lions Gate and Summit claim that they do not have any licensing agreements, correspondence, or communications relating to *Breaking Wind* (2012) in their possession.

16

17

18

19

20   **(4)   Summit Abjectly Refused to Negotiate a License With BTLP (Even Though Summit Knew About BTLP's Distribution Deal)**

21

22   **(a)**   If Summit's objective was to protect its economic self-interest or earn profits, then it could have generated licensing revenues from WBBD/Gravitas' worldwide exploitation of *Twiharder.*

23

24

25   ☑   The record shows that Dean Chealy spoke to Jill Pietrini by telephone on July 11, 2012.  [JX. 1-4 (BTL_000012)].

26

27   ☑   Before BTLP's deal with Gravitas was withdrawn, BTLP's

28

counsel, Dean Chealey, Esq. notified Summit's counsel, Jill Pietrini, that BTLP was negotiating a distribution deal. Cheley told Ms. Petrini about BTLP's existing distribution deal *while the deal remained pending.* See Chealey Decl., ¶ 3, dated October 3, 2014 [SEO11320] ("On or around June 27, 2012, BTL received a cease-and-desist letter from Summit Entertainment, LLC regarding *Twiharder.* I represented BTL in the parties' negotiations and communications about the issues raised in Summit's letter. During the course of those negotiations and communications, I notified Summit's counsel, Jill M. Pietrini, that BTL was in negotiations with a distributor for distribution of the motion picture *Twiharder,* although I did not tell Ms. Pietrini the identity of that distributor.").

☑   John Gearries, principal of BTLP, swears that Summit abjectly refused to negotiate a license  See Gearries Aff. at ¶¶ 222-225; 236-241.

**(b)**   As of July 24, 2012, Summit abjectly refused to negotiate a license even though BTLP offered to add further disclaimers to the <www.twiharder.com> website and Movie Promo Materials to further distinguish *Twiharder* as a parody of *The Twilight Saga.*

☑   On July 12, 2012, BTLP offered to "add an appropriate disclaimer to the home page of the Website and DVD cover; and modify the written content on the Website to further distinguish the feature film from the Twilight and Twihard mark.  [JX. 1-4 (BTL_000017]

☑   On July 24, 2012 Summit rejected BTLP's good faith offer without any good faith negotiation or counter-proposal. See Ex. A [BTL_000019] (stating that "Between the Lines Productions' settlement offer to merely (i) add a disclaimer to its website at www.twiharder.com and DVDs and (ii) modify the written content on the website is unacceptable. We reiterate the requests made in our June 27, 2012 letter to Between the Lines Productions and notify you that Summit will have no choice but to bring suit if Between the Lines Productions does not agree to each request.")

**(c)**     As of October 31, 2012, Summit refused to negotiate a license after BTLP offered in good faith, and without admitting liability, to surrender its *Twiharder* movie title, <www.twiharder.com> domain name and promotional artwork.

☑     On October 11, 2012, Summit Refused to Negotiate a License Even Though (BTLP stated that "While we stand by our legal reasoning stated in my earlier letter, we are eager to settle this matter amicably with Summit and are willing to make the following additional concessions upon execution of a mutual release and settlement: (1) Between the Lines will change the name of the film from Twiharder to Twi-Life; (2) Surrender the domain name www.twiharder.com to Summit; and (3) Graphically alter all text to further distinguish the mark from "Twilight" trademark logos.")

☑     On October 30, 2012, Summit informed BTLP that it needed to see the *Twiharder* film before considering any further settlement offers. [JX. 1-7 (BTL_000028)]

**(d)**     As of January 15, 2013, Summit notified BTLP with finality that - having seen the entire *Twiharder* motion picture - Summit could not negotiate any license of any kind.  Summit therefore renewed its demands for total destruction of BTLP's intellectual property.

☑     On December 20, 2012, Summit viewed the entire 80-minute *Twiharder* Feature at the offices of BTLP's former counsel.  [JX. 31-2 (BTL_001806-07)]

☑     On January 15, 2013, Summit wrote BTLP as follows: "Summit Entertainment has considered your client's offer to change the film's name to Twilife in exchange for a release of all claims. However, our viewing only serves to confirm that the *Twiharder* film commits wholesale trademark and copyright infringement of the trademark TWIHARDER and other intellectual property owned by Summit . . . Summit cannot agree to settlement of this dispute short of Between the Lines Productions' agreement to stop all display and efforts to

distribute the *Twiharder* film, including any use on any websites or solicitations for sale or distribution. [JX. 1-9 (BTL_000033)].

**(e)**   As of February 27, 2013, Summit once again demanded that BTLP cease and desist – without compromise or negotiation.

☑   See SEO10501 (2/27/13 C&D Letter from Summit to BTLP) "reiterat[ing] its request for Between the Lines Productions to stop all display and efforts to distribute the Twiharder film, including any use on any websites or solicitations for sale or distribution . . . . Summit repeats its demands that Between the Lines Productions cease and desist from any use or other exploitation of the Twiharder film and associated content."

**(f)**   As of February 27, 2013, Summit once again demanded that BTLP cease and desist – without compromise or negotiation.

**(g)**   Finally, as of May 15, 2013, Summit once again demanded that BTLP cease and desist – without compromise or negotiation.

☑   See SEO10505 ("Summit repeats its demands that Between the Lines Productions cease and desist from any use or other exploitation of the *Twiharder* film and associated content. *Summit certainly will not authorize the distribution or sale of the film,* and if your client decides to proceed anyway, it will be in the face of a willful infringement claim.") (italics added)

**(5)**   **Summit Has Failed to Produce Evidence of *Actual* Consumer Confusion in More Than Four-and-a-Half (4.5) Continuous Years of Marketplace Co-Existence**

**(a)**   Defendants' trademark infringement claims are not grounded on any probative evidence of actual consumer confusion, even though *Twiharder* materials have been posted on-line since July 2010, a period of almost four and-a-half years.

☑  On June 27, 2012, Summit claimed that the *Twiharder* "Movie has created and will continue to create consumer confusion . . .. under the trademark laws." [JX. 1-2 (BTL_000005)]

☑      See Gearries Aff. at ¶¶ 97-101.

**(6)  Summit Has Failed to Produce Evidence that *Twiharder* Merchandise Was Sold to any *Bona Fide* Consumers In Actual Commerce and Knew That BTLP's CafePress Site was Disabled**

**(a)**      Sale and distribution of any *Twiharder* merchandise was blocked by Summit as of July 23, 2012.

☑ See Gearries Aff. at ¶ 221; [JX. 32-3 (BTL_001853)].   The disabling of BTLP's Cafepress account removed any economic threat of consumer confusion regarding TWHARDER merchandise.   This is because after July 23, 2012, there was no TWIHARDER merchandise available for sale – not anywhere.

☑      Only the parties to this civil action, or the parties' agents, have ever ordered any merchandise to be printed bearing the TWIHARDER mark.

☑      See Gearries Aff., R. 75 at ¶ 265; [JX. 32-6 (BTL_001855)].

**(7)  Summit Has Failed to Produce Evidence of ANY *Monetary Damages* to Support ANY of its Claims [Counts I-V]**

Despite 4.5 years of openly and notoriously marketing its *Twiharder* project, there is not a single page produced by Summit or witness proffered by  Summit respecting *any* of its federal or state law claims which seek to prove up damages against BTLP.

**C.   SUMMIT'S C&D CAMPAIGN WAS "MALEVOLENT" BECAUSE IT WAS MOTIVATED BY BAD FAITH, HYPOCRISY AND PERSONAL *ANIMUS***

**(1)   Prior To Filing Suit, BTLP Notified Summit That Its "Absolute**

**Prohibition" And "All-Or-Nothing" Stance On The *"Twiharder* Film"** Constituted "Bad Faith."

☑  On May 7, 2013, BTLP notified Summit that it's "absolute prohibition" and "all-or-nothing" stance on the "Twiharder film," which amounted to a complete refusal to deal, constituted "bad faith." [Ex. A (BTL_00045)]

☑  BTLP writes "it appears that your client stands resolved to enforce an absolute prohibition against any distribution of the *Twiharder* film in any manner. Given that no new Twilight Saga film is scheduled to be released in 2013, and given that the other feature film parodies authorized by Summit, including *Breaking Wind* and *Vampires Suck,* were brought to market many years ago, Summit's rationale for taking an "all-or-nothing" stance on the *Twiharder* film strikes my client as bad faith." [JX. 1-12 (BTL_00045)]

**(2)**  **Summit's Suppression of BTLP's Motion Picture Based On Stephenie Meyer's Religious Beliefs (or Her Hatred of the Term "Twihard") Shows Malediction and Vicious Hypocrisy**

**(a)**  *The Twilight Saga* Franchise Seeks to Propagate a System of Religious and Moral Beliefs Through Motion Pictures.

☑  Stephenie Meyer is the author of books upon which *The Twilight Saga* movies are based.  See Summit's Answer [R. 16 at ¶ 17]

☑  Stephenie Meyer was born and raised a Mormon. "Meyer's moral code is thinly disguised in the Twilight trilogy. Despite the consuming passion between Edward and Bella Swan, their pre-marital relationship is never consummated, reflecting the author's Mormon beliefs." [JX. 31-1 (BTL_001800-1807)]

☑  Scholars and media critics acknowledge that *The Twilight Saga* is an allegory for Mormon theology and values.  [JX 18-1, (BTL_001031-1046)]

☑  Summit publicly stated through their (former) general counsel, David C. Friedman, that Summit's conduct was directed, in part, by

Ms. Meyer.  See Gearries Aff., R. 75  at ¶ 148;  [JX. 5-3 (BTL_000282)]

**(b)**   Stephenie Meyer Hates the Term "Twi-Hard" and Describes it as "Awful" [JX. 15-12 (BTL_000774-775)]

**(c)**   During the pre-litigation C&D campaign, Summit repeatedly condemned BTLP's innocuous parody for its alleged "vulgarity" based on the imaginative content depicted in BTLP's movie.

☑   Summit wrote: "The intentionally sexual, vulgar, and tawdry nature of the *Twiharder* film tarnishes the essential, intrinsic, and well-known wholesomeness of the Twilight Motion Pictures." See Gearries Aff., R. 75 [JX. 1-9 (BTL_000034)]

☑   Summit wrote:  "The *Twiharder* film includes nothing that transforms the *Twilight* Motion Pictures, given that it is a poor scene-by-scene retelling, nor does it shed any light, provide critical commentary, or provide any other social value justifying a fair use defense." [JX. 1-9 (BTL_000034)]

**(d)**   Summit's Authorization of *Breaking Wind* (2012), a Truly Vulgar *Twilight* Parody, Demonstrates Outrageous Hypocrisy

☑   See William C. Burton, BURTON'S LEGAL THESAURUS, 4E. by (The McGraw Hill Companies, Inc. (2007) provides the word "hypocrisy" has the following synonyms: "bad faith," deceitfulness," "double-dealing," false profession," "fraud," "perjury," and "trickery."

☑   Since March 2012, Lions Gate, Summit's parent company, has marketed an obscene, vulgar and grotesque *Twilight* movie spoof to U.S. audiences called *Breaking Wind* (2012), which is "Unrated."  See Gearries Aff., R. 75 at ¶¶ 248-251.

☑   On December 20, 2012, at Summit's first viewing of the *Twiharder* Feature in its 80 min. entirety, Summit claimed that Stephenie Meyer's religious or moral beliefs precluded *BTLP's* copyrighted materials from entering the market.  See Gearries Aff. at ¶¶ 245-249; [JX. 31-2 (BTL_001806-07)]

☑      On January 15, 2013, Summit based its trademark dilution claims against BTLP on mild sexual innuendo contained in *Twiharder.* See Gearries Aff. at ¶¶ 248; [JX. 31-2 (BTL_001806)].

**(3)      Summit's Absolute Refusal to Negotiate a License Despite BTLP's Willingness to Substantially Edit its Copyright and Trademark Materials Shows Mercilessness**

See I.A.4 above.

**(4)      BTLP Did Not Become Aware of Summit's Malevolence Until January 15, 2013 - At the Earliest - When Summit Vowed its Intent to Permanently Destroy *Twiharder***

BTLP's cause of action for *prima facie* tort did not accrue until BTLP could set forth a plausible set of facts in the complaint stating that Summit's C&D campaign was motivated by "disinterested malevolence." The evidence produced by BTLP shows that BTLP did not reasonably know that Defendants' intent to destroy BTLP's property was solely malevolent until, at the earliest, January 15, 2013.  See Gearries Aff. at ¶ 249; [JX. 1-9 (BTL_000033)].  This is the date after Defendants' viewing of *Twiharder* when Defendants rejected BTLP's concessions, without any negotiation whatsoever, and renewed a fresh C&D campaign to destroy BTLP. Id.

**II.      EVIDENCE OF "LACK OF JUSTIFICATION"**

**A.      NO LEGAL JUSTIFICATION EXISTED FOR SUMMIT TO INTERFERE WITH MASS MARKET DISTRIBUTION OF *TWIHARDER***

**(1)      Under U.S. Law, Motion Picture Censorship is "Evil"**

"The First Amendment was adopted in large part to avoid [prior] restraint and the attendant evil of censorship[…]." <u>Intern. Soc. For Krishna, Etc. v. Kearnes</u>, 454 F. Supp. 116 (E.D. Cal. 1978), citing <u>Lovell v. City of Griffin</u>, 303 U.S. at 451-52 (1950). "Censorship, under our theory of government, is presumptively bad and is tolerated only as a necessary evil." <u>In re Spain in Flames</u>, 36 D.&C. 285 (Pa. D. & C., 1937)

Incredibly, in its first summary judgment brief, Summit claims that it was permissible to censor BTLP's motion picture based on Stephenie Meyer's religious beliefs. [R. 80, PageID# 3420:12-17]

**(2)** **By Its Own Admission, Summit's C&D Campaign Was Not Driven By the Risk of Market Displacement of *The Twilight Saga Movies***

When compelled to address the issue of market displacement for the first time, Summit's concern was not that it would lose money from the mass market release of *Twiharder*. Rather, Summit's express intent was simply to deprive BTLP of the business opportunity to make money. And it did using trademarks to enforce its copyrights.

**(3)** **A Copyright Holder's Motive to Pre-Empt Traditional "Fair Use" Markets Such as Artistic Parody Lacks Legal Justification**

**(a)** Summit claimed during the pre-litigation C&D campaign [JX. 1-11 (BTL_00043)], as well as in its Answer [R. 16, at ¶ 66] that *Breaking Wind* (2012) was an authorized parody of *The Twilight Saga* films.

☑ On April 18, 2013, Summit wrote that: "Between the Lines Productions is trying, without authorization, to enter a market already occupied by an authorized derivative work of the *Twilight* films [referring to *Breaking Wind*]. This constitutes a significant harm to Summit." [JX. 1-11 (BTL_00043)].

In their Answer to BTLP's initial complaint in this action:

☑      Summit "admit[s] that *Breaking Wind* is an authorized parody of [The Twilight Saga:] Eclipse." [R. 16 at ¶ 66].

☑      Summit "admit[s] that *Breaking Wind* was marketed with Defendants' permission as a parody of *The Twilight Saga*" [R. 16 at ¶ 69].

☑      Summit "admit[s] that a subsidiary of LIONS GATE released Breaking Wind, which was marketed with LIONS GATE'S permission as a parody of "The Twilight Saga." [R. 16 at ¶ 73]

For purposes of its "Copyright Misuse" affirmative defense, it is important to emphasize that Summit is suing BTLP for infringement of *The Twilight Saga* motion pictures, <u>not</u> for infringement of *Breaking Wind (2012).* [R. 16, Counterclaims, ¶¶ 64-73].   Yet, Summit's pre-litigation C&D campaign was expressly based on the purported market harm to *Breaking Wind,* <u>not</u> to The Twilight Saga.  As, Summit has failed to prove it has any financial interest in that title, its' C&D constitutes improper leveraging.

**(4)   Summit's Accusation of "Wholesale Copying" to Suppress Artistic Parody Lacks Legal Justification**

**(a)**   After Viewing the *Twiharder* movie trailer and audio-visual clips, Summit Claimed that *Twiharder* Was a "Condensed Version of the Twilight Pictures Themselves"

☑      "Twiharder copies key scenes from the *Twilight* Motion Pictures…Between the Lines Productions has also copied the key elements of the scripts of the copyrighted *Twilight* Motion Pictures and the *Twilight* Motion Pictures themselves.  <u>In fact, it appears that the entire movie is just a condensed version of the *Twilight* Motion Pictures.</u>") [JX. (BTL_000005)]

**(b)**   After Viewing the *Twiharder* Feature, Summit Adopted the Illogical Position That *Twiharder* Was "Wholesale" Copying – A Legal Term Used to Describe Mechanical Replication (or "Xeroxing")

> ☑ "[O]ur viewing [of the *Twiharder* film] only serves to confirm that the *Twiharder* film commits <u>wholesale</u> … copyright infringement [because] … it uses…the same story line verbatim and dialogue, similar costumes, and character names and myriad scenic, visual and musical references to the films . . . The *Twiharder* film … copies the <u>whole</u> of Summit's films *Twilight* and *The Twilight Saga: New Moon*, not just a couple of scenes, as well as parts of *The Twilight Saga: Eclipse*"); [JX. 1-9 (BTL_000033-34)]

**(5)**   **Summit's Copyright Claim is Based on an Expressly Overruled, Inapposite "Mechanical Replication" Case**

> ☑   By its own admission, Summit's copyright claims are driven by the U.S. Supreme Court's decision in <u>Sony Corp of America v. Universal City Studios, Inc</u>., 464 U.S. 417  (1984) ("<u>Sony Betamax</u>") which found that in the context of a defendant's mechanical replication of Betamax tapes, every commercial use of copyrighted material is "presumptively unfair."

> ☑   Ten years later, in <u>Campbell vs. Acuff-Rose</u>, 510 U.S. 569 (1994), the High Court expressly overruled the <u>Sony Betamax</u> presumption, particularly with respect to artistic parodies sold for profit  (just like this case).  In reversing the lower court's opinion (which relied on <u>Sony Betamax</u>), the Supreme Court held the exact opposite:  that parody for profit was presumptively NOT an unfair use of a pre-existing copyrighted work.

**B.**   **NO SOCIAL JUSTIFICATION EXISTED FOR SUMMIT TO SUPPRESS BTLP'S MOTION PICTURE *TWIHARDER*, AN OBVIOUS PARODY**

**(1)**   **Artistic Parody Benefits Society and Promotes the "useful Arts"**

"[P]arody is a form of social and literary criticism" that "has socially significant value as free speech under the First Amendment." <u>Mattel v. Walking Mountain Prods.</u>, 353 F.3d 792, 801 (9th Cir. 2003). Because parody implicates "core" constitutional concerns, <u>Cardtoons, L.C. v. Major League Baseball Players Ass'n</u>, 95 F.3d 959, 972 (10th Cir. 1996), courts uniformly have noted "the broad scope permitted parody in First Amendment law." <u>Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group</u>, 886 F.2d 490, 493 (2d Cir. 1989). "The question is simply whether a parody may reasonably be perceived in the content." <u>Campbell vs. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 582 (1994).[2]

There is no reported case in the forty years since the Copyright Act was enacted where a motion picture was found to be both an expressive parody and an infringement. Summit has failed to proffer any legal theory or factual construct for what *Twiharder* is, if not a parody.  As a matter of law, Summit's copyright claims are non-actionable under the First Amendment or foreclosed by the "Fair Use" doctrine pursuant to 17 U.S.C. § 107.

**(2)   *Twiharder* (and BTLP's Movie Promo Materials) Are Obviously Spoofing  *The Twilight Saga* Movie Franchise**

**(a)**   BTLP marketed *Twiharder* at all times as a "parody" and "spoof" of *The Twilight Saga* franchise.  <u>See</u> Gearries Aff., R. 70 at ¶¶ 88-89; 91-105; 108-112.

**(b)**   *Twiharder* was at all times objectively perceived in the actual

---

[2]

U.S. marketplace as a "parody" and "spoof" of *The Twilight Saga.*

☑    major digital distribution executives.  <u>See</u> Gearries Aff., R. 70 at ¶¶ 178-181;

☑    major industry trade magazines, <u>id</u>. at ¶ 201;

☑    esteemed international film festivals, <u>id</u>. at ¶¶ 108-112;

☑    entertainment content insurance brokers, <u>id</u>. at ¶¶ 184-88;

☑    sophisticated transactional counsel, <u>id</u>. at ¶¶ 196;

☑    major insurance providers, <u>id</u>. at ¶¶ 209-213.

**(c)**    Summit expressly acknowledged in its first C&D Letter, dated June 27, 2012, that BTLP had attempted "to characterize the Movie as a parody."   A reasonable jury could find that Summit's conclusion was drawn from marketplace perception. [JX. 1-1 (BTL_000001)]

**(d)**    On April 18, 2013, Summit admitted in writing that BTLP's movie *Twiharder* is a parody of *The Twilight Saga* films which occupies the same market as *Breaking Wind* (2010) a *Twilight* parody film.  <u>See</u> Gearries Aff. at ¶ 252 [JX. 1-11 (BTL_000043)]

**(e)**    By Defendants' own admission, *The Twilight Saga* is extremely famous and has obtained cultural significance, just like the *Barbie* doll or Ginger Ringers.  <u>See</u> Summit Counterclaims, R. 16, ¶ 9.

## V.    <u>EVIDENCE OF ECONOMIC INJURY</u>

## A.    <u>"Out-of-Pocket" Costs</u>

BTLP shall produce receipts showing the costs expended to produce a "Final Cut" version of its motion picture *Twiharder* and market its

production.

**B.**     **"Lost Profits"**
         **Optimal Yardstick:** *Breaking Wind* **(2012) [Approx. $6.4M Gross]**
         [Digital Distribution / Home Media]

Summit admits that *Breaking Wind* (2012) is a feature-length parody of *The Twilight Saga* series. [R. 16, at ¶ 66].  Summit also admits that *Twiharder* occupies the same consumer market as *Breaking Wind* (2012) [JX. 1-11 (BTL_00043)] and therefore occupies the identical consumer market.  Gross revenues can be reasonably utilized as a yardstick to establish the revenues *Twiharder* would have made but for Summit's interference.   The record shows that at all relevant times during its pre-litigation C&D campaign, Summit contemplated that *Twiharder* would compete in *direct* market competition with *Breaking Wind* (2012), which Summit concedes is an authorized *Twilight* parody movie.  [JX. 1-11 (BTL_000043)].

In an arms length transaction, BTLP purchased statistical data of sales estimates prepared by Bruce Nash of Los-Angeles-based Nash Communications, LLC.  Mr. Nash operates the website The Numbers, which analyzes box office data.  In addition to many other comparable titles provided, Mr. Nash's company estimates that, based on its worldwide exploitation over a seven-year period, *Breaking Wind (2012)* would earn gross revenues in excess of $6,457,914. [R. 116-4, PageID#: 5115]   Nash also estimates that the gross revenues to date amount to $5,438,307.  [R. 116-6, PageID#: 5122].

Although Mr. Nash's business model prevents him from appearing as an expert witness in this case, BTLP's principals can provide lay testimony about the data purchased from Nash Communications, LLC, as

well as box office revenues in general. <u>See</u> Fed. R. Evid. 701 (lay witnesses, such as a business owner "not testifying as an expert," may offer opinions "rationally based on the perception of the witness.").

**B.** **"Lost Business Opportunities"**
**Optimal Yardstick:** *Vampires Suck (2010)* **[Approx. $125M Gross]**
[Wide Release Box Office]

Lost business opportunity damages may be awarded if the lost opportunities were within the contemplation of the parties at the time of contracting and the damages can be established with reasonable certainty. <u>See, e.g.</u>, <u>Fitzgerald v. Mountain States Tel. and Tel. Co.</u>, 68 F.3d 1257, 1264 (10th Cir. 1995); <u>T.D.S. Inc. v. Shelby Mut. Ins. Co.</u>, 760 F.2d 1520, 1531 (11th Cir. 1985). Injuries are deemed unforeseeable only if it appears highly extraordinary that the tortious conduct would have caused the type of injury suffered by the plaintiff. <u>Jackson v. Ryder Truck Rental, Inc.</u>, 20 Cal. Rptr. 2d 913, 918 (Ct. App. 1993).

At the time Summit initiated its campaign against BTLP, it was reasonably foreseeable that *Twiharder* could have yielded box office revenues on financial par with *Vampires Suck* (2010), which Summit admits is another unauthorized *Twilight* movie spoof. [JX. 1-9 (BTL_000034)] ("the *Vampires Suck* film may focus on the *Twilight* Motion Pictures, but also spoofs other vampire genre films."). The two films occupied an identical derivative market for parody of *The Twilight Saga* films. Although a theatrical distribution deal had not yet been secured when Summit first interfered in June 2012, the wide theatrical release of *Twiharder* was expressly contemplated by BTLP (as well as Summit) and factored into BTLP's marketing plan. [JX. 36-7].

Not unlike the direct comparison with *Breaking Wind* (2012), *Vampires Suck* (2010) can be used as a reasonably certain "yardstick" to measure the revenues *Twiharder* could have earned had it been released theatrically.  It was certainly foreseeable to Summit that by intentionally interfering with *Twiharder's* distribution to the worldwide mass market, the damage caused by such interference would contemplate the loss of any business opportunity for *Twiharder* to be released in the same manner, and on the same scale, as *Vampires Suck* (2010).

According to the Numbers.com box office data, which is publically available, *Vampires Suck* (2010) earned more than $125 million in international gross revenues.  Given that BTLP's lost opportunity of *Twiharder's* widescale theatrical release is a precise type of injury that Summit would have contemplated before initiating the 6/27/14 C&D campaign, the law and public policy should allow a jury to rely on such publically available data – the box office revenues of *Vampires Suck* (2012) – to award a reasonable measure of damages to BTLP.

## C.    Punitive Damages

Under New York law, BTLP is entitled to an award of punitive damages for Summit's commission of a malicious tort.  See Loucks v. Standard Oil Co. of N.Y., 224 N.Y. 99, 112, 120 N.E. 198, 202 (1918) (Cardozo, J.) (noting that nothing in New York's public policy prevents the award of punitive damages). Punitive damages are appropriate where the improper motive of the tortfeasor is both a necessary element in the cause of action and a reason for awarding punitive damages.  Nardelli v. Stamberg, 44 N.Y.2d at 503, 377 N.E.2d at 976–77, 406 N.Y.S.2d at 445 (quoting RESTATEMENT OF TORTS § 908 (1939));

1  Here, an award of punitive damages is appropriate to punish
2  Summit for its malicious conduct vis-à-vis BTLP.  More importantly, an
3  award of punitive damages shall serve the important policy objective of
4  deterring Summit and other similarly situated aggressive IP enforcers from
5  leveraging their government-issued licenses (e.g., copyright and
6  trademark) to inflict harm on independent filmmakers for the sake of
7  suppressing free speech or for causing harm due to personal animus.

8  To date, Summit's reckless IP enforcement tactics, which have
9  victimized BTLP for years, have been publically condemned by American
10 legal scholars and journalists - repeatedly and forcefully.  This type of
11 "pattern or practice" conduct weighs in favor of a punitive damages award
12 in this case.

13  ☑  On July 8, 2010, a visiting fellow at YALE LAW SCHOOL's
14 Information Society Project named Christina Mulligan contributed an
15 article to the WASHINGTON POST / LOS ANGELES TIMES, entitled *The*
16 *Twilight Saga: Forbidden Love and T-Shirts.* [Ex. K (BTL_000497-98)].
17 Ms. Mulligan's nationally-publicized commentary foreshadowed
18 some of the <u>identical</u> issues now brought before the Court.

19
20  "[W]hen it's not breaking box office records, Summit
21  Entertainment, the studio that made the *Twilight* series, is
    doing its best to make sure that if you want to see a
22  vampire brooding, you do it through Summit … ***The***
23  ***company seems to be lobbing lawsuits at pretty much***
24  ***anyone*** who uses *Twilight's* name or images without its
    permission.

25  Naturally, Summit is trying to maximize profits from the
26  *Twilight* franchise. It understandably wants to prevent the
27  bootlegging of *Twilight* DVDs….***But its lawsuits go far***
28  ***beyond curbing piracy and end up limiting how we can***

*talk about pop culture* …The law may be on Summit's side in some cases, but *the spirit of what the company is doing — shutting down almost anyone referencing Twilight without its permission — shows the shortcomings in how we understand and interpret copyright law.*

By suing a fan magazine, a platform for fan-made T-shirts and a documentary filmmaker, Summit is attacking speech that should be free. ***It shouldn't matter that these works are made for profit — speech is no less important because it is sold.*** And if Summit can sue these entities, it can sue amateurs as well.

The law's ambiguity, especially copyright law's fair use defense, along with the high costs of civil litigation and the possibility of huge punishments for infringement, will probably push several parties to reach settlements.

*Moreover, **the recording and film industries have set the terms of the debate about intellectual property in recent years**, pushing the view that almost any use of a work without permission is or should be illegal.*

***They have lumped those actively engaged in creation***, such as fan-fiction writers and video re-mixers, together ***with those who slavishly copy entire films or masquerade knock-offs as official merchandise.***

Nonetheless, Congress and the courts should reflect on Summit's aggressive lawsuits and choose to embrace the values at the heart of artistic protection: the promotion of knowledge and learning.

Pictures, videos and slogans on T-shirts are tools of modern expression, and with a phenomenon as omnipresent as *Twilight, **fans should be free to engage, manipulate, remix and remake. Free speech is just too important for anything less.*** [Ex. K (BTL_000498)]

(emphasis added)

☑   Katy Tasker of www.publicknowledge.org wrote about SUMMIT's anticompetitive conduct in July 2010, echoing the issues before the Court:

> *Summit ... seem[s] to be under the misguided impression that they should have absolute power and control over their intellectual property,* but, as Mulligan thoughtfully points out, the Supreme Court spelled out in <u>Sony v. Universal City Studios</u> back in 1984 that *copyright "has never accorded the copyright owner complete control over all possible uses of his work." A copyright is a government-granted monopoly, not a divine right*—and should be treated as such…People seem to forget why there are limitations on the control a copyright holder can assert over his content: <u>*there are certain fundamental principles (like free speech) that we hold in a higher regard and that we cannot risk devaluing for the benefit of a rights holder.*</u> [Ex.K (BTL_000501)]

☑   On March 19, 2013, www.techdirt.com reported:

Summit Entertainment, the movie studio behind the *Twilight* films, is no stranger to <u>*ridiculous-to-insane overreaches of intellectual property law. In fact, the studio seems to make a habit out of it.*</u>"

☑   Finally, Courts should be vigilant in helping to deter largescale copyright holders who seek to use government licenses to enforce what are otherwise unenforceable "moral rights." In the article *Playing in Someone Else's Sandbox: A Legal and Cultural Overview of Fanfiction*, Harvard Law Committee on Sports & Entertainment Law, Briefing Book: Signal/Noise 2k, p. 35. (April 8, 2005), law student

Erica George observed:

> "*The implicit threat of a lawsuit on copyright grounds provides a de facto enforcement of otherwise unprotectable moral rights.*" (emphasis provided)

◆   ◆   ◆

## BTLP'S EVIDENCE IN SUPPORT OF ITS AFFIRMATIVE DEFENSES FOR FIRST AMENDMENT IMMUNITY / PRIVILEGE

In addition to the evidence cited above, BTLP proffers the motion pictures and graphic artwork themselves for the Court's independent review.

## BTLP'S EVIDENCE IN SUPPORT OF ITS AFFIRMATIVE DEFENSES FOR NON-INFRINGEMENT ("FAIR USE")

In addition to the evidence cited above, BTLP proffers the motion pictures and graphic artwork themselves for the Court's independent review.

BTLP will establish that its motion picture, and all promotional materials related thereto, is an artistic parody which lampoons *The Twilight Saga* movie franchise, one of the most controversial blockbuster film series in modern history.  The evidence will show as follows:

**(1)    Polarizing Public Opinions**

At the height of its market popularity (2008-2013), *The Twilight Saga* movie franchise was a pop-culture media driven "event" that strongly polarized public opinion, particularly with respect to its portrayal of women as meek and subordinate. The films deal with serious adult themes including domestic violence, teen pregnancy, drug addiction, date rape,

teen infatuation, racial hierarchy, revenge, murder, torture, and death. Due to the polarizing viewpoints concerning *The Twilight Saga*'s themes, and its sanctimonious attitude, *The Twilight Saga* has been a constant target for parodists since its debut in movie theaters.

### (2)   Selling Sex – Without the Sex

The great hypocrisy of *The Twilight Saga* films is that the actors have been cast to sell sexual imagery to the masses in order to promote the "morality" of pre-marital sexual abstinence.  At its core, BTLP's *Twiharder* pokes fun at this blatant hypocrisy throughout its movie and marketing materials.  Unlike those depicted in *Twilight*, the characters in *Twiharder* never take their ridiculous displays of sexuality very seriously.

### (3)   Gender Subordination

The historical controversy surrounding pre-marital sexual abstinence is that it tends to subordinate women, who are denied free will and often stigmatized for being disobedient to a moral code established by men.  *The Twilight Saga* has been widely criticized by female activists as "promoting, normalizing and idealizing an emotionally and physically abusive relationship" that is highly demeaning to women. The Parents Television Council have warned parents that the relationships depicted in *The Twilight Saga* films reportedly meet "all fifteen criteria set by the National Domestic Violence Hotline for being an abusive relationship." [JX. 32 (BTL_000680)].

*Twiharder* pokes fun at *Twilight*'s theme of gender subordination by depicting the female lead as unattractive, self-loathing and unwanted by

the central male character.

**(4)    Racial Stereotypes**

Civil rights activists and scholars alike have criticized *The Twilight Saga* for perpetuating one-dimensional stereotypes about Native Americans, and indigenous culture generally, through the obsolete depiction of the main character Jacob Black as a "noble savage," "bloodthirsty warrior" and "sexual predator." Whereas the Anglo characters in *Twilight* are portrayed as sophisticated human vampires who live in ultra-modern dwellings, the People of Color portrayed in the film are subjugated to the roles of vicious animals who live in the forest.  And when not roaming around as four-legged animals, the Native American (and Brazilian) actors in *The Twilight Saga* are prized solely for their physical attributes. As such, the People of Color are virtually always shirtless or scantily clad – with not much else to say.

Twiharder pokes fun at these themes through the lead JB Lycan (the caricature of Jacob Black), played by Christopher Friel, who can be seen removing his shirt gratuitously (in any situation) to reveal his physicality. The actor, who is of mixed Asian descent, also paints his face darker in some scenes and wears a wig to invoke the spectre of 19th century minstrelry.

Further, there is heavy emphasis throughout *The Twilight Saga* on socio-political hierarchy and economic power based on the color of a person's skin rather than the content of her character [JX. 18-3 (BTL_001052-1056)].

*Twilight* deals heavily in "stock" racial stereotypes. *Twiharder* pokes

fun at this theme by casting a "black girl, white girl and latina girl" to portray stereotypical roles.

---

As if entirely oblivious to American life in the 21st century, Summit describes Twilight's depictions as "essential, intrinsic and well-known [for its] wholesomeness." [JX. 1-9 (BTL_000034)].  It is precisely these type of "holier-than-thou" assertions that draw the ire of parodists and critics.

BTLP will also establish that because its work is an artistic parody, there cannot be any market displacement.

**BTLP'S EVIDENCE IN SUPPORT OF AFFIRMATIVE DEFENSES FOR STATUTE OF LIMITATIONS AND LACHES.**

BTLP openly and notoriously published their copyrighted works on the internet, registered a domain name using www.twiharder.com, and filed their works, bearing the mark TWIHARDER, with the Copyright Office and U.S. Patent and Trademark Office more than three years before Summit filed suit on January 26, 2014.

☑ On February 1, 2010, BTLP sent the SCREEN ACTORS GUILD ("SAG") a number of original audio-visual works produced by BTLP, tentatively entitled "TWILIGHT SPOOF: Between the Lines" [R. 75, ¶ 88, Ex. Q (BTL_000982)]

☑ On February 26, 2010, BTLP set up a facebook page called "Twiharder Movie" [SEO10534]

☑ On April 11, 2010, BTLP notified the SCREEN ACTORS GUILD that the title of its film parody would be "Twiharder." [R.75, ¶ 93, Ex. Q (BTL_000985)]

☑ On April 12, 2010, BTLP registered the domain name www.Twiharder.com through www.godaddy.com. BTLP continues

to maintains a website at [R.75, ¶ 94, Ex. D (BTL_000206-7)][ R. 75, ¶ 95, Ex. F (BTL_000348-349)]

☑      On June 21, 2010, BTLP registered a screenplay with the work title "Twiharder" with the U.S. Copyright Office. Lionsgate/Summit's Answer [R. 16, ¶ 22]; [R. 75, Ex. B (BTL_000 48-49)]

☑      On July 4, 2010, the TWIHARDER stylized logo, which is at issue in this dispute, was initially published on BTLP's vimeo.com site. [R. 75, ¶ 100; Ex. BB (BTL_001783)]

☑      On July 4, 2010, BTLP's (Spring 2010) DVD Cover / lead movie poster was initially published on Vimeo.com SEO_01203 (original New Moon artwork for single disc edition))

☑      On July 10, 2010, BTLP applied for the mark Twiharder with the PTO. [R. 75, ¶ Ex. C (BTL_000069-70)]

☑      On July 11, 2010, BTLP first published its second audio- visual clip to the BTL Vimeo Site, entitled "I'm So Sexy," which contained an original music video featuring audio-visual content that was shot in connection with the final edited version of the feature- length film Twiharder. [R. 75, ¶ 101 Ex.

☑   On July 14, 2010, BTLP filed a trademark application with the USPTO principal register, Serial No. 85084979, in International Class 0092 claiming to have been using the trademark TWIHARDER since April 1, 2010. [R. 75, ¶ 138; Ex. C (BTL_000069-70)]

☑      On July 19, 2010, BTLP posted the Twiharder movie poster on its facebook pagewhich parodies the New Moon artwork. [SEO10534; SEO10564]

☑      On July 19, 2010, BTLP posted the Twiharder Wolfpak parody artwork on its facebook page. [SEO10533]

☑      On July 20, 2010, BTLP posted the"Bedford Mullen" and "JB Lycan" parody artwork on BTLP's facebook page. [SEO10533]

☑  On July 20, 2010, BTLP posted the Twiharder movie trailer on its facebook page, [SEO10532-33]

☑  On August 4, 2010, BTLP first published the Twiharder movie posters to the Vimeo website. [R.75, ¶ 102; Ex. BB (BTL_001785)]

☑  As of September 10, 2010, Summit had never applied for any trademarks or servicemarks with the PTO bearing the mark TWIHARD.

☑  On September 10, 2010, Summit applied to the PTO for the TWIHARD mark under Class 025. [R. 75, ¶ 142-44].

☑  Summit's counsel, Jill Pietrini is highly sophisticated in IP enforcement matters and has a team of attorneys who police the internet for potential infringements of their clients' intellectual property portfolio.

☑  Lions Gate / Summit moved to transfer the civil action to avoid an accelerated trial date (December 2013) and to create an unfair tactical advantage for BTLP's lead out-of-state counsel.   The transferor court granted Lions Gate's motion without explanation.

☑  After the action was transferred in August 2013, Lions Gate /Summit defaulted on its Court-Ordered obligation to file a "responsive pleading," i.e. an answer (and compulsory counterclaims). Seeking to challenge what it believed to be an unconstitutional transfer order, BTLP dismissed the case and brought it back to the Home Forum.

☑  Although the voluntary dismissal and re-filing in New York was not received well by Judge Rakoff, it did manage to compel Summit to file its counterclaims on January 27, 2014.  But by that time, it was too late.  More than three (3) years had expired after BTLP initially published the works (or portions of works) which are now subject to dispute.

**8.      Statement of Issues Remaining to be Tried**

◆      **BTLP's Statement**

*Prima Facie* **Tort**

1.      Whether Summit acted with "disinterested malevolence" in causing economic harm to BTLP.

2.      Whether Summit utilized an otherwise lawful means to inflict harm.

3.      Whether BTLP is entitled to out-pocket, compensatory, punitive or nominal damages as a direct or proximate result of Summit's tortious conduct and, if so, in what amount.

**Copyright**

4.      Whether BTLP's feature-length motion picture *Twiharder* (and the related pictoral/graphic works) are imaginative or artistic works.

5.      Whether BTLP's imaginative works can be objectively perceived as parody.

6.      Whether BTLP's imaginative works target a famous work as the object of commentary or criticism concerning matters of public interest.

7.      Whether BTLP's imaginative works constitute non-infringing fair use under 17 U.S.C § 107.

8.      Whether Summit used its copyright(s) to secure an exclusive right or limited monopoly not granted by the copyright office;

9.      Whether Summit extended the scope of its limited copyright monopoly in a manner that is contrary to public policy.

10.     Whether BTLP is entitled to attorney's fees and costs for litigating the copyright-related claims and, if so, in what amount..

11.     Whether BTLP is entitled to recover pre-judgment (and post-

judgment) interest on its claims and, if so, in what amount.

**Trademark / Unfair Competition**

12. Whether BTLP's use of its TWIHARDER mark is "artistically relevant" to the subject matter of BTLP's movie (and related promotional materials);

13. Whether BTLP's use of the TWIHARDER mark is "expressly misleading" as to the source or content of BTLP's work.

14. Whether BTLP's use of the TWIHARDER mark is likely to cause consumer confusion with any of Summit's TWILIGHT marks.

15. Whether BTLP's use of the TWIHARDER mark constitutes "prior use" relative to Summit's subsequent use of the TWIHARD mark

16. Whether BTLP's use of the TWIHARDER mark is likely to cause consumer confusion with either of Summit's TWIHARD marks.

17. Whether BTLP's lack of any merchandise sales to *bona fide* purchasers in actual commerce precludes Summit's claims relating to Cafepress merchandise.

**Dilution by Tarnishment or Blurring**

18. Whether the *Twiharder* motion picture (and the related pictoral/graphic works) is a "non-commercial" work, i.e. does more than propose a commercial transaction under the Trademark Dilution Revision Act.

19. Whether the TWILIGHT Marks are "tarnish-proof".

20. Whether BTLP is entitled to attorneys' fees for Summit's bad faith attempt to leverage the TDRA as a vehicle for viewpoint discrimination.

**Statute of Limitations / Laches**

21.   Whether Summit knew or should have known about BTLP's allegedly infringing materials at any time before January 26, 2011.

22.   Whether Summit delayed in initiating the lawsuit (filed January 27, 2014).

23.   Whether Summit's delay in filing suit was unreasonable.

24.   Whether Summit's delay in filing suit resulted in prejudice to BTLP.

**Other**

25.   Whether BTLP is entitled to judgment based on its affirmative defenses to Summit's claims for relief.

26.   Whether BTLP is entitled to judgment based on Summit's affirmative defenses to BTP's claims for relief.

27.   Whether Summit's state law claims are substantially congruous to Summit's federal claims.

**9.   Parties statements regarding discovery.**

**BTLP's Statement re: Outstanding Discovery:**

   ♦   BTLP timely served its first set of written document requests and interrogatories on September 5, 2014, leaning enough time for Summit to respond within the discovery period.  However, Summit and Lions Gate did not respond until after the October 6, 2014 discovery deadline.  They stonewalled the most critical discovery aspect of BTLP's case, which relates to the copyright licensing and revenues of *Breaking Wind* (2012), a direct market comparable *Twilight* parody; and the licensing of *Vampires Suck* (2010), another prime market comparable.  Accordingly, BTLP will move to compel discovery concerning the revenues and licensing agreements of the *Twilight* parody film *Breaking Wind* (2012) and *Vampires Suck* (2010).

1
2
3
4
5
6

◆ BTLP also requests a brief period to conduct third-party discovery on the issue of damages, which would include third-party subpoenas to Fully Mooned, LLC (the copyright owner of Breaking Wind), Regency Enterprises, LLC (the copyright owner of Vampires Suck) and mass market distributors such as iTunes, Amazon.com, Barnes and Nobles.com and Walmart.com.

7
8
9
10
11
12
13
14
15
16
17

◆ The reason why third-party discovery on damages was not taken during the discovery period was because BTLP believed, in good faith, that a party has an obligation to discover information from the opposing party, in the first instance, before burdening third parties with requests for the identical information.   But now that Summit has stonewalled BTLP's discovery efforts, and also seeks to preclude the numbers provided by Nash Communications, LLC in the ordinary course of business, BTLP respectfully requests a brief period of third-party discovery so as to allow BTLP the opportunity to retrieve information that is likely dispositive of its damages claims for *prima facie* tort.

18
19
20
21
22
23

**10.   Disclosures and Exhibits**

◆ All disclosures under F.R.Civ.P.26(a)(3) have been made by BTLP. Summit has failed to make its disclosures because it has failed to provide the contact information of its witnesses and has failed to separately identify the exhibits it plans to produce at trial.

24
25

◆ The joint exhibit list of the parties has been filed under separate cover as required by L.R. 16-6.1.

26

General Objections to Exhibit List:

27
28

◆ Summit did not produce any documents in this action until after

the Joint Exhibit list was filed.  BTLP respectfully requests the opportunity to update its entries to add documents from Summit's untimely production.

◆  BTLP objects to the fact that Summit has failed to provide bate-stamp ID numbers which correspond to the vague and cryptic descriptions provided in Summit's portion of the joint exhibit list, making it virtually impossible for BTLP to know what's actually included in any of the entries. BTLP also objects on the grounds that BTLP has no way of knowing whether Summit has produced all documents identified in its portion of the parties' joint exhibit list.

**11.** **Witnesses**

**BTLP's Statement**

◆  Witness lists of the parties have heretofore been filed with the Court. (R. 82 (BTLP's list) and R. 84 (Summit's list).  Only the witnesses identified in the lists will be permitted to testify (other than solely for impeachment).

◆  No depositions have been taken in this matter. Because no depositions have been taken, neither party has marked depositions in accordance with Local Rule 16-2.7 or lodged depositions under Local Rule 32-1.

**12.** **Law and Motion Matters**

◆  BTLP's Motions (Pending):

(a)  BTLP's Motion for Summary Judgment on Counts I-V of Summit's Counterclaims. [Docket Nos. 93, 94, 96]

◆  BTLP's Motions (Contemplated):

(a)  BTLP intends to move the Court to amend its pleading for the limited purpose of particularizing its damages claims under the *prima facie* tort doctrine (if the Court finds that an amended pleading is warranted to effectuate that purpose);

(b)  Depending on the Court's rulings on the parties' cross motions for summary judgment, set for hearing on November 17, 2014, BTLP will move the Court *ex parte* for a motion *in limine* to exclude the CafePress "samples" fabricated on demand by Summit on grounds that such clothing articles were not purchased in the ordinary course of business, were not a part of any actual inventory held by BTLP, and are highly prejudicial to BTLP . These articles were manufactured by Summit – not BTLP.

(c)  Depending on the resolution of the copyright claims, and given that many of the legal and factual issues underlying the remaining claims set for trial are distinct from the antitrust claims, BTLP intends to move the Court for reconsideration of its denial of BTLP's Rule 15(a)(2) motion [R. 66] to add antitrust claims against Lions Gate based on violations of antitrust laws, 15 U.S.C. §§ 1, 2. In the alternative, BTLP will seek leave of Court to file a new action (on or before June 25, 2015) so as to vindicate the national public interest against an antitrust violator.

## 13. <u>Bifurcation</u>

♦ <u>BTLP's Statement</u>: None. Unless the Court finds it in the best interests of judicial economy, Plaintiff BTLP hereby withdraws its previous request [R.

82] to sever Count III of BTLP's complaint for *prima facie* tort and, similarly, withdraws its request to bifurcate the case according to the issues of liability and damages.

**14.   The foregoing admissions having been made by BTLP, and BTLP having specified the foregoing issues of fact and law remaining to be litigated, this Final Pretrial Conference Order shall supercede the pleadings and govern the course of the trial of this cause, unless modified to prevent manifest injustice.**

DATED _____, 20__

_____
UNITED STATES DISTRICT JUDGE

Approved as to form and content

BY:_____/s/jameshfreeman_____

James H. Freeman

Attorney for BTLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

## Between the Lines Productions, LLC's Objections to Summit Entertainment, LLC's JX Exhibit Entries

\* For purposes of brevity, only those exhibits to which BTLP objects are listed in the below table.  BTLP has also stated general objections above in [paragraph 10. Disclosures and Exhibits] based on the lack of bate-stamp # IDs to separately identify each exhibit (as required by Rule 26(a)(3).

| Ex. # | ID | Description | BTLP's Objections [FRE} |
|-------|------|-------------|-------------------------|
| 1007 | Physical | Sample of Twiharder headwear sold on CafePress.com | 402, 403, 901 |
| 1008 | Physical | Sample of Twiharder magnets sold on CafePress.com | 402, 403, 901 |
| 1009 | Physical | Samples of Twiharder beverageware sold on CafePress.com | 402, 403, 901 |
| 1010 | Physical | Samples of Twiharder stickers sold on CafePress.com | 402, 403, 901 |
| 1011 | Physical | Samples of Twiharder bags sold on CafePress.com | 402, 403, 901 |
| 1012 | Physical | Samples of Twiharder stationery products sold on CafePress.com | 402, 403, 901 |
| 1013 | Physical | Sample of *Twiharder* | 402, 403, 901 |

| Ex. # | ID | Description | BTLP's Objections [FRE} |
|---|---|---|---|
| | | calendars sold | |
| 1014 | Physical | Samples of Twiharder journals sold on Cafepress | 402, 403, 901 |
| 1015 | Physical | Samples of Twiharder undergarments sold on CafePress.com | 402, 403, 901 |
| 1016 | Physical | Sample of Twiharder Thermos bottles sold on CafePress.com | 402, 403, 901 |
| 1017 | Physical | Samples of other Twiharder items sold on CafePress.com | 402, 403, 901 |
| 1018 | Physical | Sample(s) of official Twilight Saga TWIHARD apparel sold on CafePress.com | 901 |
| 1019 | Physical | Sample(s) of official Twilight Saga TWIHARD headwear sold on CafePress.com | 901 |
| 1020 | Physical | Sample(s) of official Twilight Saga TWIHARD magnets sold on CafePress.com | 901 |
| 1021 | Physical | Sample(s) of official Twilight Saga TWIHARD beverageware sold on CafePress.com | 901 |
| 1022 | Physical | Sample(s) of official Twilight Saga TWIHARD stickers | 901 |

| Ex. # | ID | Description | BTLP's Objections [FRE] |
|---|---|---|---|
| | | sold on CafePress.com | |
| 1023 | Physical | Sample(s) of official Twilight Saga TWIHARD bags sold on CafePress.com Physical | 901 |
| 1024 | | Samples of additional official Twilight Saga merchandise | 901 |
| 1053 | | Copyright registration of The Twilight Saga: Breaking Dawn – Part 2 motion picture, Reg. No. PA1-812-965 | 402, 403, 901 [Copyright has been transferred to Lions Gate/ Chase Bank] |
| 1060 | | Copyright registrations of Twilight Saga home entertainment releases and trailers | 402 |
| 1061 | | Additional copyright registrations relating to Twilight | 402 |
| 1062 | | Additional copyright registrations relating to The Twilight Saga: New Moon | 402 |
| 1063 | | Additional copyright registrations relating to The Twilight Saga: Eclipse | 402 |
| 1064 | | Additional copyright | 402 |

| Ex. # | ID | Description | BTLP's Objections [FRE} |
|-------|-----|-------------|--------------------------|
| | | registrations relating to The Twilight Saga: Breaking Dawn Part 1 | |
| 1065 | | Additional copyright registrations relating to The Twilight Saga: Breaking Dawn Part 2 | 402, 403, 901 |
| 1066 | | BTL movie poster (title treatment) | |
| 1088 | C00086-93 | Email correspondence between BTL, Giovanni Cuarez, and Dean Cheley, dated July 3, 2012 through July 17, 2012 | 801, 901 |
| 1089 | C00164-69 | Email correspondence between Giovanni Cuarez and Joseph Gravier, dated July 2, 2012 through July 16, 2012 | 801, 901 |
| 1090 | C00176-80 | Email correspondence between Giovanni Cuarez and BTL, dated July 13, 2012 through July 17, 2012 | 801, 901 |
| 1091 | C00181-85 | Email correspondence between Michael Bencivenga and Giovanni Cuarez, dated June 25, 2012 through July 2, 2012 | 801, 901 |

| Ex. # | ID | Description | BTLP's Objections [FRE} |
|-------|-----|-------------|------------------------|
| 1092 | C00186-203 | June 5, 2012 E&O Insurance Quote from Chubb Insurance Company | 801, 901 |
| 1093 | C00204-10 | Email correspondence between Giovanni Cuarez and Michael Bencivenga and Joseph Gravier, dated June 15, 2012 through June 20, 2012 | 801, 901 |
| 1094 | C00215-18 | Email correspondence between BTL and Giovanni Cuarez, dated July 13, 2012 through July 16, 2012 | 801, 901 |
| 1118 | | Invoice for Twiharder goods purchased on CafePress.com | 402, 403, 901 |
| 1119 | | Printout of Twiharder store on CafePress.com | 402, 403, 901 |
| 1241 | | Authorized use of Twilight intellectual property by various licensees | 402, 901 |

**END**