SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
JILL M. PIETRINI (Cal. Bar No. 138335)
jpietrini@sheppardmullin.com
PAUL A. BOST (Cal. Bar No. 261531)
pbost@sheppardmullin.com
BENJAMIN O. AIGBOBOH (Cal. Bar No. 268531)
baigboboh@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone:   (310) 228-3700 / Facsimile: (310) 228-3701

Attorneys for Defendant and
Counterclaimant Summit Entertainment,
LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| BETWEEN THE LINES PRODUCTIONS, LLC, a California limited liability company,<br><br>                    Plaintiff,<br><br>          v.<br><br>LIONS GATE ENTERTAINMENT CORP., a British Columbia corporation, and SUMMIT ENTERTAINMENT, LLC, a Delaware limited liability company,<br><br>                    Defendants.<br><br>―――――――――――――――<br><br>AND RELATED COUNTERCLAIMS. | Case No. 2:14-cv-00104-R (PJWx)<br><br>**DEFENDANT AND COUNTERCLAIMANT SUMMIT ENTERTAINMENT, LLC'S REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION ON PLAINTIFF BETWEEN THE LINES PRODUCTIONS, LLC'S THIRD CLAIM FOR PRIMA FACIE TORT**<br><br>Date:   November 17, 2014<br>Time:   10:00 a.m.<br>Ctrm:   8<br>Judge:  Hon. Manuel L. Real<br><br>Complaint filed:       Dec. 16, 2013<br>Counterclaims filed:   Jan. 27, 2014<br>Trial Date:            Nov. 25, 2014 |

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................................. 1

II.  BTL HAS NOT MET THE SUMMARY JUDGMENT STANDARD ........... 1

III.  SUMMARY ADJUDICATION IS PROPER BECAUSE BTL HAS FAILED TO ALLEGE A CLAIM FOR PRIMA FACIE TORT .................... 3

    A.  Prima Facie Tort Is "Highly Disfavored" Under New York Law ......... 3

    B.  Prima Facie Tort Requires BTL To Allege, And Prove, That Summit's *Sole* Motive Was To Injure BTL And That BTL Suffered Special Damages As A Result ................................................. 4

        1.  BTL Has Not Alleged That Summit's Sole Motive Was To Injure BTL ................................................................. 5

        2.  BTL Has Not Alleged Any Special Damages ............................. 5

IV.  BTL HAS FAILED TO ESTABLISH A GENUINE DISPUTE OF MATERIAL FACT AS SUMMIT'S INTENT OR INTRODUCE ANY EVIDENCE OF DAMAGES ................................................................. 6

    A.  There Is No Evidence That Summit Intentionally Inflicted Harm On BTL ................................................................................. 6

    B.  There Is No Genuine Dispute Of Material Fact As To Whether Summit's Sole Intent Was To Maliciously Injure BTL ........................ 7

    C.  BTL Has Offered No Admissible Evidence To Support A Request For Special Damages .............................................................. 10

        1.  BTL Has No Evidence Of Its Out-Of-Pocket Costs .................. 10

        2.  BTL's Claim For Lost Profits Fails Because BTL's Purported "Lost Profits" Evidence is Inadmissible And Even If It Were Admissible, It Would Be Insufficient As A Matter Of Law .................................................................. 11

            a.  BTL's Purported "Lost Profits" Evidence Is Inadmissible For Several Reasons ................................... 11

            b.  Even If Admissible, BTL's Purported Evidence Of Lost Profits Is Insufficient As A Matter Of Law ............. 19

        3.  BTL's Claim For $125,000,000 In "Lost Business Opportunity" Damages Fails As A Matter Of Law ................... 21

        4.  BTL *New* Claim For Punitive Damages Fails ........................... 22

V.  CONCLUSION ................................................................................. 24

1

## **TABLE OF AUTHORITIES**

2

3

**Page(s)**

<u>Cases</u>

4

5

*Azby Brokerage, Inc. v. Allstate Ins. Co.*
    681 F. Supp. 1084 (S.D.N.Y. 1988) ..................................................................4

6

7

*Cardo v. Board of Mgrs., Jefferson Vil. Condo 3*
    29 A.D.3d 930 (N.Y. App. Div. 2d Dep't 2006)..........................................5

8

9

*Celotex Corp. v. Catrett*
    477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) .................................1, 2

10

11

*Crane v. Crest Tankers*
    47 F.3d 292 (8th Cir. Mo. 1995) .......................................................16

12

13

*Crime, Justice & Am., Inc. v. Smith*
    2014 U.S. Dist. LEXIS 141388 (E.D. Cal. Oct. 2, 2014) ...............................14

14

15

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*
    509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ................................17

16

*Equal Emp't Opportunity Comm'n v. GLC Restaurants, Inc.*
    2007 U.S. Dist. LEXIS 399 .............................................................13

17

18

*Evans v. Excellus Health Plan, Inc.*
    2012 U.S. Dist. LEXIS 109849 ..........................................................5

19

20

*Folex Golf Indus. v. China Shipbuilding Indus.*
    2013 U.S. Dist. LEXIS 67044 (C.D. Cal. May 9, 2013) (Real, J.) .....................2

21

22

*Frontline Med. Assocs., Inc. v. Coventry Health Car*
    263 F.R.D. 567 (C.D. Cal. 2009)...................................................11, 13

23

24

*Estate of Gonzalez v. Hickman*
    2007 U.S. Dist. LEXIS 84390 ..........................................................13

25

26

*Kenford Co. v. County of Erie*
    67 N.Y.2d 257 (1986)...................................................................20

27

*Knicrumas v. Albany City School Dist.*
    241 F. Supp.2d 199 (N.D.N.Y. 2003) ...................................................3

28

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Lamb Eng'g & Constr. Co. v. Nebraska Pub. Power Dist.*
　103 F.3d 1422 (8th Cir. 1997) ................................................................. 16

*Lerwick v. Kelsey*
　24 A.D.3d 931 (N.Y. App. Div. 3d Dep't 2005) ..................................... 4

*In re Lewis*
　97 F.3d 1182 (9th Cir. 1996) ................................................................... 2

*Lifewise Master Funding v. Telebank*
　374 F.3d 917 (10th Cir. 2004) ............................................................... 17

*Marinaccio v Town of Clarence*
　20 N.Y.3d 506 (2013) ............................................................................ 23

*Mariscal v. Graco, Inc.*
　2014 U.S. Dist. LEXIS 120182 (N.D. Cal. Aug. 27, 2014) ................... 12

*Nationwide CATV Auditing Servs., Inc. v. Cablevision Sys. Corp.*
　2013 U.S. Dist. LEXIS 65795 (E.D.N.Y. May 7, 2013) ..................... 4, 5

*Paddack v. Dave Christensen, Inc.*
　745 F.2d 1254 (9th Cir. 1984) ............................................................... 15

*Payaslyan v. Allstate Ins. Co.*
　2013 U.S. Dist. LEXIS 71919 (C.D. Cal. May 2, 2013) (Real, J.) .......... 2, 10

*Posner v. Lewis*
　18 N.Y.3d 566 (N.Y. 2012) ..................................................................... 4

*Restis v. Am. Coalition Against Nuclear Iran, Inc.*
　2014 U.S. Dist. LEXIS 139402 (S.D.N.Y. Sept. 30, 2014) ................. 3, 9

*Ross v. Louise Wise Servs., Inc.*
　8 N.Y.3d 478 (2007) .............................................................................. 23

*Schonfeld v. Hilliard*
　218 F.3d 164 (2d Cir. 2000) ..................................................... 19, 20, 21

*Securiton Magnalock Corp. v. Schnabolk*
　65 F.3d 256 (2d Cir. 1995) ................................................................... 17

1

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Silverman v. City of New York*
   2001 U.S. Dist. LEXIS 2631 (E.D.N.Y. Feb. 12, 2001) ................................. 5, 6

*Stormes v United Water N.Y., Inc.*
   84 A.D.3d 1351 (N.Y. App. Div. 2d Dep't 2011) ............................................ 24

*Taylor v. List*
   880 F.2d 1040 (9th Cir. 1989) ......................................................................... 2

*Toyrrific, LLC v. Karapetian*
   2013 U.S. Dist. LEXIS 54043 (C.D. Cal. Apr. 16, 2013)................................. 12

*Twin Laboratories, Inc. v. Weider Health & Fitness*
   720 F. Supp. 31 (S.D.N.Y. 1989) ...................................................................... 3

*Twin Labs., Inc. v. Weider Health & Fitness*
   900 F.2d 566 (2d Cir. 1990) ......................................................................... 4, 8

*U.S. ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.*
   95 F.3d 153 (2d Cir. 1996) ............................................................................. 10

*In re Vaughan*
   471 B.R. 263 (Bankr. D.N.M. 2012) ............................................................... 17

*Virgilio v. City of New York*
   407 F.3d 105 (2d Cir. 2005) ........................................................................... 23

Other Authorities

Fed.R.Civ.P. 26 and 37 ....................................................................................... 12

Fed.R.Civ.P. 26(a)(1)(A)(iii) ............................................................................. 12

Fed.R.Civ.P. 37 ................................................................................................... 15

Fed.R.Civ.P. 37(c)(1)............................................................................. 11, 12, 13

Fed.R.Evid. 702 ............................................................................................ 14, 15

Fed.R.Evid. 803(6) ............................................................................................. 15

Fed.R.Evid. 803(6)(E) ........................................................................................ 16

1

## <u>TABLE OF AUTHORITIES</u>
### (continued)

2

3                                                                              <u>Page(s)</u>

4   Fed.R.Evid. 803(17) ........................................................................ 15, 16

5   L.R. 11-8 ............................................................................................... 1

6   L.R. 56-2 ............................................................................................... 1

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.     <u>INTRODUCTION</u>

In its opposition to Defendant and Counterclaimant Summit Entertainment, LLC's ("Summit") motion for summary adjudication, Plaintiff and Counter-Defendant Between the Lines Productions, LLC ("BTL") proves that it has not properly alleged, and has no evidence to support, its claim of prima facie tort. Instead of submitting or identifying admissible evidence in support of its claim, BTL makes conclusory statements, relies on inapposite cases and advances irrelevant and baseless contentions.[1]  In short, BTL's argument in support of its prima facie tort claim boils down to "because I said so."  As Summit has established in its motion and herein, BTL's claim for prima facie tort fails as a matter of law. Accordingly, summary adjudication should be granted and BTL's prima facie tort should be dismissed with prejudice.

## II.    <u>BTL HAS NOT MET THE SUMMARY JUDGMENT STANDARD</u>

Fed.R.Civ.P. 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265, 273 (1986).  In such a case, "[t]here can be 'no genuine issue as to any material fact,' since a complete

---

[1]     In opposing Summit's motion, BTL has again failed to comply with the Local Rules and the Court's orders.  BTL's opposition does not include an introduction, statement of facts or conclusion and, despite being 25 pages and citing to dozens of cases and other irrelevant authorities, does not include a table of contents or table of authorities.  L.R. 11-8.  BTL has also, again, filed documents after its deadline to do so, in direct contravention of the Local Rules and this Court's repeated orders and admonitions.  Specifically, the declaration of Bruce Nash and the supporting evidence was not timely filed by BTL.  (Dkt. 116.)  BTL also failed to properly respond to Summit's statement of uncontroverted facts and, instead, simply refiled an earlier document without making any changes to it (not even to the hearing date listed in the caption).  (Dkt. 102-2.)  *See also* L.R. 56-2.

failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 322-23.  The moving party is not required to negate its opponent's claim; instead, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325; *see also Payaslyan v. Allstate Ins. Co.*, 2013 U.S. Dist. LEXIS 71919, at **2-3 (C.D. Cal. May 2, 2013) (Real, J.).

Summary judgment "dispose[s] of factually unsupported claims or defenses." *Celotex Corp.*, 477 U.S. at 323-24; *see also Folex Golf Indus. v. China Shipbuilding Indus.*, 2013 U.S. Dist. LEXIS 67044, at *8 (C.D. Cal. May 9, 2013) (Real, J.).  A summary judgment motion "cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also In re Lewis*, 97 F.3d 1182, 1187 (9th Cir. 1996); *Folex Golf Indus.*, 2013 U.S. Dist. LEXIS 67044, at *8 (C.D. Cal. May 9, 2013) ("Bald assertions based on a mere scintilla of evidence will not preclude summary judgment.").  To survive summary judgment, the nonmovant must produce some "significant probative evidence" to support its claim.  *Lewis*, 97 F.3d at 1187.

BTL has not even come close to meeting the summary judgment standard.  BTL has not submitted any evidence to establish a factual dispute on its prima facie tort claim.  Rather, BTL relies upon arguments and a conclusory affidavit of one of its principals, who opines on everything even though he does not have personal knowledge and certainly is not an expert on the subjects on which he pontificates. (Dkt. 75.)  Most notably, BTL does not even contend in its opposition that it pled the special damages element required for a prima facie tort claim (*see* Opp. at 19:13-25:24), and even if it had, BTL admits that it does not have any evidence of special damages.  (*Id*.)  Instead, BTL states that it will produce evidence of damages at some unknown point, and laments that Summit has not given BTL evidence of sales information for third party motion pictures that BTL contends are comparable

parodies of the *Twilight* Motion Pictures.  It is BTL's burden to plead and establish its alleged damages.  Trial starts in 22 days.  BTL cannot survive summary judgment by stating that it will produce evidence of special damages at some point during those 22 days.

## III.   SUMMARY ADJUDICATION IS PROPER BECAUSE BTL HAS FAILED TO ALLEGE A CLAIM FOR PRIMA FACIE TORT

Because BTL has failed to properly allege a claim for prima facie tort – a claim that is "highly disfavored" under New York law – BTL's motion should be granted.

### A.   Prima Facie Tort Is "Highly Disfavored" Under New York Law

BTL does not dispute that "[p]rima facie tort is disfavored under New York law." *Knicrumas v. Albany City School Dist.*, 241 F. Supp.2d 199, 212 (N.D.N.Y. 2003) (quoting *Hall v. City of White Plains*, 185 F. Supp.2d 294, 304 (S.D.N.Y. 2002)).  *See also Restis v. Am. Coalition Against Nuclear Iran, Inc.*, 2014 U.S. Dist. LEXIS 139402, at *58 n.15 (S.D.N.Y. Sept. 30, 2014) ("[P]rima facie tort is a 'highly disfavored' cause of action in New York.") (quoting and citing *Nevin v. Citibank, N.A.*, 107 F. Supp.2d 333, 347 (S.D.N.Y. 2000); *Hall v City of White Plains*, 185 F. Supp.2d 293, 304 (S.D.N.Y. 2002)).  Nor does BTL dispute that a prima facie tort claim should not be upheld where, as here, "policy considerations dictate that an act should become a basis for liability." *Twin Laboratories, Inc. v. Weider Health & Fitness*, 720 F. Supp. 31, 35 (S.D.N.Y. 1989).  Application of the prima facie tort doctrine in situations where a party seeks to protect its undisputed rights in copyrights and trademarks would serve as an unnecessary and unintended chill on parties' rights to protect their valuable intellectual property.  For this reason alone, the Court should grant summary adjudication.

Regardless, BTL has not properly alleged a prima facie tort claim and has not submitted any evidence to support its claim even if it were properly alleged. Therefore, summary adjudication is appropriate.

-3-

**B.**   **Prima Facie Tort Requires BTL To Allege, And Prove, That Summit's *Sole* Motive Was To Injure BTL And That BTL Suffered Special Damages As A Result**

To establish its claim for prima facie tort, BTL must prove by a preponderance of the evidence that:  (1) Summit intentionally inflicted harm without excuse of justification; (2) Summit's sole motive was a malicious intent to injure BTL; and (3) BTL suffered special damages. *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 571 (2d Cir. 1990) (plaintiff cannot recover for prima facie tort "unless the defendant's conduct was not only harmful, but done with the sole intent to harm.  We have held that motives…such as profit, self-interest, or business advantage will not suffice under the doctrine of prima facie tort.") (internal citations and quotations omitted).[2]  Contrary to BTL's claims (Opp. at 1:15-2:2), this is the modern statement of the disfavored prima facie tort claim.[3]  *See. e.g.*, *Nationwide CATV Auditing Servs., Inc. v. Cablevision Sys. Corp.*, 2013 U.S. Dist. LEXIS 65795, at *57 (E.D.N.Y. May 7, 2013) ("[T]here is no recovery in prima facie tort unless malevolence is the <u>sole</u> motive for [the] defendant's otherwise lawful act . . . by which is meant that the genesis which will make a lawful act unlawful must be a malicious one unmixed with any other and exclusively directed to injury and damage of another….") (citations omitted) (emphasis added).

---

[2]   *See also Azby Brokerage, Inc. v. Allstate Ins. Co.*, 681 F. Supp. 1084, 1087-88 (S.D.N.Y. 1988) (plaintiff must "allege…that defendant was motivated solely by a malicious intention to injure plaintiffs...[and] must allege special damages."); *Posner v. Lewis*, 18 N.Y.3d 566, 570 n.1 (N.Y. 2012) (there can be no recovery under prima facie tort "unless malevolence is the sole motive for defendant's otherwise lawful act….").

[3]   BTL cites to Section 870 of the Restatement (Second) of Torts  as the "definitive modern statement of the tort."  (Opp. at 1:15-2:2:2)  Not only are the cases cited by BTL to support this claim at least 25 years old, other cases cited by BTL confirm that Summit's statement of the prima facie tort claim is correct.  *See*, *e.g.*, *Lerwick v. Kelsey*, 24 A.D.3d 931, 931-32 (N.Y. App. Div. 3d Dep't 2005).

### 1. BTL Has Not Alleged That Summit's Sole Motive Was To Injure BTL

BTL has alleged that Summit had a motive other than to injure BTL – namely, Summit's purported claim of a "moral right" based on Stephenie Meyer's, the author of the *Twilight* books, religious beliefs. (*See* Dkt. 1 at ¶ 134,78 at 7:1-12; Opp. at 12:4-13:23.)  BTL argues that Ms. Meyer's religious beliefs led Summit to contend that *Twiharder* would tarnish the image of the *Twilight* Motion Pictures and the related intellectual property.  (Dkt. 78 at 7:1-2.)  As stated in its motion and the supporting evidence therefor, Summit does not concede that it was motivated by a "moral right."  Regardless, BTL's allegations of a motive <u>other than malice</u> are enough to warrant summary adjudication.  *See*, *e.g.*, *Nationwide CATV Auditing Servs.*, 2013 U.S. Dist. LEXIS 65795, at **57-59 (E.D.N.Y. May 7, 2013) (dismissing claim for prima facie tort because plaintiff's "own allegations demonstrate that [defendant] had motives other than disinterested malevolence, such as profit, self-interest, or business advantage.") (internal quotations omitted).

### 2. BTL Has Not Alleged Any Special Damages

New York law is clear:  "[i]n order to state a cause of action for prima facie tort, special damages must be 'alleged with sufficient particularity to identify actual losses…. '[R]ound sums without any attempt at itemization are insufficient.'" *Silverman v. City of New York*, 2001 U.S. Dist. LEXIS 2631, at *36 (E.D.N.Y. Feb. 12, 2001) (citations omitted).  "Merely alleging 'lost future income, conjectural in identity and speculative in amount' is insufficient." *Evans v. Excellus Health Plan, Inc.*, 2012 U.S. Dist. LEXIS 109849, at **24-25 (N.D.N.Y Aug. 6, 2012) (quoting *Vigoda v. DCA Prods. Plus, Inc.*, 293 A.D.2d 265, 741 N.Y.S.2d 20, 22-23 (N.Y. App. Div. 2002)).  The cases cited by BTL confirm this. *See*, *e.g.*, *Cardo v. Board of Mgrs., Jefferson Vil. Condo 3*, 29 A.D.3d 930, 931 (N.Y. App. Div. 2d Dep't 2006) ("A critical element of the cause of action is that [the party asserting the cause of action] suffered specific and measurable loss, which requires an allegation of

1    special damages.") (quotation omitted).

2       Despite this, BTL has failed to even **address** its failure to properly allege the

3    required "special damages."  In fact, BTL completely ignores the fact that, in its

4    complaint, it alleges, solely, that it seeks "to recover compensatory damages against

5    [Summit] for the loss of its business opportunity to distribute the motion picture

6    TWIHARDER via Warner Brothers Digital Distribution in the Fall of 2012."  (Dkt.

7    1 at ¶ 35; *see also* Dkt. 78 at 3:2-11.)  BTL does not address its failure to identify its

8    alleged losses with "sufficient particularity to identify actual losses."  *Silverman*,

9    2001 U.S. Dist. LEXIS 2631, at *36.  Nor does BTL address its failure to  even

10   allege any specific damages, let alone attempt to itemize (or prove) those damages.

11   As Summit established in its motion and here, BTL's generalized allegations

12   seeking unspecified compensatory damages or lost profits are insufficient as a

13   matter of law.  Summary adjudication is therefore proper.

14   **IV.   BTL HAS FAILED TO ESTABLISH A GENUINE DISPUTE OF**
         **MATERIAL FACT AS SUMMIT'S INTENT OR INTRODUCE ANY**
15       **EVIDENCE OF DAMAGES**

16       **A.   There Is No Evidence That Summit Intentionally Inflicted Harm**
17           **On BTL**

18       There is no evidence at all that Summit was aware of BTL's negotiations with

19   Gravitas Ventures, LLC ("Gravitas") for distribution of *Twiharder*.[4]  BTL does not

20   dispute that, without this evidence, there can be no claim that Summit acted

21   intentionally to disrupt BTL's purported distribution relationship.  Instead of

22   _____

23   [4]     In support of its argument that Summit's sole motive was to injure it, BTL
24   states that "before BTLP's deal with Gravitas was withdrawn, BTLP's counsel,
     Dean Cheley, Esq.[,] notified Summit's counsel, Jill Pietrini that BTLP was
25   negotiating a distribution deal."  (Opp. at 8:8-10.)  The purported evidence of this –
     the "Cheley Decl." – has not been provided to the Court by BTL.  Even if it were,
26   the purported language supporting BTL's contention does not establish that BTL's
27   counsel notified anyone about potential *Twiharder*'s distribution *before* Gravitas
     revoked its offer.  (Opp. at 8:11-17.)
28

submitting actual evidence to establish a factual dispute as to Summit's intent, BTL argues that Summit intentionally inflicted harm by (1) "expropriat[ing] the ownership of BTLP's property," i.e., *Twiharder* and the related asserts; (2) "banning the exhibition and distribution" of *Twiharder*; and (3) "excluding *Twiharder* from market." (Opp. at 2:3-5:4.) BTL's arguments are meritless. Summit asserted its legal objections to BTL's use of its intellectual property. Summit did not expropriate or destroy *Twiharder* or any *Twiharder*-related materials. BTL still owns it purported copyright registrations related to *Twiharder*. BTL still operates and maintains its website at available at www.twiharder.com. (Dkt. 96 at ¶ 58.) Summit did not ban BTL (or anyone else) from exhibiting or distributing *Twiharder* or exclude it from the market, nor does Summit have the power to do so. Only the Court can issue an injunction enjoining BTL from exhibiting or distributing *Twiharder*. As BTL readily admits, the *Twiharder* motion picture is currently being distributed by BTL and is available for download by anyone in the world. (Dkt. 99-2 at p. 12-13.)

Thus, because BTL concedes that there is no evidence that Summit intentionally interfered with any distributor relationship, and there is no evidence that Summit expropriated, destroyed, banned or excluded *Twiharder* and its related materials, BTL cannot establish intentional infliction of harm, and its prima facie tort claim therefore fails as a matter of law.

### B. There Is No Genuine Dispute Of Material Fact As To Whether Summit's Sole Intent Was To Maliciously Injure BTL

BTL attempts – relying only on argument, the self-serving declaration of BTL principal John Gearries, and inadmissible hearsay in settlement correspondence – to create a genuine dispute as to whether Summit's **sole** motive was to injure BTL. BTL ignores the testimony of Rachel Kimbrough and the undisputed evidence to argue that Summit had no "economic" interest in asserting its trademark and copyright infringement claims against BTL. (Opp. at 5:9-12:3.) BTL's focus on

Summit's purported "economic interests" misses the point. A claim for prima facie tort cannot stand if the defendant had **any** motive other than to injure plaintiff. There is no requirement that the motive be economic. Summit's desire to protect its intellectual property against infringement and dilution –whether considered "economic" or not – is sufficient to defeat a claim for prima facie tort. *See Twin Labs, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 571 (2d Cir. 1990) (prima facie tort claim lacked merit because although there was dispute over true motive, there was no reasonable dispute that defendant acted out of "self-interest," not intent to harm plaintiff). As the undisputed evidence establishes, Summit's motive was to protect its valuable business interests in the *Twilight* Motion Pictures and the related intellectual property. BTL has failed to create an issue of fact on Summit's intent. Indeed, BTL has not submitted any evidence to contradict the declaration of Rachel Kimbrough stating that Summit's intent in contacting BTL was to assert its intellectual property claims against BTL and protect Summit's intellectual property in the *Twilight* Motion Pictures.

Summit reasonably perceived *Twiharder* and the *Twiharder*-related materials as violative of Summit's valuable rights. As Rachel Kimbrough testified:

> Summit's intention was to protect its valuable intellectual property rights in and to the *Twilight* motion pictures including, but not limited to, any copyright and trademarks associated with the *Twilight* motion pictures, and to protect its business interests with regard to the *Twilight* motion pictures. Summit was not motivated by malice towards BTL.

(Dkt. 91-2 at ¶ 4, Ex. C at ¶ 6.) Summit was not alone in its assessment of *Twiharder*. Potential insurance carriers required BTL to obtain a legal-opinion letter regarding "the parody and fair use aspects" of *Twiharder*, which they would only do if there was a concern that *Twiharder* would infringe Summit's rights. (Dkt. 1 at BTL_001167.) One insurance carrier, OneBeacon Insurance ("OneBeacon"), flatly denied insurance coverage based on its assertion that *Twiharder* did not qualify as "fair use" before Summit sent its June 27, 2012 letter:

-8-

**From:** Giovanni Cuarez [mailto:gio@aeweb.com]
**Sent:** Monday, June 11, 2012 8:15 AM
**To:** John Gearries
**Cc:** Seham Abuali; Christopher Sean
**Subject:** RE: Between The Lines - E&O Quotes

Hi John,

Below is the response from the OneBeacon Insurance Underwriter:

> Please be advised that despite the fact that most of the application stated 'Fair Use', this submission does not qualify nor would a defense for 'Fair Use' be tendered. The number one factor for claiming 'Fair Use' is the purpose of use – is the producer making money from it or merely using the work in an educational manner? Unfortunately, this risk will be making money from this spoof. Unless you can provide tangible evidence that this risk has obtained written permission from Melissa Rosenberg, Stephanie Meyer's and all other copyright owners (especially music) of Twilight I am not willing to consider offering terms.

Note: To better assist and identify your production, please always include your Company Name or Quote Number on the Subject Line of your email.

(Dkt. 80-2 at ¶ 2, Ex. A.)  BTL completely ignores this evidence in its opposition. Nor does BTL dispute that whether Summit's (and others') assertion that *Twiharder* is a fair use is vindicated by the trier-of-fact is irrelevant to a determination of Summit's motives for the purposes of prima facie tort.  In fact, New York courts recognize that expression of an opinion – for example, that a particular film infringes a party's rights – should not be subjected to liability of prima facie tort. *Restis v. Am. Coalition Against Nuclear Iran, Inc.*, 2014 U.S. Dist. LEXIS 139402, *58 (S.D.N.Y. Sept. 30, 2014) ("[T]he Second Circuit has observed that in prima facie tort cases involving acts of expression, 'wherever a defendant's actions can be seen, at least in part, as having been motivated by the desire to express some opinion, [this] cause of action…will fail.' *McKenzie v. Dow Jones & Co., Inc.*, 355 F. App'x 533, 536 (2d Cir. 2009).").

BTL's arguments about Summit's purported motives, when they are supported by any evidence all, are supported by _inadmissible_ statements and innuendo.  For example, BTL contends that Summit selectively enforced its rights against BTL.  This argument is support only by inadmissible statements by Mr. Gearries, and directly contradicts BTL's contention that Summit is an "overly aggressive IP enforcer" that employs "reckless IP enforcement tactics" to stifle free speech across the country.  (Opp. at 25:12-22.)

BTL's other arguments – that Summit was "not motivated by any risk…that…*Twiharder*…would serve as a market substitute for" the *Twilight* Motion Pictures, that Summit "abjectly refused to negotiate a license with BTLP," and that Summit has not produced evidence of confusion or damages – are similarly unsupported by any admissible evidence and untrue.[5]  (*See*, *e.g.*, Dkt. 80 at 14:24-15:10.)  This "evidence" is "insufficient to raise genuine issues of fact and defeat summary judgment."  *Payaslyan*, 2013 U.S. Dist. LEXIS 71919, at *4 (Real, J.).

## C.   BTL Has Offered No Admissible Evidence To Support A Request For Special Damages

BTL filed its first iteration of its lawsuit against Summit on May 28, 2013. (Dkt. 66 at 1:22-25.)  BTL, however, has never produced any admissible, relevant evidence to support a claim for, or calculation of, "compensatory damages and/or lost profits."  Instead, BTL relies only on argument in an attempt to establish its entitlement to more than $6 million in "lost profits," at least $125,000,000 in "lost business opportunity damages, and punitive damages in an indeterminate amount. BTL has failed to introduce any evidence of damages, let alone any evidence of special damages.

### 1.   BTL Has No Evidence Of Its Out-Of-Pocket Costs

BTL admits that it has not produced evidence of its "out-of-pocket" costs,

---

[5]   BTL argues, without support, that the intent requirement in a prima facie tort is "essentially equivalent to 'Lack of Justification or Excuse.'"  (Opp. at 14:3-5.) This is false.  Intent and justification are distinct elements of the prima facie tort test.  *See*, *e.g.*, *U.S. ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153 (2d Cir. 1996).  BTL cannot collapse the elements of a prima facie tort claim to suit its argument.  Thus, BTL's unsupported contentions about Summit's "legal justification" or "social justification" introduced "to bolster its claim" of Summit's malevolence are irrelevant.  (Opp. at 14:1-19:12.)  They are also wrong and misleading.  For example, contrary to BTL's contention in its opposition, nowhere in its motion did Summit assert "it was permissible to censor BTLP according to its content-based viewpoint."  (Opp. at 14:19-21.)  Censorship is a function of a governmental-entity, not a private actor.

which it now contends total "approximately $120-135,000." (Opp. at 20:1-4.) Not only has BTL never produced any evidence of its purported out-of-pocket costs – despite the fact that it is mandated by Fed.R.Civ.P. 26(a)(1)(A)(iii) – BTL has repeatedly misrepresented to the Court and Summit that its "out-of-pocket" costs were "approximately $300,000" (Dkt. 78 at 3:21-25) – which is almost 3 times more than what BTL now claims.  BTL was required to disclose the documents to support its purported "out-of-pocket" costs as part of its Fed.R.Civ.P. 26 disclosures.  To this date, BTL has not produced any such evidence to Summit or the Court.  Even if BTL had, it would still be excludable under Fed.R.Civ.P. 37(c)(1).  Without any admissible evidence of its "out-of-pocket" costs, BTL cannot establish its purported lost profits or lost business opportunity damages.  For this reason alone, Summit's motion should be granted.  *See*, *e.g.*, *Frontline Med. Assocs., Inc. v. Coventry Health Car*, 263 F.R.D. 567, 569-70 (C.D. Cal. 2009) (Fed.R.Civ.P. 26 "requires a computation [of claimed damages], supported by documents"; where a plaintiff claims lost profits, to comply with Fed.R.Civ.P. 26, it must provide "information reasonably available to it as to gross revenues, expense and any other component of its lost profits computation.").

In short, BTL cannot establish a factual dispute to avoid summary judgment by stating that it will produce evidence sometime in the future.  If that were the case, summary judgment could never been entered against a party.

**2.    BTL's Claim For Lost Profits Fails Because BTL's Purported "Lost Profits" Evidence is Inadmissible And Even If It Were Admissible, It Would Be Insufficient As A Matter Of Law**

**a.    BTL's Purported "Lost Profits" Evidence Is Inadmissible For Several Reasons**

BTL concedes that the only evidence it has of its purported lost profits are the "financial estimates" belatedly produced by Bruce Nash.  The "financial estimates" are inadmissible for the reasons stated below, and BTL provides no argument to

support their admissibility.[6]  Because BTL has no admissible evidence of its purported lost profit damages, BTL has not established that a factual dispute exists to defeat Summit's motion for summary adjudication.

*First*, BTL did not produce all of the purported "financial estimates" until **October 28, 2014** – nearly a month after the close of discovery and a day after it filed its opposition.  (Dkt. 116.)[7]  Furthermore, as is discussed fully in this motion and Summit's Motion *in Limine* No. 2 (Dkt. 114-1 at 8:19-11:28), the portions of the "financial estimates" that BTL provided mere days before the close of discovery are subject to exclusion under Fed.R.Civ.P. 26 and 37.  Fed.R.Civ.P. 26(a)(1)(A)(iii) (plaintiff must "make available for inspection and copying as under Rule 34 the documents or other evidentiary material…on which each [damage] computation is based, including materials bearing on the nature and extent of injuries suffered."); Fed.R.Civ.P. 37 (c)(1) ("If a party fails to provide information…as required by Rule 26(a) or (e), the party is not allowed to use that information…on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless.").[8]

---

[6]     In its opposition, BTL limits its arguments to *Breaking Wind*, and does not reference any of the other allegedly comparable films listed in Mr. Nash's financial estimate documents.  For that reason, Summit limits its discussion to the motion picture *Breaking Wind*.  However, evidence of the allegedly other "comparable" motion pictures is inadmissible and irrelevant for the same reasons about evidence related to *Breaking Wind*.

[7]     On October 28, 2014, BTL produced, for the first time, the documents purportedly produced by Mr. Nash and attached to his declaration as Docket Nos. 116-5, 116-6, and 116-7.  (*See* Dkt. 75-33.)

[8]     *See also Mariscal v. Graco, Inc.*, 2014 U.S. Dist. LEXIS 120182, at **5-6 (N.D. Cal. Aug. 27, 2014) (excluding evidence or testimony related to damages claim because the plaintiff failed to comply with Fed.R.Civ.P. 26, which "denied Defendant the opportunity to adequately conduct discovery and prepare a defense on this claim."); *Toyrrific, LLC v. Karapetian*, 2013 U.S. Dist. LEXIS 54043, at *8 (C.D. Cal. Apr. 16, 2013) (pursuant to FRCP 26, parties must disclose damages calculation and support "of their own volition and without being compelled.");

1   Additionally, BTL has not even produced actual copies of the documents – only

2   computer "screenshots" of the alleged "financial estimates" – instead of the actual

3   Microsoft Excel documents that they appear to be.  These screenshots demonstrate

4   that the Microsoft Excel documents contain multiple tabs or pages – "Service Deal

5   Distribution," "Minimum Guarantee" and "Other Assumptions" – none of which

6   were produced:



12   (Dkt. 116-5; *see also* Dkt. 116-3, 116-4, 116-6, 116-7.)  Clearly, BTL has not

13   complied with its obligations under Fed.R.Civ.P. 26.  The financial estimates are

14   excludable on this basis alone.

15        *Second*, BTL does not dispute that the financial estimates are the subject of

16   expert testimony.  As discussed fully in this motion and Summit's Motion *in Limine*

17   No. 2 (Dkt. 114-1 at 12:1-15:10), because the "financial estimates" and any

18   _____

19   *Frontline Med. Assocs.*, 263 F.R.D. at 569-70; *Estate of Gonzalez v. Hickman*, 2007

20   U.S. Dist. LEXIS 84390, at **15-16 (C.D. Cal. June 28, 2007) (excluding damages
     evidence for failure to disclose because plaintiff failed to timely disclose evidence

21   supporting them depriving defendants an opportunity "to test them through
     discovery aimed at the relevant underlying factors…and to rebut them by retaining

22   an expert who could opine on" defendant's damages evidence); *Equal Emp't
     Opportunity Comm'n v. GLC Restaurants, Inc.*, 2007 U.S. Dist. LEXIS 399, at

23   **29-30 (D. Ariz. Jan. 4, 2007) ("As a general matter, disclosing a computation of

24   damages under Rule 26(a) is necessary for the opposing party to produce responding
     evidence, such as an expert report.  The Court cannot conclude that Plaintiffs'

25   failure to disclose a computation of damages…was harmless.  Thus, pursuant to

26   Rule 37(c)(1), Plaintiffs will be prevented from presenting at trial any computation
     of damages…required by Rule 26(a)(1)(C).").

27

28

testimony by Mr. Nash (although, Mr. Nash apparently refuses to testify on BTL's behalf) are subject to Fed.R.Evid. 702, they should be excluded.  An expert witness is one who, "by knowledge, skill, experience, training or education," may provide testimony in the form of opinion if "the expert's scientific, technical or other specialized knowledge will help the trier of fact," the testimony is based on sufficient facts or data, and the testimony is the product of reliable methods reasonably applied to the facts of the case.  Fed.R.Evid. 702.  In short, an expert witness is one that "employ[s] specialized knowledge in [his or her] testimony." *Crime, Justice & Am., Inc. v. Smith*, 2014 U.S. Dist. LEXIS 141388, at *9 (E.D. Cal. Oct. 2, 2014) (contrasting a lay opinion, which "is rationally based on the witness's perception and not based on scientific, technical, or other specialized knowledge.").

There can be no dispute that Mr. Nash's proposed testimony is based on his specialized knowledge, not on his rational perception of the facts at issue.  Mr. Nash is not a percipient witness.  He did not witness any of the conduct that gives rise to BTL's claims.  In fact, it does not appear that Mr. Nash ever even viewed the *Twiharder* motion picture.  (Dkt. 116.)  Mr. Nash was retained by BTL at least as early as April 2013 to provide sales projections for 20 films other than BTL's film *Twiharder*.  (Dkt. 75-33, pp. 17-26.)[9]

The documents attached to Mr. Nash's declaration confirm that Mr. Nash's testimony is subject to Fed.R.Evid. 702.  According to the documents, Mr. Nash and his company, Nash Information Services, LLC, have, since 1997, "developed its

---

[9]     As far as Summit can tell, Mr. Nash was not aware that he was preparing sales projections to establish BTL's lost profit damages.  In fact, the Nash financial estimates appear to have been created for the purposes of presenting to potential investors in *Twiharder*.  (*See, e.g.*, Dkt. 75-33, p. 1 ("The projection both helps to set expectations for investors, and is also useful when negotiating with potential distributors.").)  Furthermore, the Nash financial estimates make it clear that "the sales projection is *not* a predication of how much a particular movie is going to make."  (Dkt. 75-33, p. 4.)

Movie Industry Model, a sophisticated tool for analyzing past and future performance of movies, including ancillary revenue through DVD and Blu-ray sales and rentals, TV sales, and foreign revenues." (Dkt. 116-2, p. 2.) The documents identify, in basic terms, what Mr. Nash refers to as the "Sales Projection Methodology," which describes a specialized methodology used to "produce a model of the financial performance of a 'typical' movie of this type," which apparently means a movie of *Twiharder*'s "type." (Dkt. 116-2, p. 3; *see also* Dkt. 116-2, p. 4 (estimates produced using "Nash Information Services, LLC's analytical models".)) Mr. Nash uses his "analytical models" to create a "movie sales projection…for the profit/loss of a film project based on comparison projects and a set of assumptions" – assumptions that Mr. Nash never identifies or describes. (Dkt. 116-1, p. 3.) Because any testimony provided or evidence created by Mr. Nash was done after the fact, at BTL's request, and is based, not on Mr. Nash's rational perception of the facts at issue, but instead on Mr. Nash's alleged specialized knowledge and expertise, both the documents and any testimony from his are inadmissible under Fed.R.Civ.P. 37 and Fed.R.Evid. 702.

 *Third*, BTL has not even tried to argue or establish Nash that the "financial estimates" are non-hearsay or hearsay that falls within a statutory exception. Instead, BTL offers the declaration of Mr. Nash, in which he states (in full), "[a]t the request of BTLP's counsel, I make this certification in good faith under Rules 803(6)(A)-(C); 803(17); and 902(11) of the Federal Rules of Evidence." (Dkt. 116, ¶ 7.) This is not enough to prove that Mr. Nash's "financial estimates" are admissible over any hearsay objection. Mr. Nash is not a lawyer and there is no evidence that he reviewed or even understands the relevant Federal Rules of Evidence. Nor do the documents fall within the hearsay exceptions embodied in Fed.R.Evid. 803(6) or 803(17).

 As an initial matter, a "document prepared for purposes of litigation is not a business record because it is lacking in trustworthiness." *Paddack v. Dave*

*Christensen, Inc.*, 745 F.2d 1254, 1259 (9th Cir. 1984). BTL does not dispute that it contacted Mr. Nash to use his "financial estimates" in litigation. *See*, *e.g.*, *Lamb Eng'g & Constr. Co. v. Nebraska Pub. Power Dist.*, 103 F.3d 1422, 1432 n.5 (8th Cir. 1997) (affirming exclusion of report created by certified public accountant for use in connection with litigation). Unsurprisingly, the "financial estimates" themselves prove that they lack trustworthiness. Fed.R.Evid. 803(6)(E) (hearsay exception does not apply where "the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.") Mr. Nash, himself, disclaims the accuracy of his "financial estimates," stating "the sales projection is *not* a prediction of how much a particular movie is going to make" and that Nash Information Services, LLC does "not make an evaluation of how likely the[] assumptions [underlying its sales projection] are to turn out to be true." (Dkt. 116-1, p. 3.) Mr. Nash also states that the "revenue and expense figures for comparable films are estimates based on [Nash Information Services, LLC] industry tracking," but fails to detail how the estimates are actually determined. (*Id.*) BTL's entire claim for lost profits is based on one of these unexplained "estimates."

Similarly, the "financial estimates" do not and cannot qualify for the hearsay exception identified in Fed.R.Evid. 803(17). They were created by Mr. Nash for BTL. There is no evidence that anyone other than BTL, Summit and the Court have ever seen the "financial estimates" Mr. Nash prepared for BTL, let alone that the documents prepared for BTL "are generally relied on by the public or be persons in particular occupations." Fed.R.Evid. 803(17). The self-serving statement in Mr. Nash's declaration is a verbatim copy of the language of Fed.R.Evid. 803(17) is insufficient to establish that the documents prepared for BTL fall within the hearsay exception. *See*, *e.g.*, *Crane v. Crest Tankers*, 47 F.3d 292, 296 (8th Cir. Mo. 1995) (evidence excluded because proponent "made no showing and offered no foundation that the exhibit is generally used or relied upon by the public or persons in the legal or other professions.").

*Fourth*, BTL cannot lay a foundation for the "financial estimates." Mr. Nash's declaration does not lay a foundation. It does not provide anything more than a cursory description of the methodology use to create undefined "financial estimates." (Dkt. 116, ¶¶ 8-10.) This is insufficient. *See*, *e.g.*, *In re Vaughan*, 471 B.R. 263 (Bankr. D.N.M. 2012) (excluding expert affidavit because it failed to describe methodology sufficiently for court to evaluate and "answers none of the questions the Supreme Court found relevant to admission of expert testimony" in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)). Nor can BTL lay a foundation for the "financial estimates" at trial. Mr. Nash will not testify at trial (Dkt. 116, ¶ 4.), nor should he, as he was not properly disclosed by BTL. (Dkt. 104.) Contrary to its contention in its opposition, BTL's principals cannot lay a foundation for the "financial estimates." (Opp. at 21:23-22:2.)[10] There is no evidence that BTL's principals have any

───────────────────

[10]   BTL contends that its principals can provide "lay testimony about the data purchased from Nash Communications, LLC [*sic*], as well as box office revenues in general." (Opp. at 21:25-27.) BTL's principals can certainly testify about the actions they took to obtain the "financial estimates," but they cannot testify to anything contained therein. Nor can they testify to BTL's alleged lost profits. BTL's lost profit analysis is not based "on straightforward, commonsense calculations," but instead detailed financial analysis provided by a third-party, of which BTL lacks any personal knowledge. For that reason, among others (including that they are out-of-jurisdiction and not interpreting the relevant law), the cases cited by BTL to support its argument that its principals can testify to its lost profit damages are inapplicable. *See*, *e.g.*, *Lifewise Master Funding v. Telebank*, 374 F.3d 917, 929-30 (10th Cir. 2004) (testimony of president of company about lost profits inadmissible because "he does not have personal knowledge of the factors used [in the] damages model to estimate its lost profits" and any such testimony was not "rationally based on [the president's] perception."); *Securiton Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265 (2d Cir. 1995) (business owner calculating lost profits based on actual decrease in sales, which business owner has personal knowledge of). Regardless, whether BTL can provide this testimony at trial is irrelevant to a motion for summary judgment. BTL has had years to collect this evidence, and has failed to do so. In fact, BTL and its principals have refused to appear for depositions that

1  understanding, whatsoever, of how Mr. Nash prepared his financial estimates.

2  Indeed, Mr. Nash states that he is precluded from testifying as an expert (Dkt. 116,

3  p. ¶ 4).  As a result, BTL is trying to introduce Mr. Nash's expert testimony through

4  BTL's principals, which is improper opinion and hearsay.

5        *Fifth*, BTL has produced no evidence whatsoever establishing that the

6  "financial estimates" produced by Mr. Nash for BTL are relevant to its claim for at

7  least $6.4 million in "lost profit" damages.  BTL argues, based solely on conclusory

8  legal argument, that the motion picture *Breaking Wind* can serve as a "yardstick to

9  establish the revenues *Twiharder* would have made but for Summit's interference."

10  (Opp. at 21:14-16.)  BTL does not dispute that its own allegations undermine any

11  relevance argument, as BTL alleges several key differences between *Breaking Wind*

12  and *Twiharder* including, but not limited to, that *Breaking Wind* was released

13  theatrically (there is no evidence that *Twiharder* was going to be released

14  theatrically, or that there was any interest in a theatrical release), that several

15  versions of *Breaking Wind* were released on DVD (no such release for *Twiharder*),

16  and that "*Breaking Wind*…embodies X-Rated or semi-pornographic material

17  infused with grotesque scatological slapstick."  (Dkt. 75 at ¶¶ 73-80.)

18        Nor does BTL address other differences between the motion pictures

19  including, but not limited to, production budgets, marketing budgets, casts, and

20  advertising.  In short, *Breaking Wind* is completely irrelevant to BTL's request for

21  special damages.  As Mr. Nash stated to BTL, "the actual performance of a movie

22  depends on many factors," including, but not limited to, "budget and genre of the

23  film, the experience and 'bankability' of the key talent involved," whether the "film

24  is competently made, appropriately marketed, and will be received positively by

25  audiences," "whether the film gets picked up by an appropriate distributor," and

26  "how popular it is with audiences."  (Dkt. 116-1, p. 3.)  BTL has not attempted to

27  

28  were timely noticed by Summit.  (Dkt. 117-2, ¶¶ 8, 11.)

1   introduce evidence of any of these factors to establish that *Breaking Wind* and

2   *Twiharder* are indeed comparable.

3        Finally, BTL has not provided any explanation or justification for Mr. Nash's

4   decision to do an estimate of *Breaking Wind*'s gross revenues "over a seven-year-

5   period." (Opp. at 21:19-23.)  BTL has not established when *Twiharder* was to be

6   released (if at all).  In any event, *Twiharder* could not have been released any earlier

7   than June 2012 (when BTL attempted to secure distribution and insurance).  (Dkt. 1,

8   ¶¶ 106-109.)  Even if BTL had lost profits, there is no basis for seeking what BTL

9   purports is seven years of *Breaking Wind*'s gross revenues.

10        In short, there is no basis for using *Breaking Wind* (or any other purportedly

11  "comparable" motion pictures) as a "yardstick" for *Twiharder* other than BTL's

12  conclusory arguments.  They are irrelevant and evidence related to them is

13  inadmissible.  The cases cited by BTL, which have similar circumstances, confirm

14  this.  *Schonfeld v. Hilliard*, 218 F.3d 164, 174 (2d Cir. 2000) (affirming exclusion of

15  lost profits based upon comparison between plaintiff's cable television channel and

16  other channel because "[i]t rested on a foundation of sand.  Schonfeld failed to

17  establish the high degree of correlation between [his cable channel] and the

18  proffered firms…upon which the probative quality of this evidence depends.").

19        Because the "financial estimates" produced by Bruce Nash – which BTL

20  admits are the only "evidence" of its purported lost profits – are inadmissible for

21  several reasons, BTL's prima facie tort claim fails as a matter of law.

22            **b.    Even If Admissible, BTL's Purported Evidence Of**
23                **Lost Profits Is Insufficient As A Matter Of Law**

24        As BTL's own case law confirms, "[s]ubject as they are to the changing

25  whims and artistic tastes of the general public, claims for profits lost in unsuccessful

26  entertainment ventures have received a chilly reception in the New York courts."

27  *Schonfeld*, 218 F.3d at 174.  Lost profits "may not be merely speculative, possible or

28  imaginary."  *Id*. at 172.  Where, as here, the party seeking lost profits is a "new

business venture," the evidence of purported lost profits "receives greater scrutiny because there is no track record upon which to base an estimate." *Id*.[11] "Projections of future profits based upon 'a multitude of assumptions' that require 'speculation and conjecture' and few known factors do not provide the requisite certainty." *Id*.

As discussed above, Mr. Nash's "financial estimates" are based on myriad assumptions, which Mr. Nash fails to describe or expand on. (*See*, *e.g.*, Dkt. 116-1, p.3 ("sales projection...based on...set of assumptions"; Nash Information Services, LLC does "not make an evaluation of how likely these assumptions are to turn out to be true").) Even when provided through an expert witness testimony (which BTL admits it will not and cannot do), this type of analysis is insufficient to establish lost profits as a matter of law. *See*, *e.g.*, *Schonfeld*, 218 F.3d at 173 (affirming district court's order granting summary judgment finding that ("Here, the district court concluded that the Channel was a new entertainment venture similar to the proposed stadium in [*Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 267 (1986)]. The operating entity's profits, the court noted, 'were purely hypothetical, stemming from the sale of untested programming to a hypothetical subscriber base, sold to advertisers at a hypothetical price and supported by hypothetical investors and

---

[11]   There is no dispute that BTL qualifies as a "new business venture." BTL was formed for the express purpose of producing and seeking to distribute *Twiharder* and there is no evidence that BTL, or either of its principals, had even produced or distributed a film prior to *Twiharder*. (*See*, *e.g.*, Dkt. 1 at ¶¶ 9, 82-102.) *See also Schonfeld*, 218 F.3d at 173 (affirming district court ruling that party seeking lost profits was engaged in a "new business venture" because, among other reasons, it would have been introducing "a new product," a television channel, it had "no established customer base" and it had "never...operated a cable channel, so there is no historic record from which lost profits could be projected."). Furthermore, BTL's contention that "[l]ost-profit damages may be proven where the new business venture is selling products similar to other products within a known market" is not binding (it is an Illinois case) and not applicable (the party claiming lost profits, a drug manufacturer, introduced evidence of sales of identical drugs through an expert witness, not through speculative and self-interested testimony from lay witnesses).

carriers.'  After reviewing the seemingly endless list of assumptions upon which Schonfeld's expert relied in determining lost profits, the court held that Schonfeld could establish neither the existence nor the amount of lost profits with reasonable certainty….  We fully agree with the district court's analysis.") (internal citations omitted).  Any testimony from BTL's principals regarding alleged lost profits is similarly insufficient.  *Id.* at 173 ("[T]he entrepreneur's 'cheerful prognostications' are not enough" to establish lost profits to a reasonable certainty.).

### 3. BTL's Claim For $125,000,000 In "Lost Business Opportunity" Damages Fails As A Matter Of Law

BTL's seeks – as an apparent alternative to the lost profits it seeks – damages for "lost business opportunity" in the amount of $125 million.  (Opp. at 23:1-24:20.)  This claim fails for several reasons.

BTL has cited no case law supporting "lost profit damages" for its prima facie tort claim.  In fact, as BTL concedes, the case law BTL cites applies only in the breach of contract context:  "[l]ost business opportunity damages may be awarded if the lost opportunities were within the contemplation of the parties at the time of **contracting** and the damages can be established with reasonable certainty." (Opp. at 23:3-7 (emphasis added).)  Thus, BTL's claim for "lost business opportunity" damages fails as a matter of law.

Even if "lost business opportunity" damages were recoverable, BTL has introduced no evidence <u>at all</u> in support of its $125 million demand.  BTL fails to even cite any evidence in its opposition.  (Opp. at 23:1-24:20.)  BTL, instead, introduces conclusory statements – such as "it was reasonably foreseeable that *Twiharder* could have yielded box office revenues on financial part with *Vampire Sucks* (2010)" or "*Vampires Sucks* (2012) [*sic*] can be used as a reasonably certain 'yardstick' to measure the revenues *Twiharder* could have earned had it been released theatrically" – as the sole support for its claim for $125 million.

The reason BTL has offered no evidence of its "lost business opportunity"

damages is because there is none.  There is no evidence that *Twiharder* was going to be released theatrically or that anyone, including BTL, had any interest in a theatrical release.[12]  And, just as with its argument regarding lost profits based on *Breaking Wind*, BTL has not produced any evidence supporting its argument that *Vampires Suck* should be treated as a "yardstick" for *Twiharder*.  BTL does not address the myriad differences between the motion pictures including, but not limited to, production budgets (documents introduced by BTL estimate *Vampires Suck*'s budget is approximately 200 times what BTL claims its total "out-of-pocket" costs related to *Twiharder* are, Dkt. 75-11, p. 4), marketing budgets, casts, advertising, release dates, distributors, and experience and recognition of creative talent, such as directors and writers.  Just as with *Breaking Wind*, BTL has not introduced a single piece of evidence supporting its conclusion that *Vampires Suck* should be treated as a "yardstick" for *Twiharder*.

### 4.   BTL *New* Claim For Punitive Damages Fails

BTL – aware that its claim for damages is unsupported and unsupportable – now, <u>for the first time</u>, asserts that it is "entitled to punitive damages for Summit's commission of a malicious tort."  (Opp. at 24:22-23.)  BTL did not include a prayer for punitive damages in its complaint.   (Dkt. 1, Prayer for Relief, ¶¶ 5 ("Plaintiff seeks compensatory damages"), 6 ("Plaintiff respectfully seeks its full costs and award of reasonable attorneys' fees…."").)  For this reason alone, any claim for punitive damages should fail as a matter of law.

Even if BTL had properly pled a request for punitive damages (it did not), BTL's purported punitive damages claim still fails on substantive grounds.  Punitive damages may not be awarded in the absence of an award of compensatory damages.

---

[12]     The fact that BTL had not sought any theatrical distribution for *Twiharder* – and, in fact, appears to have not been interested in doing so – appears to be how BTL distinguishes between its nearly identical claims for "lost profits" and "lost business opportunity."

*Virgilio v. City of New York*, 407 F.3d 105, 117 (2d Cir. 2005) ("[U]nder New York law [punitive damages] cannot be invoked without some compensatory injury. Once a claim for compensatory injuries is barred, the possibility of a punitive award is likewise relinquished.") (internal citations omitted).  Because BTL cannot establish its claim for compensatory, its purported punitive damages claim fails.

Furthermore, even if BTL could pursue its claim for punitive damages, it fails as a matter of law, as the case law cited by BTL confirms.  "Punitive damages are permitted when the defendant's wrongdoing is not simply intentional but 'evince[s] a high degree of moral turpitude and demonstrate[s] such wanton dishonesty as to imply criminal indifference to civil obligations."  *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 489 (2007) (citations omitted).  Punitive damages may only be sought:

> when the wrongdoing was deliberate and has the character of outrage frequently associated with crime.  The misconduct must be exceptional, as when the wrongdoer has acted maliciously, wantonly, or with a recklessness that betokens an improper motive or vindictiveness…or has engaged in outrageous or oppressive intentional misconduct or with reckless or wanton disregard of safety or rights.

*Id*. (internal quotations and citations omitted); *see also Marinaccio v Town of Clarence*, 20 N.Y.3d 506, 511 (2013) ("[S]tandard for imposing punitive damages is a strict one and punitive damages will be awarded only in exceptional cases, the conduct justifying such an award must manifest spite or malice, or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called willful [*sic*] or wanton.") (internal quotations and citations omitted).

BTL has not introduced any actual evidence to support its new claim for punitive damages, let alone meet the "strict" standard for the imposition of such an extraordinary remedy.  BTL's request for punitive damages is based, solely, on BTL's conclusory arguments that Summit is an "overly aggressive IP enforcer" that, through "reckless IP enforcement tactics" has "victimized BTLP for years."  (Opp. at 25:13-22.)  BTL has offered no admissible evidence to support its conclusory

argument.[13]  BTL cannot rely solely on argument to establish meet the strict standard for punitive damages.  Accordingly, BTL's new claim for punitive damages fails as a matter of law.  *Stormes v United Water N.Y., Inc.*, 84 A.D.3d 1351 (N.Y. App. Div. 2d Dep't 2011) (granting judgment as a matter of law on claim for punitive damages because "no evidence tending to establish that their conduct rose to the level of moral culpability required to impose punitive damages.").

## V.   CONCLUSION

For the above reasons and the reasons set forth in its Motion for Summary Adjudication on BTL's Third Claim for Prima Facie Tort, summary adjudication should be granted as to BTL's claim for prima facie tort.

Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

Dated:  November 3, 2014        By: /s/ Jill M. Pietrini
                                    Jill M. Pietrini

                                Attorneys for Defendant and Counterclaimant

---

[13]    BTL cites "Ex. K (BTL_000497)" and "Ex. K (BTL_000501)."  There is no Exhibit K attached to declaration of Bruch Nash and no Exhibit K was submitted with BTL's opposition.  To the extent that BTL refers to "Exhibit K" to its complaint (Dkt. 1), the "evidence" is merely inadmissible hearsay and expert opinion for the reasons set forth in Summit's Motion *in Limine* No. 9.  (Dkt. 111.) Furthermore, this inadmissible evidence is insufficient to meet BTL's burden, particularly given that the "American legal scholars and journalists" upon which BTL relies concede that that law is "on Summit's side."  (Dkt. 1, Ex. K at BTL_000497.)  As noted,  Summit was not alone in assessing *Twiharder* as an infringement of its rights.  (Mot. at 13:7-14:5.)  BTL fails to address this evidence – evidence that it introduced – on opposition.

PROOF OF SERVICE
STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California. My business address is 1901 Avenue of the Stars, Suite 1600, Los Angeles, CA 90067-6055.

On November 3, 2014, I served true copies of the following document(s) described as **DEFENDANT AND COUNTERCLAIMANT SUMMIT ENTERTAINMENT, LLC'S REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION ON PLAINTIFF BETWEEN THE LINES PRODUCTIONS, LLC'S THIRD CLAIM FOR PRIMA FACIE TORT** on the interested parties in this action as follows:

James H. Freeman, Esq.              Steve Lowe, Esq.
J.H. Freeman Law                    LOWE & ASSOCIATES, P.C.
3 Columbus Circle, 15 FL            11400 Olympic Boulevard, Suite 640
New York, NY 10019                  Los Angeles, CA  90064
Tel:  (212) 931-8535                Tel:  (310) 477-5811
Fax:  (212) 496-5870                Fax:  (310) 477-7672
james@jhfreemanlaw.com              steve@lowelaw.com

**BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on November 3, 2014, at Los Angeles, California.

/s/ Latrina Martin
Latrina Martin

SMRH:434585775.2

-25-