JAMES H. FREEMAN
*Admitted Pro Hac Vice*
JH FREEMAN LAW
3 Columbus Circle, 15th Floor
New York, NY 10019
Tel: (212) 931-8535
james@jhfreemanlaw.com

STEVE LOWE (Cal. Bar #122208)
LOWE & ASSOCIATES, P.C.
11400 Olympic Blvd., Suite 640
Los Angeles, CA 90064
Tel: (310) 477-5811 / Fax: (310) 477-7672
steven@lowelaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| BETWEEN THE LINES PRODUCTIONS, LLC, a California limited liability Company, | Case No. 2:14-cv-00104-R (PJWx) |
| Plaintiff, | Hon. Judge Manuel L. Real |
| vs. | **COUNTER-DEFENDANT BETWEEN THE LINES PRODUCTIONS LLC'S REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON SUMMIT's COUNTERCLAIMS** |
| LIONS GATE ENTERTAINMENT CORP., a British Columbia corporation, and SUMMIT ENTERTAINMENT, LLC, a Delaware limited liability company | |
| Defendants. | Hearing Date: |
| SUMMIT ENTERTAINMENT, LLC, | Date: November 17, 2014 Time: 10:00 a.m. Ctrm: 8 Judge: Hon. Manuel L. Real |
| Counterclaimant | |
| vs. | |
| BETWEEN THE LINES PRODUCTIONS, LLC | |
| Counter-Defendants | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## ARGUMENT

## NO MATERIAL DISPUTE OF FACT EXISTS TO PRECLUDE THE COURT'S FINDING OF BTLP'S NON-INFRINGEMENT OF THE COPYRIGHT ACT

**A.    THE STATUTORY "FAIR USE" FACTORS UNDER 17 U.S.C. 107 WEIGH IN FAVOR OF THE COURT'S FINDING OF NON-INFRINGEMENT**

"Although the issue of fair use is a mixed question of law and fact, the court may resolve issues of fair use at the summary judgment stage where there are no genuine issues of material fact as to such issues." Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 608 (2d Cir. 2006)

Here, Summit has failed to show the existence of any material disputes of fact concerning whether *Twiharder* is a non-infringing Fair Use under 17 U.S.C. 107. All that remains is the parties' disputes concerning the questions of law as to  whether *Twiharder* is a parody.

**(1)    FACTOR #1 – "PURPOSE AND CHARACTER OF USE" - Weighs in BTLP's Favor**

> **(a)    There is No Material Dispute of Fact Concerning the "Character of Use" Because the Parodic Character of BTLP's Work Presents an Objective Legal Question**

A work is a parody for purposes of copyright analysis "if its aim is to comment upon or criticize a prior work by appropriating elements of the original in creating a new artistic, as opposed to scholarly or journalistic, work." Suntrust, 268 F.3d at 1268–69.  "The question is simply whether a parody may reasonably be perceived in the content.  Campbell

v. Acuff-Rose Music, Inc., 510 U.S. 569, 582-83, 594 (1994).

In the Ninth Circuit, the question of reasonable perception is one of law.  Mattel, Inc. v. Walking Mountain Prods., 353 F.3d 792, 801-02, 806 (9th Cir. 2003) (finding that the work could reasonably be perceived as a parody, and holding the use was fair).  "What is critical is how the work in question appears to the reasonable observer, not simply what an artist might say about a particular piece or body of work." Caricou 714 F.3d 694, 708 (2013).

Since the U.S. Supreme Court's ruling in Campbell, a judicial determination that the work can be "reasonably perceived" as parody is – without exception - *ultimately* dispositive of a finding of fair use in the parodist's favor under section 107.   See, e.g., Louis Vuitton Malletier v. Haute Diggity Dog, LLC, 507 F.3d 252, 269-70 (4th Cir. 2007) (summarily finding parody and fair use); Suntrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1268, 1276 (11th Cir. 2001) (finding the work could be "reasonably perceived" to be a parody and holding fair use); Leibovitz v. Paramount Pictures Corp., 137 F.3d 109, 114-15, 117 (2d Cir. 1998) (same); Bourne v. Twentieth Century Fox Film Corp., 602 F. Supp. 2d 499, 506-08, 511 (S.D.N.Y. 2009) (same); Burnett v. Twentieth Century Fox Film Corp., 491 F. Supp. 2d 962, 969, 971 (C.D. Cal. 2007) (same); MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc., 2004 WL 434404, at *13, *15 (S.D.N.Y. Mar. 8, 2004) (same); Abilene Music, Inc., v. Sony Entm't, Inc., 320 F. Supp. 2d 84, 89-90, 94-95 (S.D.N.Y. 2003) (same); World Wrestling Fed'n Entm't v. Big Dog Holdings, Inc., 280 F. Supp. 2d 413, 427-28, 430 (W.D. Pa. 2003) (same); Mattel, Inc. v. Pitt, 229 F. Supp. 2d 315 (S.D.N.Y. 2002); Kane v. Comedy Partners, 2003 WL 22383387 (S.D.N.Y. Oct. 16, 2003) (same); Lyons

P'ship v. Giannoulas, 14 F. Supp. 2d 947 (N.D. Tex. 1998) (same); Jackson v. Warner Bros., Inc., 993 F. Supp. 585 (E.D. Mich. 1997) (same); see also Lucasfilm Ltd., v. Media Mkt. Grp., Ltd., 182 F. Supp. 2d 897, 901 (N.D. Cal. 2002) (applying the reasonably-perceived standard on a motion for a preliminary injunction, finding a parody, and holding that the plaintiff was unlikely to prevail on its copyright infringement action because the defendant's use was fair).

**(b)   BTLP's *Twiharder* Feature and Movie Promo Materials are Substantially Transformative**

"[T]he goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. Such works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright ... and the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." Campbell v. Acuff-Rose Music Inc., 510 US 569, 579 (1994) (citations omitted). "A transformative parody "comment[s], through ridicule, on what a viewer might reasonably think is the undue self importance conveyed by the subject of the [original work]." Leibovitz v. Paramount Pictures, 137 F.3d 109, 114-115 (2d Cir. 1998). [1]

A use is considered transformative "where a defendant changes a plaintiff's copyrighted work or uses the plaintiff's copyrighted work in a different context such that the plaintiff's work is transformed into a new creation." Wall Data Inc. v. Los Angeles County Sheriff's Dept., 447 F.3d

---

[1] See WEBSTER's THIRD NEW INTERNATIONAL DICTIONARY 1643 (1986) defines *parody* as a "writing in which the language and style of an author or work is closely imitated for comic effect or in ridicule often with certain peculiarities greatly heightened or exaggerated."

769, 778 (9th Cir.2006); <u>Lucasfilm v. MediaMarket Group</u>, 182 F. Supp. 2d 897, 901 (N.D. Cal. 2002) (finding a pornographic spoof to be protected as a "parody of Star Wars, in that it is a literary or artistic work that broadly mimics an author's characteristic style and holds it up to ridicule"); <u>Suntrust Bank v. Houghton Mifflin</u>, 268 F.3d. 1257, 1271 (11th Cir. 2001) ("The Wind Done Gone" held to be protected parody because it comments on the idealized portrait of the antebellum South portrayed in "Gone With The Wind" through inversions of characters such as the slave character, who instead of being the loyal and obedient "Pork" of the original is instead portrayed as the defiant "Garlic").

In creating a parody, the parodies inevitably borrows portions of the copyrighted work in order to evoke the work for purposes of comment or critique. <u>Campbell</u>, 510 U.S. at 580–81. The ability of an artist to make "similar statements through other means about society" does not necessarily preclude the artist from using a means that "conveys these messages in a particular way that is ripe for social comment," because the court does "not make judgments about what objects an artist should choose for their art." <u>Mattel, Inc. v. Walking Mountain Productions</u>, 353 F.3d 792, 802, n. 7 (9th Cir. 2003) (discussing the use of Barbie dolls in photographs of tableaus that undermined the traditional image of a Barbie doll); <u>Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.</u>, 886 F.2d 490, 494 (2d Cir. 1989) (stating that the "keystone of parody is imitation" and noting that "[a] parody must convey two simultaneous-- and contradictory-- messages: that it is the original, but also that it is not the original and is instead a parody. To the extent that it does only the former but not the latter, it is ... a poor parody").

Here, BTLP has produced objective, probative evidence in support of the Court's finding of non-infringement of the Copyright Act.  This relevant evidence includes:

(i) the motion pictures themselves, as published to audiences;

(ii) documents showing actual, "real-time" marketplace perceptions of *Twiharder* as a "parody" or "spoof" *The Twilight Saga*;

(iii) documents showing BTLP's good faith intent to transparently market *Twiharder* as a "parody" or "spoof" of The *Twilight Saga;*

(iv) documents showing published commentary about *Twilight's* controversial themes and messages;

(v) documents showing that *The Twilight Saga* is famous and culturally significant;

(vi) Documents showing that the themes and messages addressed by *The Twilight Saga* are matters of public concern subject to extensive debate in the press and in academia.

(vii) Documents showing that Summit objectively perceived *Twiharder* as a parody and did not perceive any threat of market displacement of its blockbuster films.

BTLP respectfully submits that all such evidence is relevant to the Court's determination of non-infringement.  The Court may weigh the "total mix" of information, including direct and circumstantial evidence, to reach its ultimate findings.

The most important fact to consider in determining non-infringement is an undisputed matter: the copyrighted content of the *Twiharder* and *Twilight* motion pictures themselves.  These audio-visual materials have already been published in their "final cut" forms and are not subject to

change on this motion.   The parties do not dispute the fact that the copyrighted content exists; they only dispute the legal conclusion to be drawn from viewing such content.

BTLP respectfully submits that its motion under Rule 56 on the defenses of First Amendment and Fair Use may be granted in BTLP's favor without any other evidence than the movies themselves.[2]

BTLP believes that the parodic character of *Twiharder* and the related promotional materials is self-evident and cannot be reasonably disputed. Summit argues (without any case citations) that BTLP has "failed" to meet its "burden of proof" by offering "any evidence of how *Twiharder* parodies the Twilight Motion Pictures."   [R. 99, PageID#: 3920:27-28].[3]   The "evidence" Summit demands is nothing more than an additional proffer of BTLP's subjective opinions – but with greater detail.[4]

---

[2] Federal Courts, including within this Circuit, have determined the issue of Fair Use on a motion to dismiss for failure to state a claim under Rule 12(b)(6) by reference to no other evidence on record than the content of the audio-visual materials themselves. See, e.g., Allen v. Scholastic, 739 F. Supp. 2d 642, 645 n. 1 (S.D.N.Y. 2011) ("[i]n copyright infringement actions, the works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings."); Sedgwick Claims Mgmt. Svcs. v. Delsman, 2009 U.S. Dist. LEXIS 61825, at *4 (N.D. Cal. July 16, 2009) (finding defendant's use of the plaintiffs photographs on a blog and in post cards was a fair use, and granting his Rule 12(b)(6) motion); Righthaven v. Realty One Group, 2010 WL 4115413, *3 (D. Nev., Oct. 19, 2010) (in copyright action, granting defendants' Rule 12(b)(6) motion to dismiss based on fair-use defense); Burnett, 491 F. Supp. 2d at 967 (in response to the defendants' Rule 12(b)(6) motion, the court explained that fair use may be decided "as a matter of law, where the facts are presumed or admitted.".

[3] to aid the Court in its independent review of the materials, and to refute Summit's opposition argument, BTLP herein identifies with greater particularlity the actual scenes, style and characters in Twiharder that parody the Twilight films

[4] Indeed, Summit's opposition brief is largely based on the notion that BTLP has not met its "burden" to establish the parodic character of BTLP's movie "scene-by-scene." See R. 99, Page ID#: 3919 ("BTL cannot meet its burden by simply describing Twiharder

---

**BTLP's REPLY BRIEF IN FURTHER SUPPORT OF ITS RULE 56 MOTION**

BTLP's motion picture *TwiHarder* is an original work of authorship; however it finds its inspiration through expressions of implied critique concerning certain themes, characters, styles, and attitudes propagated by *The Twilight Saga* movies, and is therefore dependent - in part - on the existence of Defendants' copyrighted work(s) for its own character.

*Twiharder* lampoons specific characters, scenes and dialogue from Twilight: New Moon and parodies the celebrity status and personalities of the lead actors of *The Twilight Saga* for comedic effect.  The caricatures displayed in *Twiharder* comment on Defendants' targeted works by using humor, satire and ironic imitation to point out absurdities in the plotline, acting and dialogue of the Twilight Saga films.

*Twiharder* is radically transformative of *Twilight: New Moon* by virtue of "adding something new, with a further purpose or different character, or altering it with new expression, meaning, or message."  Campbell, 510 U.S. 579  BTLP's  motion picture also comments on the celebrity status and fan-crazed followers of *The Twilight Saga* franchise. *Twiharder* uses only as much as necessary from the original feature works to evoke the Twilight Saga movies and there is a substantial number of original elements in the newly created work, including original storylines, characters and dialogue. *Twiharder* provides social benefits by shedding light on *New Moon*

---

and the alleged targets of its parody – the Twilight Motion Pictures – without citing to the actual scenes where . . . the Twilight Motion Pictures and is parodied in Twiharder.").  Summit cannot reasonably argue that BTLP has failed to proffer evidence in support of its First Amendment and Fair use defenses to copyright claims; it can only argue that more particularlity is warranted to support BTLP's own subjective opinion concerning *Twiharder's* parodic character.  To refute Summit's opposition, BTLP offers more particularity for the Court's consideration in the declaration of John Gearries, dated November 3, 2014.

specifically and *The Twilight Saga* pop culture phenomenon generally, and exhibits a new creative work in the process.

Without citing any case law authority, Summit argues that probative evidence on the record showing that *Twiharder* has been actually perceived in the "real-time" market as a parody or spoof is "irrelevant." Courts have used public perception to analyze parodic character. Abilene Music, Inc., v. Sony Entm't, Inc., 320 F. Supp. 2d 84, 91 (S.D.N.Y. 2003).

**(b)** **There is No Material Dispute of Fact Concerning the "Purpose of Use" because BTLP Concedes that it Sought to Exploit its Cinematic Work Parody to the Widest Audience Possible**

In Campbell, the Supreme Court instructed that the focus of the first-factor analysis should be on whether the work is transformative, rather than on the commercial character of the work. 510 U.S. at 584. If mere "commerciality carried presumptive force against a finding of fairness," the Court explained, such a "presumption would swallow nearly all of the illustrative [fair] uses listed in the preamble paragraph to § 107, since these activities are generally conducted for profit in this country." Id.

In this case, there is no material dispute of fact that BTLP intended to market and distribute its *Twiharder* film to the widest audience possible. As a creative author seeking to make its own contributions to society's free marketplace of ideas, BTLP makes no apologies about wanting its cinematic work product to be exhibited through all possible distribution channels – worldwide.

Accordingly, only legal questions remain concerning whether BTLP's

**BTLP's REPLY BRIEF IN FURTHER SUPPORT OF ITS RULE 56 MOTION**

9

"purpose of use" weighs for or against a finding of Fair Use. For the reasons stated below, BTLP contends that resolution of the legal question weighs in favor of Fair Use.

**First,** "[c]opyright protection expresses the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors." Mazer v. Stein, 347 U.S. 201, 219 (1954); see also Fox Film Corp. v. Doyal, 286 U.S. 123, 127 (1932) (Chief Justice Hughes) ("the primary object in conferring the [copyright] monopoly lie[s] in the general benefits derived by the public from the labors of authors." ). Well-standing principles of copyright law presume that an economic incentive exists for parodists to invest time, money and effort into creating and distributing the intellectual product of their own creative labor. Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303, 307 (2d Cir. 1966), cert denied, 385 U.S. 1009 (1967). ("All publications presumably are operated for profit . . . . "[B]oth commercial and artistic elements are involved in almost every work.").[5] Here, BTLP's intent to seek personal gain via the creation and distribution of its feature-length movie parody is entirely consistent with the policy underlying the Copyright Clause to "advance public welfare through the talents of authors."

---

[5] See, e.g., Time, Inc. v. Hill,  385 U.S. 374, 397, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) ("that books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment.' ") (quoting Joseph Burstyn, Inc. v. Wilson,  343 U.S. 495, 501–02 (1952)); Ann–Margret v. High Society Magazine, Inc.,  498 F.Supp. 401, 406 (S.D.N.Y.1980) ("[S]imple use in a magazine that is published and sold for profit does not constitute a use for advertising or trade sufficient to make out an actionable claim, even if its manner of use and placement was designed to sell the article so that it might be paid for and read.") (internal quotation marks omitted);

**Second,** "whether an author . . . is motivated in part by a desire for commercial gain, or 'whether [his publication] is designed for the popular market. . . has no bearing on whether a public benefit may be derived from such a work." Rosemont Enterprises, Inc., 366 F.2d at 307. Here, BTLP's intent to exploit its cinematic work to the widest audience possible has no bearing on whether the public welfare has been advanced by the introduction of *Twiharder* into the worldwide exhibition market for motion pictures. At its core, *Twiharder's* expressive content disseminates a genuine refutation of the ideals, morals, viewpoints, styles and attitudes propagated by *The Twilight Saga*. Just as a political candidate for the U.S. presidency stands her best chance of being elected by debating the incumbent in plain view of the widest audience possible, *Twiharder* achieves its maximum social benefit by reaching every individual on Earth who has ever been exposed to *The Twilight Saga's* controversial messages about sexual celibacy, female subordination, racial typecasting, teenage suicide and clansmanship.

**Third,** a genuine parodist should be entitled to earn whatever financial rewards success may bring from the mass market exploitation of its own creative work. This point was well-articulated by the Court in Cardtoons v. Major League Baseball Player Ass'n, 868 F. Supp. 1266, 1268 (N.D. Okla. 1994), which observed:

> "A parodist takes a person, exaggerates and distorts facets of the person until hilarity ensues, and markets the result. The result is not the equivalent of the original: the parodist has studied the original and modified it until it is something that could never be mistaken for its progenitor. It is reasonable that a parodist would seek compensation for his efforts, for though the parodist takes substantial inspiration from his subject, he creates something that did not exist before."

Here, BTLP principal members, John Gearries and Christopher Friel, incurred substantial time and resources to write a screenplay, produce and edit its film; promote and market the film for widescale distribution. It is no easy task for an independent filmmaker's motion picture to be chosen for distribution by mainstream distributors such as Gravitas or Warner Brothers. It is no easy task for *Twiharder* top be selected by two international film festivals, one in New York and one in Los Angeles. BTLP deserved to be rewarded for its contributions, to the extent that the public was ready, willing and able to pay for the privilege of viewing *Twiharder*. Summit's malicious intent to discriminate against BTLP's viewpoints and stylistic mode of expression. Because *Twiharder* represents a radically transformative feature-length motion picture that required substantial time, energy, labor, financial resources, and personal / professional dedication to originate, BTLP naturally seeks to share the fruit of its artistic creation with the widest audience possible.

**Fourth,** the U.S. Supreme Court has held that commercial intent of parodist is essentially irrelevant unless the work is not a genuine parody. Campbell, 510 U.S. at 582-85. The High Court cast doubt on the relevance of good faith in a fair use analysis. Id. at 585 n. 18 ("[e]ven if good faith were central to fair use, . . . [i]f the use is otherwise fair, then no permission need be sought or granted. Thus, being denied permission to use a work does not weigh against a finding of fair use.")

**Fifth,** every federal court to have considered artistic parody under Section 107 of the Copyright Act of 1976 is of the unanimous opinion that a parodists' commercial intent is largely irrelevant to the Fair Use determination. See, e.g., Arica Institute v. Palmer, 970 F.2d 1067, 1078 (2d

Cir. 1992) (holding that favored statutory uses, such as parody, receive fair-use protection regardless of any "concurrent commercial purpose"); Maxtone-Graham v. Burtchaell, 803 F.2d 1253, 1262 (2d Cir. 1986) ("[w]e do not read Section 107(1) as requiring us to make a clear-cut choice between two polar characterizations, 'commercial' and 'non-profit'; [w]ere that the case, fair use would be virtually obliterated, for '[a]ll publications presumably are operated for profit.'") (citations omitted); Mattel, 353 F.3d at 803 ("even works involving comment and criticism 'are generally conducted for profit in this country.'" (quoting Campbell, 510 U.S. at 584, Blanch, 467 F.3d at 257); Northland Family Planning Clinic, Inc. v. Center for Bio-Ethical Form, 868 F.Supp.2d 962 (C.D. Cal. 2012) ("commercial aspects of the accused work are less important when the work is significantly transformative"); Lyons,  179 F.3d at 38 (rejecting argument that defendant "intended to profit," as "even at its inception, [the use] was clearly meant as a parody").

**Sixth,** for purposes of the Copyright Act of 1976, *TwiHarder* is not "commercial speech" because it is not commercial advertising that proposes its audience to enter into a commercial transaction. *Twiharder* is NOT, when viewed upon its own merits, a commercial advertisement that proposes a transaction for goods or services.  Nor does the *Twiharder* film include product endorsements or product placements embedded within the substantive content of the movie. Plaintiff's full-length motion picture *TwiHarder* is pure, intrinsic speech content: a "motion picture" parody that functions to excite laughter in audiences by lampooning another well-known motion picture franchise.

**(2)   FACTOR #2 – "NATURE OF COPYRIGHTED WORK" - WEIGHS IN BTLP'S FAVOR BECAUSE IT IS ACCORDED NO WEIGHT IN PARODY CASES**

The second factor of the codified Fair Use analysis "is given little weight in parody cases ...." Suntrust, 268 F.3d at 1271. "[The second factor is not] terribly significant in the overall fair use balancing. In any event, it may weigh slightly against [the defendant]." Mattel Inc., 353 F.3d at 803 (citation omitted); Leibovitz., 137 F.3d at 115 (2d Cir. 1998) ("The second factor therefore favors [the plaintiff], but the weight attributed to it in this case is slight."); Bourne, 602 F. Supp. 2d at 509 ("[T]he Court affords little weight to this second prong of the analysis."); Burnett, 491 F. Supp. 2d at 970 ("the second factor 'is not much help in resolving ... parody cases, since parodies almost invariably copy publicly known, expressive works.'" (quoting Campbell, 510 U.S. at 586); MasterCard Int'l Inc., 2004 WL 434404, at *14 ("This factor is without much force in most [parody] cases, and its relevance here is slight."); Abilene Music, Inc., 320 F. Supp. 2d at 93 (stating that the second factor is not much help in parody cases (citation omitted)); Mattel, Inc. v. Pitt, 229 F. Supp. 2d at 323  ("In a critical comment or parody analysis ... this factor, even if weighing in favor of plaintiff, assumes less importance than the other three factors."); Lyons P'ship v. Giannoulas, 14 F. Supp. 2d 947, 955 (N.D. Tex. 1998) ("[A]s the Supreme Court has recognized, the creative nature of an original will normally not provide much help in determining whether a parody of the original is fair use.").

Here, there is no dispute that Summit's motion picture *Twilight: New Moon* was published prior to the making of BTLP's motion picture *Twiharder* and is well-known in the world of popular culture, having

1
2
3
4
5

achieved substantial financial success in the global marketplace. Because parodies simulate publicly known, original works to achieve their comic purpose, the second factor of the Fair Use defense set forth in Section 107 is essentially neutral and therefore weighs in BTLP's favor (in light of the first factor).

6
7
8

**(3)    FACTOR #3 – "AMOUNT OR SUBSTANTIALITY" - WEIGHS IN BTLP'S FAVOR BECAUSE IT IS ACCORDED LITTLE OR NO WEIGHT IN ARTISTIC PARODY CASES**

9
10
11
12
13

The third factor focuses on "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). Courts ask "whether the quantity and value of the materials used[] are reasonable in relation to the purpose of the copying." Blanch, 467 F.3d at 257 (quotation marks omitted).

14
15
16
17
18
19
20
21
22
23
24
25
26
27

Where Courts find parodic character under factor number one, the third factor generally weighs in the parodist's favor because a parodist is expected to conjure up the original.  See, e.g., Leibovitz, 137 F.3d at 116 (holding that Campbell's "approach leaves the third factor with little, if any, weight against fair use so long as the first and fourth factors favor the parodist," and concluding that, in light of those two factors in the case, "the third factor does not help [the plaintiff], even though the degree of copying of protectable elements was extensive"); MasterCard Int'l Inc., 2004 WL 434404, at *14-15 (the third factor has "'little, if any, weight against fair use so long as the first and fourth factors favor the parodist,'" and noting that its finding that the work was a transformative parody obviated the need to weigh this factor independently."); Mattel Inc., 353 F.3d at 804 ("[I]n light of [the defendant's] parodic purpose and medium

28

used [,] ... [t]h[e] [third] factor also weighs in [the defendant's] favor."); <u>Bourne</u>, 602 F. Supp. 2d at 509-10 (analyzing the third factor and finding that "the third factor weighs in favor of Defendants"); <u>Burnett</u>, 491 F. Supp. 2d at 970-71 ("[The defendant's work] takes just enough of the imagery and accompanying theme music to make this crude depiction of the Charwoman character 'recognizable' to viewers. Accordingly, the third factor weighs in favor of fair use."); <u>World Wrestling Fed'n Entm't</u>, 280 F. Supp.2d at 42 (holding that the third factor carries "little, if any, weight against fair use when the first and fourth factors favor the parodist").

Here, BTLP has not digitally replicated or "sampled" any of the copyrighted materials of the Defendants' materials in this action.  BTLP has merely targeted *The Twilight Saga: New Moon* as objects of parody with the manifest intent to excite laughter and provoke thought in audiences. *Twiharder* criticizes its intended target through a recognizable allusion to its object through distorted imitation of the characters, events, and essence of the original.

In creating *Twiharder* as a full-length motion picture, BTLP has "conjured up" material from *The Twilight Saga: New Moon*, including inversions of characters, commentary on themes and images of the targeted work as more than just a fleeting evocation of the original to make its humorous point.  See <u>Elsmere Music, Inc. v. National Broadcasting Co.</u>, 623 F.2d 252, 253 n.1 (2d Cir. 1980) (in affirming the district court's decision, Second Circuit noted "that the concept of 'conjuring up' an original came into the copyright law not as a limitation on how much of an original may be used, but as a recognition that a parody frequently needs to be more than a fleeting evocation of an original in order to make its

humorous point. A parody is entitled at least to 'conjure up' the original."). *Twiharder* references characters, themes and plot points from Defendants' work in order to trigger recognition of *New Moon* in the mind of the ordinary observer.

BTLP did <u>not</u> create *Twiharder* with the intent to pass off Defendants' work as its own, but rather, with the specific intent to excite laughter in such ordinary observers by visually distorting elements from the targeted work for comedic effect. *Twiharder's* innovative form of expression and cinematic style is distinguishable from the expressive form and style on display in *New Moon* and therefore must be regarded in furtherance of its own creative purpose.  <u>Berlin v. E.C. Publications, Inc.</u>, 329 F.2d 541, 545-46 (2d Cir.), <u>cert. denied</u>, 379 U.S. 822 (1964) (finding fair use where there existed "disparities in theme, content and style between the original" and work parodied).

An ordinary observer who views *Twiharder* is immediately able to detect the actors depicted in *Twiharder* as caricatures of the actors featured in *New Moon* without any aid.  No ordinary observer could reasonably be deceived by *Twiharder.*  No ordinary observer could be reasonably led to believe that *Twiharder* is a literal picturization of Defendant's screenplay rights or adaptation of the book by Stephenie Meyer upon which the Defendants' movie *The Twilight Saga: New Moon* is based. The comedic nature of the Plaintiff's work parody dictates that the visually distorted caricatures featured in Plaintiff's motion picture Twiharder have, in many cases, entirely exaggerated motivations or the exact <u>opposite</u> motivations as the targeted protagonists featured in Defendant's motion picture. In short, audiences are able to reasonably perceive the parodic character of

the Plaintiff's new work *Twiharder.*

Plaintiff's full-length motion picture *Twiharder* represents in its entirety the fruit of Plaintiff's own independent planning, execution and effort.  Tin Pan Apple, Inc. v. Miller Brewing Co., 737 F. Supp. 826, 830 (S.D.N.Y. 1990).   Plaintiff has created its own "motion picture" using independent means and methods of production, whilst employing its own artistic preferences as to key casting decisions, staffing, equipment selection, financial budgeting, location, ambience, lighting techniques, dynamic contrast, cinematography, camera angles, dialogue, plot sequence, scene duration, sound mixing, music synchronization, special effects, editing transitions, color fixation, tonal modulation, and animated titling.

**(4)**   **Factor #4 – "Effect of Use Upon Potential Market" - Weighs in BTLP's Favor Because Artistic Parody is Presumed to Occupy a Distinct Market From the Original**

With respect to the fourth "fair use" factor, U.S. Courts presume that artistic parodies do NOT compete in the same market as the original works they are parodying.  See, e.g., Campbell, 510 U.S. at 59 ("Indeed, as to parody pure and simple, it is more likely that the new work will not affect the market for the original in a way cognizable under this factor, that is, by acting as a substitute for it.  This is so because the parody and the original usually serve different market functions.); NXIVM Corp. v. Ross Inst.,  364 F.3d 471, 481–82 (2d Cir. 2004) ("We have made clear that "our concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps  the market of the original work.") Fisher vs. Dees, 794 F.2d 432,

437-438 (9th Cir. 1986) ("the economic effect of a parody with which we are concerned is . . . whether it fulfills the demand for the original."); <u>Bourne Co. v. Twentieth Century Fox Film Corp.</u>, 602 F. Supp. 2d 499, 510 (S.D.N.Y. 2009) (finding that the defendant's work did not "usurp the market" for the plaintiff's work. It stated that "the parody and the original here serve different market functions"); <u>Burnett</u>, 491 F. Supp. 2d at 971 ("[T]he Court finds that commercial substitution is not likely in this case. Defendant is correct that the market demand for a non-parodic use of the Charwoman would not be fulfilled by a use that has the character in front of 'blow-up' dolls and 'XXX movies.'"); <u>MasterCard Int'l Inc.</u>, 2004 WL 434404, at *15 (finding that, although "[t]he [defendant's work] may serve a general overlapping market[:] the viewing public," it "serves an entirely different purpose than [the plaintiff's work]" and is therefore not infringing); <u>Mattel, Inc. v. Pitt</u>, 229 F. Supp. 2d at 324 ("Even if the Court were to find the element of parody less significant than either the commercial or the erotic element of Defendant's dolls, the dolls do not appear to pose any danger of usurping demand for Barbie dolls in the children's toys market."). A use that has no effect upon the market for, and value of, the work need not be prohibited in order to protect the author's incentive to create." <u>Hustler Magazine</u>, 796 F.2d at 1155-56 (internal quotation marks omitted) (alteration in original).

Here, presuming the Court find <i>Twiharder</i> to be a parody under factor one, BTLP is entitled to the presumption at law that its works will not usurp any of Summit's blockbuster Twilight films or movie posters. Accordingly, the burden is on Summit – not BTLP – to produce evidence of potential market usurpation.   See <u>Suntrust Bank,</u> 268 F.3d at 1274-75

(noting that the plaintiff focused only on the value of the works and presented no evidence of market harm, while the defendant "proffered [evidence] ... focused on market substitution and demonstrate[d] why [the defendant's] book is unlikely to displace sales of GWTW").

As a comedic parody, *Twiharder* clearly serves a different market function than the teen fantasy / vampire romance series of motion pictures produced by Defendants under *The Twilight Saga* moniker. The primary purpose of *Twiharder,* which is obviously of a comical nature, was <u>not</u> to directly compete with *Breaking Dawn* 2 in an attempt to usurp the market for Defendants' work.  Because *Twiharder* constitutes a transformative use under Section 107(1), it is not likely to supersede or displace the original New Moon motion picture upon which the parody was based. Twiharder was never positioned to compete with New Moon in the first place.  While New Moon was released in theaters on November 20, 2009 and appeared on home video on March 20, 2010, the *Twiharder* film was not scheduled to be released until October or November 2012, a full three years after the theatrical debut of *New Moon.*

Rather, the Twiharder feature film was to serve as a dissenting viewpoint and critical commentary on the stock themes and stereotypical characters utilized in New Moon. Twiharder therefore could not cause any market harm to New Moon or any other other *The Twilight Saga* films because although Plaintiff's work parody may serve to criticize Defendants' works, it cannot possibly usurp demand for the serious, dramatic work by imitating it through the comedic arts.

BTLP has presented ample evidence that *Twiharder* occupies the same relevant market as other *Twilight* parodies.  <u>See</u> R. 49, PageID#: 2005-2012

(discussing relevant markets of original works vs. movie spoofs); R. 51-1, PageID#: 2113-14 (showing different relevant markets between blockbuster movies and their derivative markets for movie spoofs). Here, because the imitation displayed by the Twiharder "motion picture" peaks the, it could not possibly harm the market of the original dramatic work. Moreover, Summit admitted that *Twiharder* occupies the same market as *Breaking Wind*, a direct market competitor. [Gearries Aff., R. 75, Ex. A [BTL_000043].

Accordingly, the fourth factor weighs in BTLP's favor.

### E.   PUBLIC POLICY WEIGHS IN FAVOR OF A FAIR USE FINDING TO PROTECT THE INCREASINGLY NARROW SUPPLY CHAIN OF GENUINE, UNAUTHORIZED PARODY

The "ultimate test of fair use ... is whether the copyright law's goal of 'promoting the Progress of Science and useful Arts' ... would be better served by allowing the use than by preventing it." Castle Rock, 150 F.3d at 141 (brackets and citation omitted).  The U.S. Supreme Court declared that "the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." Associated Press v. United States, 326 U.S. 1, 20 (1945). "It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market...."

In spite of its entertainment value, Americans' longstanding tradition of "making fun" of matters in the public spotlight is a hard fought civil freedom guaranteed by the U.S. constitution and worthy of substantial federal protection. 711 F.3d 334, 341 fn. 3 (2d Cir. 2013) (describing "parody" as "a highly valued means of expression under the

Constitution.")   (citations omitted).   "Destructive' parodies play an important role in social and literary criticism and thus merit protection even though they may discourage or discredit an original author."  Parody Defense, 96 Harv.L.Rev. at 1411; Fisher vs. Dees, 794 F.2d 432, 437-438 (9th Cir. 1986)

In 1952, the U.S. Supreme Court recognized that the viewpoints expressed in motion pictures were entitled to First Amendment protection. Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495 (1952).  The High Court observed that motion pictures are a particularly valuable form of free speech because they "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression." Id. at 343 U.S. 495.  In what's known as the "Miracle Decision," the U.S. Supreme Court outlawed censorship of speech content deemed  "sacrilegious" on grounds that well-known religious organizations did not need Government's protection from the dissemination of countervailing viewpoints.

Likewise, under U.S. law, popular works of art and famous tradenames do not receive Government protection from becoming the object of public ridicule.  See, e.g., Campbell vs. Acuff-Rose, 510 U.S. 569, 591-92 (1994) ("[A] lethal parody, like a scathing theater review, kills demand for the original, [but] does not produce a harm cognizable under the Copyright Act."); MCA, Inc. v. Wilson, 677 F.2d 180, 191 (2d Cir. 1981) (Mansfield, J., dissenting) ("[P]ermissible parody, whether or not in good taste, is the price an artist pays for success...."); Bourne v. Twentieth Century Fox, 602 F. Supp. 2d 499, 511 (S.D.N.Y. 2009) ("the owner of the

rights to a well-known work must expect, or at least tolerate, a parodist's deflating ridicule.") (citations and internal quotes omitted).[6]

Lampoons created by those who are "unauthorized" to speak are essential to the free marketplace of ideas because their very function is to challenge authority and, in doing so, reshape political views.  Back in 1975, for example, a new show called *Saturday Night Live* debuted on a national broadcast television, becoming instantly popular.   The weekly show featured comedian Chevy Chase performing bumbling pratfalls at the expense of President Gerald Ford (who had suffered a few clumsy episodes in public due to a bad knee).  Chase's outrageous depictions, which conveyed the unmistakeable impression that Ford's physical shortcomings made him unsuitable to lead the country, were later credited by the NEW YORK TIMES as influencing the outcome of the 1976 presidential election.   It was later revealed that Chevy Chase's merciless ridicule of Ford was not just for laughs: Chase voted for Jimmy Carter.

Not all systems of government grant such freedom to its inhabitants. Just months ago, a 29-year-old U.S. citizen was sentenced to jail in the United Arab Emirates for posting a parody video on YouTube that spoofed young Emirati men who have embraced hip-hop culture.[7]   Mr. Cassim was charged with violating the nation's cyber crime law which makes acts

---

[6] See also Jordashe Enters., Inc. v. Hogg Wyld, Ltd., 828 F.2d 1482, 1486 ("the requirement of trademark law is that a likely confusion of source, sponsorship, affiliation must be proven, which is not the same thing as a 'right' not to be made fun of.") (citations omitted). Cardtoons, L.C. vs. Major League Baseball Players Association, 95 F.3d 959 (10th Cir. 1996) ("Society does not have a significant interest in allowing a celebrity to protect the type of reputation that gives rise to parody.") (right of publicity)

[7] See *An American Is Going To Jail For A Year For Posting A Video On YouTube* http://www.businessinsider.com/man-in-jail-for-parody-video-2013-12

deemed damaging to the country's reputation punishable by jail time. This example shows how the First Amendment right to express unauthorized parody is, at it core, a declaration of the human right to speak freely without the fear of reprisal from the powers that be

### An Adverse Ruling on Fair Use Will Reinforce Summit's Destructive IP Enforcement Policy that ALL Parody Authors Require the Original Copyright Holders' Authorization

Throughout these proceedings, Summit has emphatically contended that work parody <u>must</u> be authorized. However, any requirement that a genuine parodist seek authorization from the copyright holder of the targeted work only ensures that a "chilling effect" will befall the supply market for genuine parody, leading to massive self-censorship and the ultimate eradication of all genuine parody from U.S. markets.

A fair use finding in BTLP's favor will reinforce the crucial holding that authors of critical derivative works do not require – and should not be expected to seek - authorization from the holder of the targeted work. <u>See, e.g.</u>, <u>Campbell v. Acuff–Rose Music Inc.</u>, 510 U.S. 569, 585 n.18 (1994) ("If the use is otherwise fair, then no permission need be sought or granted."); <u>Harper & Row v. Nation Enterprises</u>, 471 U.S. 539, 549 (1985) ("Fair use was traditionally defined as 'a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner *without his consent.*"</u>); Lewis Galoob Toys v. Nintendo, 964 F.2d 965, 969 (9th Cir. 1992) ("<u>Fair Use</u>  creates a "privilege to use copyrighted material in a reasonable manner without the consent of the copyright owner[.]"); <u>Fisher vs. Dees</u>, 794 F.2d 432, 437-438 (9th Cir. 1986) (**"**Parodists will seldom get permission from those whose works are parodied . . . Self-esteem is seldom

strong enough to permit the granting of permission even in exchange for a reasonable fee."   Leibovitz, 948 F. Supp. at 1226 (Courts have been realistic in acknowledging the "unlikelihood that the creators of imaginative works will license critical reviews or lampoons of their own productions." Mattel Inc. v. Walking Mountain Prods., 353 F.3d 792, 805 (9th Cir. 2003) (noting the plaintiff is not "likely [to] ... license an artist to create a work that is so critical of Barbie," and that "it [was] safe to assume that [the plaintiff] will not enter such a market or license others to do so"); Leibovitz, 137 F.3d at 116-17 (2d Cir. 1998) ("[The defendant was] not entitled to a licensing fee for a work that otherwise qualifies for the fair use defense as a parody."); Kane v. Comedy Partners, 2003 WL 22383387, at *6 (S.D.N.Y. Oct. 16, 2003) ( noting that the plaintiff was not entitled to licensing fees because the work was fair); World Wrestling Fed'n Entm't, Inc. v. Big Dog Holdings, Inc., 280 F. Supp. 2d 413, 429-30 (W.D. Pa. 2003) (holding that the plaintiff was "not entitled to a licensing fee for a work that otherwise qualifies for the fair use defense as a parody").

## ACCORDINGLY, BTLP HAS ESTABLISHED FAIR USE

**/JAMESHFREEMAN/**